Ik, Pieter-Jaap Klok, beëdigd vertaler van de Engelse en de Spaanse taal, beëdigd door de
Arrondissementsrechtbank te Breda, verklaar hierbij dat voorgaand document een getrouwe en
nauwkeurige vertaling in de Nederlandse taal is van de aangehechte brontekst geschreven in
de Engelse taal.

I, Pieter-Jaap Klok, Sworn Translator of the Dutch, English and Spanish languages, certified by
the Court of Justice of Breda, the Netherlands, certify that the above is a true and complete
Dutch translation of the original English text attached hereto.

Plaats: _Eindhoven_          Datum: 24 - 10 - 2018

# EXHIBIT B

**TO THE COURT OF FIRST INSTANCE OF CURAÇAO**
**24 OCTOBER 2018**

**Claimant appearing voluntarily**

# APPLICATION
# IN SUMMARY PROCEEDINGS


by


**PARMAN INTERNATIONAL B.V.**
having its registered office in Curaçao

Attorneys: Mrs. G. te Winkel and F.C. Leijdesdorff
(Jones Day, Amsterdam, the Netherlands)
Mr. A. Bach Kolling
(Bach Kolling Mediation & Law, Curaçao)

Claimant




vs.




**CENTRAL BANK OF CURAÇAO AND SINT MAARTEN**
having its registered office in Curaçao

Attorneys: Mrs. S.M. Altena, K.D. Keizer and S.N.I. Francisco

Respondent


1

**Claimant**:

**PARMAN INTERNATIONAL B.V.**, having its registered office and address at J.B. Gorsiraweg 4, Willemstad in Curaçao, hereinafter referred to as **Parman**, electing domicile at Concertgebouwplein 20, 1071 LN in Amsterdam at the offices of Jones Day, of which law firm *mr*. G. te Winkel is appointed as attorney, and Mahaaiweg 7 in Curaçao, at the offices of Bach Kolling Mediation & Law, of which law firm *mr*. A. Back Kolling is appointed as attorney and as such is authorized to sign and submit this document in that capacity, with the right of substitution.

This application for an interim injunction involves:

**Respondent**:

The **CENTRAL BANK OF CURAÇAO AND SINT MAARTEN,** having its registered office and address at Simon Bolivarplein 1, Willemstad, hereinafter referred to as **CBCS**.

2

# CONTENTS

1. INTRODUCTION ............................................................................................. 4
   A    Parties ....................................................................................................... 4
   B    Relevant facts ........................................................................................... 4
   C    Preliminary observations .......................................................................... 8
   D    Requested measures .................................................................................. 9
   E    Set-up of this petition ............................................................................. 11
2. NO EMERGENCY SITUATION .................................................................. 11
   A    Intercompany relationships ..................................................................... 11
   B    Alleged failure to follow up instructions ................................................ 13
   C    Transfer of USD 100 Million ................................................................. 15
   D    Conclusion .............................................................................................. 16
3. CBCS CONDUCT ........................................................................................ 16
4. NO EMERGENCY REGULATION FOR ENTITIES WITHOUT A LICENSE ....... 17
5. PROCEDURAL ERRORS ............................................................................ 18
   A    Introduction ............................................................................................ 18
   B    Violation of the principles of due process .............................................. 19
   C    Violation of general principles of due administration ............................. 21
   D    License withdrawal not yet irrevocable .................................................. 23
   E    Conclusion .............................................................................................. 25
6. REQUEST FOR COPIES/ACCESS UNDER ARTICLE 843A OF THE CCCP ....... 25
7. URGENT INTEREST .................................................................................... 27
8. COMPETENT COURT ................................................................................. 28

**THE CLAIMANT RESPECTFULLY SUBMITS:**

## 1.    INTRODUCTION

### A    Parties

1.1    The reason for this interim relief proceeding is the course of events regarding the proclamation of the emergency regulation on 4 and 6 July, 2018 with regard to ENNIA Caribe Holding N.V. (**ECH**), EC Investments B.V. (**EC Investments**), ENNIA Caribe Leven N.V. (**EC Leven**), ENNIA Caribe Schade N.V. (**EC Schade**), ENNIA Caribe Zorg N.V. (**EC Zorg**) respectively EC Holding N.V. (**EC Holding**), and the consequences for the (indirect) shareholders.

1.2    Parman International B.V. (**Parman**) is the parent company of ECH. ECH and its (direct and indirect) subsidiaries will hereinafter be jointly referred to as the **ENNIA Group**.

1.3    EC Leven, EC Schade and EC Zorg (hereinafter jointly referred to as the **Insurers**) are part of the ENNIA Group. They are all 100% subsidiaries of ECH. These Insurers, established 70 years ago in Curaçao, currently form the largest insurance business in the Dutch Caribbean. As all other financial institutions, the Insurers are supervised by the CBCS.

1.4    ECH, EC Investments and EC Holding, jointly referred to as the **Unregulated Entities**, also form part of the ENNIA Group, but are not – and never have been – supervised by the CBCS as they are not subject to a licensing obligation. Moreover, EC Holding does not hold assets, undertake activities or fulfill a role within the ENNIA Group; it is unclear why the CBCS included EC Holding in the emergency proceedings.

1.5    Below, under B and C, Parman will first set out the relevant facts, to the extent it is able to produce these facts. As a consequence of the proclamation of the emergency regime, Parman is cut off from any information, documentation and other sources of communication regarding the ENNIA Group. Also the members of its Board, some of whom were also Board members of the above companies of the ENNIA Group, no longer have any access to the books and records of these companies. Hence, all that is submitted below as facts is derived from memory, documentation submitted by the CBCS and public sources.

### B    Relevant facts

1.6    On July 3, 2018, the CBCS abruptly and without advance notice revoked the licenses of the Insurers (**Exhibit 1**), most likely to enable its petition to the Court to proclaim emergency proceedings as per article 60 of the National Ordinance on Insurance Supervision (the **LTV**). The Insurers immediately filed an objection with respect to the revocation of the licenses. However, after the emergency proceedings were opened, the CBCS, now acting as managing director of the Insurers pursuant to article 63 (1) LTV, withdrew this objection.

1.7    On July 3, 2018, the CBCS also formally applied to the Court to proclaim emergency proceedings on the Insurers as well as the Unregulated Entities ECH and EC Investments (the **CBCS Petition) (Exhibit 2**). Subsequently, the Court summoned the relevant parties to appear at the hearing on the CBCS Petition on July 4, 2018 at 10:00 a.m.

1.8    Early in the morning before the hearing on the CBCS Petition, the Insurers had a hearing to request a preliminary injunction to suspend the hearing on the CBCS Petition while the objection or an appeal against the revocation of the licenses was still pending. At this hearing, the Insurers informed the Court that it would be a violation of the provisions of the LTV to proclaim emergency proceedings before the revocation of the licenses would have become irrevocable.

4

The Court denied this request at about 1:00 p.m. In the meantime at 10:30 a.m., the Court had summoned the Insurers, ECH and EC Investments to appear at the hearing on the CBCS Petition that same afternoon at 2:15 p.m. Not four hours later, the Court had proclaimed the emergency proceedings with regard to the Insurers, ECH and EC Investments (**Exhibit 3**).

1.9     Despite the complexities of the challenges associated with the consequences of an emergency proceeding, the Insurers thus had no more than at best a couple of hours to examine over 500 pages of material and exhibits submitted by the CBCS.

1.10    On July 6, 2018, CBCS applied to the Court again to proclaim the emergency regulation to be applicable to EC Holding. It is unclear why the CBCS wanted to include EC Holding in the emergency proceedings as EC Holding does not hold assets, undertake activities or fulfill a role within the ENNIA Group. The CBCS' statements that it has been misinformed regarding the structure of the ENNIA Group and that EC Holding holds the shares in the Insurers are incorrect, as is the group chart that was provided to the Court on 6 July, 2018. The shares in EC Holding are held by ECH, as are the shares in the Insurers, making EC Holding a sister company of the Insurers. EC Holding does not hold any shares itself; it is an empty shelf company. If EC Holding had not first received notice of the request only 36 minutes before the hearing, it would have been able to explain this to the Court.

1.11    However, that was not the case and the CBCS' request to apply emergency proceedings to EC Holding was heard and granted by the Court on the same day that it was filed (**Exhibit 4**), again without providing EC Holding with proper notice or opportunity to prepare a defense.

1.12    The emergency regulation was proclaimed applicable to the ENNIA Group generally on the same grounds as the ones on which the licenses were revoked, namely because (i) ENNIA allegedly does not comply with the applicable solvency requirements, (ii) the Insurers' (co-)policymakers allegedly did not follow the instructions given by the Central Bank and the silent trustees[1], and (iii) because there was supposedly a reasonable fear that funds would be withdrawn from an Unregulated Entity.

1.13    With regard to the CBCS' first allegation, Parman notes the following. In September of 2015, CBCS changed the solvency requirements, as laid down in the *Valuation guidelines ARAS 2.7*, to the extent that the *inter-company claims* of the insurer could no longer be taken into account in determining the solvency ratio. As a result, the Insurers no longer technically fulfilled the prescribed minimal solvency requirements, as their balance sheets partly consist of *inter-company claims*. However, the inability to meet the solvency requirements is exclusively the result of the group structure and is as such easily remedied by restructuring the ENNIA Group's assets, which will be explained further down.

1.14    With regard to CBCS' second and third allegation; in Chapter 2.B, Parman will explain that the allegation that the Insurers' (co-)policymakers have not followed the instructions given by the CBCS and the silent trustees is unfounded. In Chapter 2.C, Parman will explain that there was no reasonable fear that funds would be withdrawn from an Unregulated Entity.

1.15    The alleged grounds put forward by the CBCS for proclaiming the emergency regulation are improperly formulated and inadequately substantiated. There was no emergency situation that justified the proclamation of the emergency regulation. The CBCS did not provide any evidence that such an emergency situation existed.

---

[1]     The CBCS appointed two silent trustees at EC Leven with effect from 1 October, 2016.

1.16    As a result of the CBCS' reckless actions, Parman has lost control of its subsidiary companies. As already mentioned, the ENNIA Group was not even given the chance to defend itself adequately against the extreme requests from the CBCS. As such, not only the ENNIA Group itself, but also its shareholder Parman were harmed severely. Moreover, Parman now faces a lack of documentation, as it has no access to the documentation it needs to substantiate its claims in the proceedings at hand. The fact that the relevant companies of the ENNIA Group were not given the chance to properly defend themselves is even more unreasonable, considering that in the proceedings that led to the proclamation of the emergency regulation the CBCS by giving such unreasonable short notice basically escaped its burden of prove with regard to its allegations made against the ENNIA Group. It is only fair and reasonable that under these circumstances, in this proceeding the burden of proof is on the CBCS.

1.17    Having said that, Parman dispute the CBCS' allegation that there was a reasonable fear that the Insurers could not fulfill their obligations. There is no capital shortfall within the ENNIA Group. Nor are or were there any liquidity issues. This has been confirmed by the CBCS itself in its press conference on 5 July 2018 (**Exhibit 5**).[2] There is more than enough capital (or equity) and there is no risk that the Insurers may at any point in time no longer be able to fulfill their financial obligations. As such, the interests of the joint creditors were never at risk. As said, the inability to meet the solvency requirements is exclusively the result of the group structure and is as such easily remedied by restructuring the assets, so that the Insurers can also formally meet the required solvency level.

1.18    The ENNIA Group is well-capitalized. The approximate value of the assets of ECH is (in millions):

| | | |
|---|---|---|
| • ECI (assets) | ANG | 1,330 |
| - ANG 560 million cash (of which in total USD 155 has been paid to EC Leven) | | |
| - ANG 770 million worth of shares in Sun Resorts N.V., owner of Mullet Bay | | |
| • BDC (equity) | ANG | 325 |
| • ENNIA Aruba Equity Operating Entities | ANG | 60 |
| • EC Leven (retained earnings) | ANG | 90 |
| Total | ANG | 1,805 |

1.19    Hence, there is a value of ANG 1.805 billion in the ENNIA Group to cover the intercompany receivables of EC Leven in the amount of approximately ANG 1.3 billion. The healthy financial situation of the group is further supported by recently performed appraisals of EC Investments' assets, i.e. the shares EC Investments holds in Sun Resorts N.V. (**Sun Resorts**), which company owns Mullet Bay, an approximately 720.000 square meter piece of land in Sint Maarten. Soon after hurricane Irma, an appraisal was performed from which followed that the value is approximately USD 431.42 million, namely USD 600 per square meter. In April 2018, the most recent appraisal has been performed which resulted in the same value. The property's value is however a point of discussions between the CBCS and former management of the ENNIA Group. According to the CBCS, the property is worth much less than established by external appraisers engaged by the ENNIA Group. However, for years the CBCS has approved the financial statements which included the value of the Sun Resorts shares as per the appraisals of Mullet Bay obtained by the ENNIA Group. In addition, Parman notes that recently, a part of the Mullet Bay land has been sold to an independent party through Sotheby's International Realty

---

[2]    Exhibit 5, p.2, second paragraph.

6

for USD 2,4 million per acre (= approx. USD 593 per square meter). The land concerned was the least desirable part of Mullet Bay, as it has sight on two parking lots and is not beachfront. Nevertheless it was indeed sold around for around appraised value.

1.20    Finally, the healthy financial situation of the ENNIA Group is also supported by the stock price of the Kirby-shares (a New York stock market listed company) held by EC Investments. As will be explained in par. 2.1, on 13 September of 2017, EC Investments sold its shares in Stewart & Stevenson (**S&S**) to the Kirby Corporation for a total consideration of USD 283 million. The purchase price was paid partly in cash and partly in shares in the Kirby Corporation.

1.21    The Kirby-shares have generated substantial value for the ENNIA Group. Between September 13, 2017 (the closing date for the S&S transaction) and the days surrounding the revocation of the licenses and the imposition of the emergency proceedings, the stock prices for Kirby have significantly increased from USD 64,35 to USD 83.75 on July 3, 2018; a gain of approximately USD 20 million for the Insurers. However, the emergency regime caused Merrill Lynch to freeze the accounts of EC Investments under its control, preventing transactions from occurring in the securities accounts of EC Investments. Since the proclamation of the emergency regulations and the subsequent freeze of the Merrill Lynch accounts, the price has dropped to approximately USD 75. As such profit has evaporated as a direct consequence of the emergency regulation.

1.22    As said, there were no valid grounds for the proclamation of the emergency regulation considering the healthy financial situation of the ENNIA Group. This is illustrated by the fact that the Insurers were the first ones who were able to directly pay out all claims arising from hurricane Irma on Sint Maarten. The ability of the Insurers to fulfill these obligations is supported, among other things, by the guaranteed and fixed interest rate of 5% agreed upon in the loan agreements with EC Investments. Despite the actual returns of the investments by EC Investments, EC Leven is always guaranteed to receive a fixed interest rate of 5%. As such, the financial condition of the ENNIA Group is stable and the application for emergency proceedings was unjustified and unwarranted.

1.23    The ENNIA Group's only problem is that – solely as a result of a change of the solvency guidelines – the Insurers' balance sheet no longer technically meets the required minimum solvency ratio. The actual financial situation of the ENNIA Group, which has ample liquidity and capital assets, had not changed.

1.24    By withdrawing the Insurers' licenses and, additionally, requesting to proclaim the emergency regulation, the CBCS itself created an detrimental situation for the Insurers that did not exist until that time. The ENNIA Group has been suffering from unrest since the licenses were revoked and the emergency regulation was proclaimed (see also paragraphs 7.2 and 7.3). It is therefore a disgrace that the ENNIA Group was unable to (adequately) defend itself against the CBCS applications to proclaim the emergency regulation applicable, since the notice periods for the hearing of July 4th, 2018 (at 2:15 p.m.) and for submitting a defense against the request of July 6th, 2018 (ultimately at 4:15 p.m.) were so limited (being 3 hours and 45 minutes, and 36 minutes respectively) that any defense was practically made impossible. If the ENNIA Group had had the opportunity to defend itself against the CBCS applications, it could have proven that there was no need for the emergency regulation or the ensuing damages. After all, since the emergency regulation has been proclaimed now, the ENNIA Group is no longer managed by professionals with expertise, but by employees of CBCS who may not have the necessary knowledge and experience to manage an insurance company.

7

1.25    This process has resulted in a gross violation of the principle of *audi alteram partem*, which is all the more harmful since it concerns an application to proclaim an extreme measure as the emergency regulation, as a result of which the U.S. shareholders were *de facto* expropriated and to which proclamation there is no option of appeal.

1.26    On 13 August 2018, Parman as the (indirect) shareholder of the Insurers filed an appeal against the revocation of the licenses (**Exhibit 6**). On 9 October 2018, Parman submitted its grounds of appeal (**Exhibit 7**).

1.27    On 25 September 2018, the CBCS commenced Chapter 15 proceedings in New York in which the CBCS requests the court to recognize the proclamation of the emergency regulation with regard to the Insurers and the Unregulated Entities in the United States. On 24 October 2018, Parman has submitted an Objection against the CBCS' request with the United States Bankruptcy Court Southern District of New York. Partly in response to this action commenced by the CBCS, Parman decided to initiate the interim relief proceedings at hand.

**C    Preliminary observations**

1.28    In the period since the emergency ruling was proclaimed, Parman has had the opportunity to examine the CBCS Petition. The CBCS Petition includes the exhibits that were submitted to the Court. Before going in to the grounds put forward by the CBCS in the CBCS Petition, Parman would like to make the following observations.

a)    The solvency issues of EC Leven could be restored relatively easily, for example by doing the following:

- All book entries relating to asset transfers from EC Leven to the books of EC Investments, which were approved by CBCS, should be reversed. As a consequence of this correction, all receivables at EC Leven from EC Investments will be fully satisfied by payment in cash and/or cash equivalent and other assets.

- The receivables on the books of EC Leven to ECH can be fully satisfied by upstreaming retained earnings from Banco di Caribe with shareholders' approval. These funds can be subsequently used to pay off EC Leven.

These suggested solutions for the technical solvency issue are in line with the restructuring plans that were repeatedly drawn up by the ENNIA Group and that were extensively discussed with the CBCS in several meetings, amongst which the last meeting of June 21st, 2018.

b)    The prevention of the loss of qualified human resources as a result of the emergency proceedings is of critical importance. It is ENNIA Group's outstanding workforce that has made it possible for ENNIA Leven to emerge as the largest and the most successful Insurer in the Dutch Caribbean islands. Fortunately at this time the departure of qualified talent has not yet reached a critical level, but to maintain its qualified employees, it is very important that the emergency measures are swiftly brought to an end.

c)    In the insurance industry critical mass is of crucial importance. In Curaçao, the economy of scale is very inadequate and the long history of annual GDP growth is no better than plus/minus 1 % per annum. It is therefore an everyday challenge to grow or even maintain market share. This justifies the requested Court order to order the CBCS to apply for the lifting of the emergency measures.

d)    It is important to note that under Parman ownership the ENNIA Group has followed a philosophy not to take away market share from competitors in the local market, but instead

8

grow its return by way of the opportunities presented to the ENNIA Group in the U.S., which has resulted in returns on investments that have been significantly in excess of the average returns in the local market. Such returns cannot be realized through investments in the local market.

e) Historically, candidates for emergency proceedings have had in common that they were unable to meet their financial obligations or had cash flow problems, resulting in payment difficulties visa-vis their customers, banks, employees, suppliers, internal revenue agents and others. The case of the ENNIA Group is the exact opposite. The ENNIA Group has never been as liquid, as profitable, as successful, and as solid and without any business related challenges of any significance, when abruptly and without any reasonable notice it was placed under emergency supervision.

f) The CBCS moved to replace one of the islands' most qualified and dedicated management teams, without giving them proper notice and time to put up a defense. Not only was the management consequently locked out of their offices, but the CBCS also took the extraordinary measure of requiring management members to vacate the company provided living quarters on short notice.

g) The CBCS furthermore attempted to poison public opinion, amongst others by speaking of possible embezzlement in connection with the movements of funds between privately owned Unregulated Entities in Curaçao and the United States in relation to an investment, while this was in fact standard practice that did not require the CBCS' approval.

**D    Requested measures**

1.29    As there were no valid grounds for proclaiming of the emergency ruling, Parman requests the Court to, with respect to <u>all entities</u> of the ENNIA Group under the emergency regulation, (i) order the CBCS to file a request under article 61(3) of the LTV to revoke the emergency regulation or to prohibit the CBCS from executing the emergency regulation, and (ii) suspend all measures and decisions taken by the CBCS under the emergency regulation. In addition, Parman request the Court to order the CBCS to enter into negotiations with Parman with the aim to agree to a restructuring of the ENNIA Group in the short term that would be acceptable to all parties.

1.30    Alternatively, if that claim is denied, Parman makes those same requests with regard to the <u>Unregulated Entities</u> only.

1.31    To prevent damage to the ENNIA Group, Parman in addition requests that the Court orders the CBCS to, within seven days after the date of the summary proceedings judgment, set out in writing which steps should be taken to carry out the restructuring of the ENNIA Group, so that the Insurers comply with the required solvency level again. Moreover, Parman requests that the Court obligates the CBCS to carry out the restructuring of the ENNIA Group within a specified period of time to be determined by the Court and to return full control of the ENNIA Group to its shareholder upon completion of this restructuring. Also, Parman requests the Court to prohibit CBCS from selling any ENNIA Group assets to any party outside the ENNIA Group or to otherwise administer these assets.

1.32    Moreover, Parman requests the Court to prohibit CBCS from reporting negatively on Parman, the ENNIA Group and any persons associated with them. Lastly, Parman requests that the Court order the CBCS to provide access to or copies of certain information that Parman needs to further substantiate its position regarding the financial situation of the ENNIA Group. After all,

9

as a result of the emergency regulation, Parman has *de facto* been expropriated and can no longer access this information.

1.33    Parman points out that if the emergency regime were to remain in place, restructuring is the only thing the CBCS can legally do with regard to the Insurers. After all, in the CBCS Petition, the CBCS only requested the Court to proclaim the emergency regulation with the order to proceed to restructuring (article 60(2)(c) of the LTV). Pursuant to article 60(1) of the LTV, the Court can only proclaim the emergency regulation at the CBCS' request. As the CBCS only requested the proclamation of the emergency regulation with the order to proceed to restructuring, the Court's judgment of July 4th, 2018 cannot give the CBCS any other authority than to restructure the Insurers. As a result of the text and structure of article 60(1) and (2), the order to restructure provided in article 60(2)(c) of the LTV is an alternative order and does not include the order provided in article 60(2)(a) of the LTV (liquidation) and article 60(2)(b) of the LTV (transfer). This clearly flows from the text of article 60(2) of the LTV, in which the word 'or' is used in the list of the three possible orders. The proclamation of the emergency regulation on July 4th, 2018, therefore, did not give the CBCS the authority to liquidate or sell the Insurers' portfolio.

1.34    The above view is supported by the Explanatory Statement to the LTV, where it is emphasized that since 2015 (when the LTV was lastly amended), restructuring can also be a possible order of an emergency regulation, in addition to the two other orders that already existed prior to the 2015 amendment, i.e. liquidation and transfer. Parman quotes in this respect the following paragraph from the Explanatory Statement (the wording between brackets is added for clarification purposes by counsel):

> *"The amendment of the second subsection [of Article 60 LTV] is the direct consequence of the amendment of Article 60(1) LTV. In the amended second subsection of Article 60 LTV is now stated that the Bank can also be granted the power to restructure the business of the insurer. It appears from practice that when imposing the emergency regulation, not only the orders as laid down in subsection 2 of Article 60 LTV (old) should be possible orders, but that restructuring of the business of the insurer must also be a possible order."*

1.35    From this paragraph follows that the order to restructure provided in article 60(2)(c) of the LTV, the order to liquidate provided in article 60(2)(a) of the LTV and the order to transfer provided in article 60(2)(b) of the LTV, are three alternative orders. The emergency regulation imposed on the Insurers authorizes the CBCS to restructure (article 60(2)(c) of the LTV), but does not include the order provided in article 60(2)(a) of the LTV (liquidation) and article 60(2)(b) of the LTV (transfer).

1.36    To prevent damage to the ENNIA Group, the restructuring in that event should be carried out as soon as possible. Upon completion of the restructuring, full control of the ENNIA Group must then be returned to its shareholder by lifting the emergency regulation. Moreover, a guarantee must be given that CBCS will not sell or transfer any ENNIA Group assets to any party outside the ENNIA Group.

1.37    Furthermore, to prevent (further) damage to the ENNIA Group, CBCS must refrain from negative reports on the ENNIA Group and any persons associated with the ENNIA Group.

1.38    Parman underlines the fact that CBCS must act in the interests of the joint creditors (article 63(2) of the LTV) and that the current situation, in which the Insurers are managed by employees of CBCS who lack the knowledge and experience to manage an insurance company, is in fact detrimental to the operations of the ENNIA Group and therefore to the joint creditors. It must

10

be taken into account that the emergency regulation may only be proclaimed applicable when the interests of the joint creditors require this extreme measure. Based on the financial situation of the ENNIA Group, this situation was not in play; the ENNIA Group has sufficient capital. Now that the different entities of the ENNIA Group are managed by CBCS employees, however, the interests of the joint creditors *are* at risk – especially if this situation continues, since they lack the knowledge and experience to manage an insurance company. In this regard, Parman refers to the aforementioned price drop of the Kirby shares.

### E        Set-up of this petition

1.39    In Chapter 2, Parman will discuss and challenge the grounds submitted by the CBCS in the CBCS Petition, for their request to proclaim the emergency regime. Regarding the solvency issue, these grounds are : (i) the solvency position of the Insurers (ii) the alleged failure to follow up instructions and (iii) the transfer of USD 100 million. Parman will first outline the *intercompany* relationships and how they were created, to show that they do not pose a threat to the financial stability of the group. Parman will once again explain why there was no emergency situation which justified the proclamation of the emergency regulation and that negotiations regarding the restructuring of the ENNIA Group were still ongoing. Next, Parman will discuss and refute the alleged failure of the Insurers to follow up the instructions of the CBCS and silent trustees. Finally in Chapter 2 Parman will address the supposed direct reason for applying for the emergency regulation, namely the transfer of USD 100 million by EC Investments.

1.40    In Chapter 3, Parman will succinctly point out that the conduct of CBCS has more than once led and still leads to the financial instability of the ENNIA Group and therefore of Curaçao. In Chapter 4, Parman will explain that the emergency should not have been proclaimed with regard to the Unregulated Entities. In Chapter 5, Parman will elaborate on the procedural errors and violations of due process and the general principles of due administration. In Chapter 6, Parman will illustrate its claim under article 843a of the Curaçao Code of Civil Procedure (hereinafter: **CCCP**). In Chapter 7, Parman will state its urgent interests in the requested injunction. In Chapter 8, Parman will comment on the competency of the Court to hear this application.

## 2.    NO EMERGENCY SITUATION

### A        Intercompany relationships

2.1    As said before, the purported solvency issue arose as a consequence of the amendment of the solvency rules in the Valuation Guidelines ARAS 2.7 by the CBCS. Pursuant to this amendment intercompany receivables can no longer be taken into account in calculating the solvency of the insurance company. The bulk of the intercompany receivables that are currently on EC Leven's balance sheets, however, arose as a result CBCS' own directions.

2.2    One major intercompany receivable in the books of EC Leven relates to a loan of ANG 300 million for the purchase of the shares in Sun Resorts, which (as said) holds the Mullet Bay property on Sint Maarten, by EC Investments from Banco di Caribe. It is important to note that the Sun Resorts shares were injected by Parman (at that time the direct shareholder of Banco di Caribe) as equity into Banco di Caribe in January 2006 <u>with the approval of CBCS </u>in order to finance the purchase of the shares in ECH. The transaction value of this purchase amounted to approximately USD 75 million. As the Sun Resorts shares at that time were valued at USD 175 million, there was an excess in injected capital of USD 100 million. This capital excess was not required as Banco di Caribe was also compliant under the solvency rules without this USD 100 million. Also, it had not been instructed by the CBCS to inject this excess capital.

11

2.3    Nevertheless, a few months after the transactions had been closed and the sellers had been paid, the CBCS abruptly notified management of Banco di Caribe that it was unilaterally withdrawing its previously given approval of these transactions. The CBCS then took the extraordinary step of instructing management to transfer the Sun Resorts shares from the regulated entity Banco di Caribe to the unregulated entity EC Investments. The CBCS instructed management of Banco di Caribe to record this transfer not as a return of capital and subsequent capital injection by ECH into ECI, but as a direct sale from Banco di Caribe to EC Investments. It is clear that the CBCS should have addressed the US shareholders instead of Banco di Caribe's management, as the shareholders had decided – with the CBCS' approval – to inject the Sun Resorts shares as capital into Banco di Caribe to finance the purchase of ECH.

2.4    Under pressure from the CBCS, management followed the CBCS' instruction to sell the Sun Resorts shares to EC Investments. Parman understands that EC Investments bought a part of the shares from Banco di Caribe for ANG 300 million. Hence, EC Investments was forced to pay a significant purchase price for which it had to borrow funds from EC Leven, and commit itself to paying a 5% yearly interest to EC Leven. These funds consisted of performing assets such as mortgages and insurance portfolios with a total value of ANG 300 million These were moved from EC Leven to Banco di Caribe. This created the receivable between EC Investments and EC Leven.

2.5    There was no sound reason for this sale. Even without Mullet Bay, Banco di Caribe was compliant under the solvency requirements. Parman as shareholder of Banco di Caribe therefore should have been given the choice to take out its injected asset and realize other funding for the purchase of ECH. Instead, the CBCS forced Banco di Caribe to sell Sun Resorts/Mullet Bay to EC Investment without the approval of Parman, which led to an intercompany receivable in the books of EC Leven of ANG 300 million plus a yearly 5% interest. In this way the operating companies still held claims amounting to the amounts paid. Until September 2015, these claims could still be taken into account in determining the operating companies' debt coverage.

2.6    Another intercompany receivable that was created upon suggestion and approval of the CBCS, are the loans totaling approximately ANG 186 million with an interest rate of 5% to ECH from the operating companies (principally EC Leven and Banco di Caribe). Between 2006 and 2016, the operating companies generated profit. However, the regulated companies were not allowed to distribute any profit to its parent company ECH. In order to make it possible for ECH to make dividend payments to Parman, the CBCS suggested that these dividend payments should be financed by loans acquired by ECH from the operating companies.

2.7    The third and last major intercompany receivable on EC Leven's balance sheet pertains to loans totaling approximately USD 203 million with an interest rate of 5% to EC Investments for its purchases over a period from 2006 through 2011 of preferred shares in S&S, a supplier of equipment to the oil and gas industries. This was one of EC Investments US investments. In September of 2017, EC Investments sold its shares in S&S to the Kirby Corporation for a total consideration of USD 283 million. The purchase price was paid as follows:

-    50% in cash: Kirby Corporation paid an amount of USD 141,5 million to EC Investments. An Amount of USD 55 million was used by EC Investments to pay off loans from EC Leven;

-    50% in shares: EC Investments acquired shares in Kirby Corporation for an amount of USD 141,5 million, which it currently still holds.

2.8    It would not have been possible to guarantee a 5% interest on the loans from EC Leven, if there had only been local investments. The investments in the US therefore had also been supported

12

by the CBCS. The return on the S&S investment for example was USD 225 million which well exceeded EC Investments' interest liabilities towards EC Leven. This is a return of 10 to 11 % per annum. As already mentioned, under Parman ownership the ENNIA Group has followed the policy to grow its return by way of the opportunities presented to the Group in the U.S., which has resulted in returns on investments that have been significantly in excess of the average returns in the local market.

2.9     Considering the above, it is completely unjust and unreasonable that the CBCS used the intercompany relationships to request for the proclamation of the emergency proceedings. Parman appreciates that under the new insolvency regulations, the intercompany claims may no longer be used to determine solvency and that as a consequence the Insurers do not technically meet the solvency requirements. For this reason the management of the Insurers was negotiating about a restructuring of the intercompany loans that would be acceptable to all parties, which negotiations were still pending when the CBCS filed the CBCS Petition. It is important in this respect that the CBCS originally gave the ENNIA Group a period of three years to bring the balance of the Insurers in line with the Guidelines. This follows from the letter of August 4th, 2016 from the CBCS to the ENNIA Group (**Exhibit 8**). In this letter the CBCS instructed various steps to solve the solvency situation. A term was set until August 4th, 2019. That term is still in progress.

2.10    However at the end of 2017, new management was appointed at CBCS. Contrary to what was agreed with the previous management of the CBCS, the new management wanted the Insurers to accelerate the restructuring. It did so despite the fact that the Insurers still had eighteen months' time in which to carry out the restructuring.

2.11    In the weeks prior to the proclamation of the emergency regulation, the Insurers and the CBCS management discussed different options to solve the Insurers' solvency problems. A representative of Parman also participated in these discussions. The last meeting took place on June 21st, 2018, a week and a half before the CBCS Petition requesting emergency proceedings. This meeting ended with the CBCS requesting the Insurers' management to make a proposal

2.12    Now, it turns out that the CBCS at that time was already working on CBCS Petition, while the Insurers' management was working on said proposal in good faith. Despite the fact that parties were still negotiating a detailed implementation of a solution, the CBCS withdrew the Insurers' licenses on July 3rd, without any previous warning, and filed the CBCS Request to proclaim the emergency regulation of the Court. Parman emphasizes, once again, that the ENNIA Group's financial situation was unchanged and by no means precarious, so there was no valid reason whatsoever to proclaim the emergency regulation so suddenly.

**B     Alleged failure to follow up instructions**

2.13    The CBCS in the CBCS Petition claims that the Insurers' policymakers and co-policymakers on numerous occasions have failed to follow the instructions given by the CBCS and the silent trustees.[3] This allegation was substantiated in the CBCS Petition by a one sided set of letters over the period 2013-2017 (**Exhibit 9**), without any explanation and without even producing the responses to those letters.

2.14    Parman notes that the Insurers have responded to each and every letter contained in these exhibits, through letters, emails, meetings, telephone conversations and otherwise. Parman politely asks for your understanding of the fact that it currently has no access to any Ennia Group-related documentation as a result of the emergency regime being imposed. As a result, it

---

[3]     CBCS Petition, §§ 8 en 18 (Exhibit 2).

13

is impossible for Parman to substantiate this position with documentation. In order to show that from these letters it cannot be concluded that the ENNIA Group failed to follow material instructions by the CBCS on numerous occasions, Parman has given a response to the relevant paragraphs in those letters in **Exhibit 10**. The letters of 10 December 2013, 10 March 2014 and 29 September 2016 are not addressed in the response as these letters do not contain any (new) allegations or directions.

2.15    One of the instructions given by the CBCS is that Mullet Bay or the shares in Sun Resorts must be sold within three years of 4 August 2016. With regard to this instruction Parman makes the following remarks:

- given the course of actions regarding Mullet Bay as explained in paragraph 2.2 to 2.5 and the CBCS' share in setting up this transaction, it is ironic that the CBCS now is critical of the fact that Mullet Bay has not (yet) been sold.

- the 3 years period that was given to effectuate this instruction has not expired as yet;

- the Insurers have also explained to the CBCS on numerous occasions that the sale would result in a substantial loss of approximately ANG 60 million. Also, it would create excess and unnecessary liquidity within the ENNIA Group;

- Parman is of the opinion that the CBCS's instructions go beyond its authority by demanding that all assets were to be replaced by cash. Pursuant to art. 31(1) of the LTV, the CBCS can give an insurer a binding instruction if the CBCS deems this necessary in the interest of those who, as policy holders, insured parties or parties entitled to payments, are or will be involved in the insurance agreements made or to be made by an insurer. This shows that an instruction given by the CBCS cannot simply contain anything the CBCS deems right. An instruction must be in the interest of, in short, the policy holders (in full: those who, as policy holders, insured parties or parties entitled to payments, are or will be involved in the insurance agreements made or to be made by an insurer). The sale of Sun Resorts / Mullet Bay would have been disadvantageous for the policyholders; and

- also, Parman is of the view that if the Insurers would have followed the instructions to replace all assets by cash, the board members of the Insurers would have acted contrary to their fiduciary duty to act in the best interest of the Insurers.

2.16    The allegation that the ENNIA Group did not follow up the instructions of the silent trustees is not even specified, let alone substantiated. The CBCS does not provide even a single example of a situation where instructions of, or related to, the silent trustees were not followed. The letters of the CBCS are not related to the silent trustees, as they had not been appointed yet at the time these letters (except for the letter of 21 December 2017) were sent. The letters of September 22 and 29, 2016 merely regard the appointment of the silent trustees and hence also do not mention any instructions by the silent trustees (that were supposedly not followed up). Finally, also the letter of December 21, 2017 does not make any mention of instructions by the silent trustees that were not being followed up by the ENNIA Group. Hence, there is no substantiation whatsoever for the allegation that the ENNIA Group neglected to follow up instructions of the silent trustees, nor is there any concrete example of management acting without the silent trustees' approval while that approval was required.

14

**C      Transfer of USD 100 Million**

2.17    The direct reason for applying for the emergency regulation on July 3rd, 2018, as apparent from
the CBCS Petition was the transfer of USD 100 million by EC Investments – an Unregulated
Entity – from its Merrill Lynch New York bank account. Using this payment as a reason to
immediately apply for the emergency regulation is completely unjustified, since this payment
was in no way special for or detrimental to the ENNIA Group. EC Investments had transferred
this amount in early July of 2018 for a particular US investment with the intention to generate
adequate return to fulfill its interest obligations towards the Insurers. It should also be noted that
the funds were transferred from an entity that was not supervised by the CBCS, to another entity
that was not supervised by the CBCS. It cannot be understood why a transfer of funds by a 100%
privately owned and unregulated company, which is a routine transaction which never required
the CBCS' approval, is now suddenly a reason for the imposition of the emergency regulation.
In any event, the amount of USD 100 million was reimbursed on their own initiative, albeit
directly to EC Leven and not to EC Investments. With this payment, the outstanding amount of
the intercompany loans from EC Leven to EC Investments has decreased by USD 100 million.

2.18    At the time EC Investments planned to make the investment of USD 100 million, EC
Investments had available funds of USD 280 million in its bank account. EC Investments needed
to make a reservation of USD 148 million to cover its debt vis a vis EC Leven. This is the
balance of the intercompany receivable that is related to the S&S investment. The real estate
property Mullet Bay covered EC Investments' debt vis a vis EC Leven with regard to the
purchase of shares in Sun Resorts. As such, EC Investments had the available funds to make the
investment of USD 100 million.

2.19    As said, due to the retransfer of the USD 100 million into the EC Leven account, EC
Investments' debt vis a vis EC Leven is now reduced by USD 100 million. In addition, ECI
generated a total amount in cash of USD 111 million by its US investments. USD 86 million of
this amount is destined for paying interest due to EC Leven and the remaining USD 25 million
is destined to pay off the principal amount of the loan from EC Leven. As a result, the debt of
EC Investment vis a vis EC Leven has been reduced by USD 211 million.

2.20    The US investments were critical for the ENNIA Group in order to attain the required return of
5% . Due to the small Curaçao market, the ENNIA Group could not survive on national
investments alone nor on the bank interest it received. As opposed to the image created by the
CBCS, this transfer of USD 100 million was in no way special for or detrimental to the ENNIA
Group. In fact, EC Investments is the investment vehicle for the ENNIA Group and as such
carried out similar transactions regularly, of which the CBCS was aware. If the CBCS objects
to the transfer of funds, why did it not raise any objections before with regard to similar transfers
of funds?

2.21    In addition, it was always the US shareholders' intention that the proceeds and returns on the
investments would remain in Curaçao, even to the extent they exceeded the 5% interest that was
due to the Insurers. Hence, the returns above this 5% remained in EC Investments. The transfer
of USD 100 million was part of the normal business operations for EC Investments. Moreover,
as mentioned before, EC Investments still had more than sufficient liquid funds to repay its debt
to EC Leven after investing the USD 100 million. The payment of USD 100 million did not
have any detrimental effects on EC Leven. The payment of USD 100 million by EC Investments
did not create an emergency situation as referred to in the LTV and did not warrant proclamation
of the emergency regulation.

15

### D    Conclusion

2.22    It follows from the above that the circumstances brought forward by the CBCS as grounds for their request, definitely did not warrant an emergency regulation to be proclaimed. After all:

a)    the ENNIA Group had sufficient equity. By restructuring the equity, the regulatory solvency position of the Insurers could be restored to the right level;

b)    the CBCS had given the ENNIA Group a three-year period to bring the balance of the Insurers in line with the Guidelines;

c)    the parties were still negotiating regarding a restructuring of the intercompany loans that would be acceptable to all parties;

d)    the argument that the ENNIA Group did not follow up instructions of the CBCS and the silent trustees is incorrect, incomplete and largely unsubstantiated;

e)    the transfer of the USD 100 million was not an extraordinary transaction and it was not disadvantageous to the ENNIA Group, so the payment did not create an emergency situation as referred to in the LTV, justifying the proclamation of the emergency regulation.

2.23    The imposition of the emergency regulation was therefore manifestly premature and it should never have been proclaimed.


## 3.    CBCS CONDUCT

3.1    The conduct by the CBCS leads to the instability of the ENNIA Group. In accordance with the emergency regulation, the CBCS is obligated to act in the interests of the joint creditors. However, spreading negative reports on the ENNIA Group and falsely accusing the ENNIA Group ultimate shareholders and directors is obviously damaging to the ENNIA Group and therefore to its joint creditors. To give an example of this negative reporting, Parman refers to the following passage from the CBCS press release of July 6, 2018 (**Exhibit 11**):

> *"The Ennia restructuring is going well. Among other things, we have reclaimed the $ 100 million that was recently placed outside the Ennia Group."*

3.2    In this press release, CBCS suggests that the amount of USD 100 million was extracted from the ENNIA Group illegally, which is false (as explained in Chapter 2 Section C). It also suggests that CBCS ensured the reimbursement of this amount, which is also false as the amount was reimbursed at Parman and the ENNIA's Group own initiative. This type of negative reporting damages the continuation of the Insurers and therefore the Insurers' joint creditors. As such, it is vital that CBCS refrains from negative reports on Parman, the ENNIA Group, its shareholders, its directors, its subsidiaries and its employees.

3.3    Due to the emergency regulation, the ENNIA Group is currently not managed by professionals with the appropriate knowledge, but by CBCS employees who lack the expertise and experience to manage an insurance company (article 63(1) of the LTV). This is another factor contributing to the instability of the ENNIA Group. The fact that CBCS has *sidelined* the ENNIA Group directors also does not contribute to a good continuation of operations.

16

3.1    All the above facts worry Parman deeply, all the more because in previous cases in which the
emergency regulation was proclaimed, CBCS did not conduct itself with due diligence. As such,
Parman has an urgent interest in a fast restructuring if the emergency regime were to remain in
place. After all, the longer the emergency regulation remains in place, the bigger the risk of
irreparable damage. To ensure a fast restructuring, Parman requests that if Parman's primary
claim is denied the Court orders the CBCS to announce the steps that must be taken within the
framework of this restructuring within seven days after the date of the summary proceedings
judgment, so that the Insurers comply with the required solvency level, and that the Court
obligates the CBCS to carry out the restructuring of the ENNIA Group within a specified period
of time to be determined by the Court and to return full control of the ENNIA Group to its
shareholder upon completion of this restructuring.

## 4.    NO EMERGENCY REGULATION FOR ENTITIES WITHOUT A LICENSE

4.1    The emergency proceedings should in any event not have opened with regard to the Unregulated
Entities. In this chapter, Parman will set out why this is the case.

4.2    To be able to order to proclaim the emergency regulation, article 60(1) of the LTV also requires
that it concerns (i) an insurer, (ii) that used to have a license, and (iii) whose license has been
withdrawn. The Unregulated Entities meet none of these – constitutive – requirements, as
explained below. For this reason, the emergency regulation should never have been pronounced
with regard to these entities.

4.3    Pursuant to article 1(1)(g) of the LTV, an insurer is defined as anyone who practices an
insurance company. An insurance company is a life insurance company or a non-life insurance
company (article 1(1)(f) of the LTV). A prerequisite for the qualification as a life or non-life
insurance company is that the company, as such, makes life or non-life insurance agreements
for its own account, including the fulfillment of the life or non-life insurance agreements made
by that company, even if the company does not intend to make profit (article 1(1)(d) and (e) of
the LTV).

4.4    The Unregulated Entities do not answer to this description by any means, as they do not make
or fulfill any insurance agreements. The activities of these entities consisted of making
investments (EC Investments) or fulfilling the function of holding company (ECH and EC
Holding), so they are not operative companies. The Unregulated Entities, therefore, do not
qualify as insurers on which the emergency regulation could be imposed. In addition, it is
beyond question that the Unregulated Entities never had a license to begin with, so, logically, it
could not be withdrawn.

4.5    Based on certain jurisprudence, emergency proceedings can be imposed on entities without a
license. In such cases, the activities of those entities must show that they collectively practice
one business, which must be regarded as one supervised organization. The 'mutual ties' between
those entities are very important in this matter. However, the annotation to the Dutch Supreme
Court's most recent judgement on this matter appropriately states that this doctrine should be
applied with great reserve and only in cases where an artificial situation was created for the sole
purpose of circumventing the relevant supervisory provisions:

> *"This is clearly an artificial situation that seems to have been created for the sole purpose
> of circumventing the provisions of the 1992 Credit System Supervision Act [Wtk], partly or
> in whole. However, the doctrine of "mutual ties" should be applied with great reserve.
> Other than in an artificial situation such as the one shown by the facts (particularly the
> fact that Belba and A/b Financiën are managed by one and the same person, the flows of*

17

*money from Belba and A/b Financiën run over the same accounts and are interchangeable, and it does not matter for the actual manager of Belba and A/b Financiën into which account money is transferred, and that he regards it all as one and the same account), there is no place for the argumentation that several legal entities collectively form one credit institution.[4]*

4.6   This does not apply to the ENNIA Group. To begin with, the flows of money from the ENNIA Insurers and those from the Unregulated Entities are strictly separated, as shown by the fact that, for example, several claims against EC Investments appear on the balance sheet of EC Leven. Furthermore, there is no artificial situation that was created for the sole purpose of circumventing the relevant supervisory provisions. After all, the current structure was designed in accordance with the CBCS' own instructions and was in existence for a decade. Additionally, there is a completely legitimate reason to store funds with other entities than the ENNIA Insurers: by structuring the investments this way, the group can benefit from tax advantages. EC Leven, therefore, set up the structure in question on its accountant's advice. Investments in the United States and the use of existing tax treaties are the only way to generate the return of 5% that EC Leven was guaranteed. The entire ENNIA Group, and particularly the Insurers, benefits from this construction. The CBCS has always been aware of this and has always supported it. This is no matter of avoiding supervision.

4.7   The absence of such mutual ties that the ENNIA Group should be understood to practice one insurance company collectively, is also shown by the fact that the CBCS has demanded that (part of) EC Investments' assets be included in the balance sheet of insurer EC Leven.

4.8   Finally, if the CBCS actually believed that the Unregulated Entities also practiced an insurance company and, therefore, are subject to supervision, it should have raised this matter much sooner (see art. 4 (4) and (5) of the LTV). The ENNIA Group has been structured this way since 2009, following the CBCS' instructions. Despite the many meetings with the ENNIA Group, the CBCS never mentioned their opinion that the Unregulated Entities had to be under supervision or required a license. Even if they had, according to the rules of reasonableness and the general principles of due administration, the CBCS would have been under the obligation to impose on the Unregulated Entities one of the far less drastic supervision measures that the CBCS has at its disposal.

4.9   For this reason, the emergency regulation should never have been pronounced with regard to the Non-Regulated Entities. In addition to the lack of any legal ground to impose the emergency regulation on these companies, the limited carve-out provided for this in the jurisprudence is not applicable. As explained above, the mutual ties between the Insurers and the Unregulated Entities is not so strong that they can be understood to practice one joint insurance company, and there is no artificial situation that was created for the sole purpose of circumventing the relevant supervisory provisions.

## 5.   PROCEDURAL ERRORS

### A   Introduction

5.1   In addition to the fact that there were no valid substantive grounds for proclaiming the emergency regulation, Parman also wishes to comment on the errors in the procedural course of events that led to the imposition of the emergency regulation.

---

[4]   HR June 24, 2015, ECLI:NL:HR:2005:AT6005, JOR 2005/212, m.nt. Botter.

5.2    The procedure for application of the emergency regulation was not carried out correctly. First, the principles of due process were violated as the ENNIA Group was not given a fair chance to defend itself against the CBCS' request to impose the emergency regulation on the ENNIA Group. Second, the CBCS' actions violated general principles of due administration. Third, the emergency proceedings could not have been opened as long as the Insurers' licenses were not irrevocably withdrawn. Finally, as extensively discussed in Chapter 4, the CBCS erred in requesting the Court to apply the emergency proceedings to the Unregulated entities.

**B    Violation of the principles of due process**

5.3    On July 3 and 6, 2018, the CBCS filed its petitions with the Court to request to impose the emergency regulation on the ENNIA Group. The CBCS Petition was not preceded by any warning or notice implying that the CBCS planned to apply for the emergency regulation should the Insurers' situation not be remedied within a certain period, while it is common practice to give such a warning or notice. As a result, the ENNIA Group did not have any chance to prevent the implementation of the emergency regulation, let alone a reasonable one.

5.4    Pursuant to art. 60(4) of the LTV, the Court attends to the request to impose the emergency regulation with the utmost dispatch and "in a civil-law procedure, as far as no departures from this are provided in this national ordinance." There is no such legal departure, which means that the consideration of the request – including the summons – must take place in accordance with the applicable rules for judicial procedure in similar civil cases. The explanatory statement included in the identical provision of the Dutch Financial Supervision Act (**Wft**) (art. 3:162a of this Wft), makes a comparison with the consideration of a request to issue an order of bankruptcy.[5] One of the commentaries to this article also remarks on the close similarity between the consideration of a request for the proclamation of the emergency regulation and one for the proclamation of an order of bankruptcy.[6] The applicable adjudication legislation dictates that a request for an order of adjudication be considered with the utmost dispatch (article 4(1) of the 1931 Curaçao Bankruptcy Decree). However, a period of at least one week is observed for the summons with regard to the consideration of the request.[7] Consequently, a period of at least one week should be observed for the summons with regard to the consideration of the request to impose the emergency regulation. That was not done in this case.

5.5    Following the CBCS Petition, EC Leven, EC Schade, EC Zorg, EC Investments and ECH were initially summoned on July 3, 2018 to appear before the Court for the consideration of the request on July 4th, 2018, at 10:00 a.m. On July 4th, 2018, at 08:00 a.m. there was a hearing in interim relief proceedings in which the relevant companies requested a preliminary injunction to suspend the hearing on the CBCS Petition while the objection and/or appeal against the revocation of the licenses was still pending. Subsequently at 10:30 a.m., the companies were summoned to appear before the Court for the consideration of the CBCS Petition at 2.15 p.m. As such, the mentioned companies then had only 3 hours and 45 minutes to prepare their defense and appear, which was practically impossible. Around 1:00 p.m. the Court denied the preliminary injunction to suspend the hearing. With great effort, the ENNIA Group's management was able to find an attorney, who attended the hearing at 2:15 p.m. with a number of managers of the mentioned companies. However, they had no time to prepare themselves, let

---

[5]    *Parliamentary Papers II* 1999/2000, 26 855, no. 3, p. 58.

[6]    R.A. Stegeman, Wft T&T – Act 2018, comment to art. 3:162a of the Wft.

[7]    Procesreglement voor civiele zaken in eerste aanleg en hoger beroep 2018 Gemeenschappelijk Hof van Justitie, p. 19 and Faillissementsrichtlijnen 2012 Gemeenschappelijk Hof van Justitie

alone prepare themselves properly for the hearing and to forward a proper defense against the CBCS' request.

5.6    The summons with regard to the request to impose the emergency regulation on EC Holding was even more unfair and improper. At 3.39 PM, EC Holding was given the opportunity to respond to the CBCS' request by email no later than 4.15 PM. This means that EC Holding had only 36 minutes to prepare a defense against the request. It goes without saying that EC Holding could not possibly defend itself (properly) against the CBCS' request.

5.7    The aforementioned course of events constitutes a serious violation of the adversarial principle and, therefore, of the principles of due process. This is a very foul business, even more so given the fact that this was a request to impose the emergency regulation, which *de facto* leads to expropriation to which no appeal is possible. The CBCS unmistakably acted contrary to article 60(6) of the LTV, article 1 of the First Protocol of the European Convention on Human Rights (ECHR), and article 6 of the ECHR.

Article 60 paragraph 6 of the LTV

> *"The Court shall not give a decision except after <u>hearing the insurer and the Bank, or at least properly summoning them</u>."*

*(Underlining by attorney)*

Article 1 of the First Protocol of the ECHR

> *"Each natural person or legal entity is entitled to the undisturbed use of their possessions. Nobody shall be deprived of their possessions, except in case this is in the public interest and <u>on the conditions provided in the law and in the general principles of international law. (...)</u>"*

*(Underlining by attorney)*

Article 6 paragraph 1 of the ECHR

> *"In the determination of his civil rights and obligations or of any criminal charge against him, everyone is entitled to a fair and public hearing within a reasonable time by an independent and impartial tribunal established by law.. (...)"*

5.8    Within this framework, Parman refers to the explanation of article 6 paragraph 1 of the ECHR, as provided in the *Guide on Article 6 of the European Convention on Human Rights*:

> *"The right of access to a Court must be "practical and effective" (Bellet v. France, § 38). <u>For the right of access to be effective, an individual must "have a clear, practical opportunity to challenge an act that is an interference with his rights"</u> (ibid., § 36; Nunes Dias v. Portugal (dec.) regarding the rules governing notice to appear)."*[8]

*(Underlining by attorney)*

---

[8]    Guide on Article 6 of the European Convention on Human Rights, Right to a fair trial (civil limb), Updated to 31 December 2017, § 75.

20

5.9     It goes without saying that the ENNIA Group was not properly summoned and was not properly heard. In addition to this, the usual warning or notice that the imposition of the emergency regulation would be requested, was not given. As a result, the ENNIA Group has not been able to put forward a proper defense against the CBCS' very drastic request.

5.10    For the record, be it hereby noted that there was no reason at all to act this way and to disregard the common rules of *due process*. The discussion about the Insurers' solvency position has been taking place for several months, if not years. There was no reason now to request the emergency regulation so suddenly nor to decide upon this request within a few hours. The ENNIA Group's financial situation is not materially worsening from prior years, on the contrary, the opposite is the case. Additionally, as opposed to a bank, an insurer has little or no risk of suffering a public "*run*" if by chance the warning or notice becomes public. Insured parties cannot reclaim their paid premiums, nor can they cancel their pension overnight, given the consequences this may have for the pension and pension build-up. For this reason, the notice or warning that the emergency regulation would be requested, allowing a last chance for improvement, could have been given without the risk of a "*run*".

5.11    Nonetheless, the CBCS explicitly requested that the Court observe a short summoning period. The reason the CBCS gave for this was an alleged reasonable fear that the Insurers might alienate money from the group before the Court made its decision on the request. This fear allegedly existed because, on that day (July 3rd, 2018), the CBCS had it "on good authority" that the Insurers and Parman had alienated a value of USD 100 million in assets from the ENNIA Group. This is incorrect; as such, the request was based on an unverified ground.

5.12    As set out in Chapter 2 Section C above, it is true that EC Investments was planning to use USD 100 million for an investment abroad. However, by making this transaction, EC Investments did not illegally alienate money from the ENNIA Group, as suggested by the CBCS. The transaction of USD 100 million was made within EC Investments' normal business activity, and had no harmful effects on the ENNIA Group. In fact, the foreign investment for which this payment was intended was meant to provide sufficient return to fulfill the obligations of the Insurers. If the normal rules of due process had been followed, the ENNIA Group could have explained this situation and refuted this accusation adequately.

5.13    In summary, the CBCS did not have any valid reason to request such a short summoning period. This course of events was in violation of the fundamental principles of justice provided in the LTV and the ECHR, among other regulations. This too justifies the decision to allow the interim provisions that Parman requested.

**C      Violation of general principles of due administration**

5.14    By acting the way the CBCS did, it also violated general principles of due administration, more specifically the proportionality principle and the principle of legitimate expectation.

*Violation of the proportionality principle*

5.15    As explained in Chapter 1.17, the ENNIA Group's situation was by no means urgent enough to justify the CBCS' drastic intervention. The CBCS was aware that the ENNIA Group had sufficient capital to solve its solvency problem, which makes petitioning for emergency proceedings a disproportionate measure.

5.16    Another reason why the CBCS' request for emergency proceedings and the revocation of the licenses of the Insurers clearly goes against the principle of proportionality is that the CBCS

could have taken less extreme measures to address the solvency issue or the alleged neglect to
follow instructions. Two examples of such (less extreme) measures are:

- limit the Insurers' free disposal of its values or forbid the Insurers to dispose of these values
  other than with the CBCS' written authorization (see paragraph 5.17);

- impose an order under penalty to insure that instructions are followed up (see paragraph
  5.18 – 5.22).

5.17    Pursuant to article 53(1) in conjunction with article 52(2) of the LTV, the CBCS is authorized
to limit the insurer's free disposal of its values, wherever located, or to forbid the insurer to
dispose of these values other than with the CBCS' written authorization, in case the solvency
margin has dropped or – according to CBCS – will drop below the minimum value required
under article 36(3) of the LTV. In case the CBCS wanted to exclude the risk that money might
be alienated from the ENNIA Group, it could have taken this less extreme measure.

5.18    The LTV furthermore provides the instrument of an order under penalty since 2015. An order
under penalty within the meaning of article 79b of the LTV is defined as: the remedial sanction
containing:

a)    an order to remedy the violation partly or in whole; and

b)    the obligation to pay a sum of money in case the order is not carried out on time or at
all.

5.19    Article 79c(3) of the LTV demands that the order under penalty describes the remedial measures
to be taken. The order under penalty includes a term within which the offender can carry out the
order without having to pay the penalty. In fact, the order under penalty can be regarded as an
"instruction plus", signifying that the offender has to pay a penalty if he fails to follow the
CBCS' instruction within the given term.

5.20    Given that the CBCS is of the opinion that the Insurers must proceed to restructuring, and that
the CBCS' purpose and authority with regard to the Insurers are limited to restructuring and do
not include the Insurers' discontinuation or winding-up, Parman entirely fails to comprehend
why the CBCS did not impose an order under penalty (without recognizing any violation), but
chose to request emergency proceedings.

5.21    This would have been logical, also because the CBCS had already given the Insurers various
instructions. These instructions were aimed at enforcing certain behavior on the Insurers, just
like an order under penalty would have been. In case the given instructions had proven
insufficiently effective in the CBCS' opinion, a logical, effective, and proportional follow-up
would have been to impose an order under penalty.

5.22    The CBCS could have imposed an order under penalty. The CBCS could have used that
instrument to explain the exact remedial measures the Insurers had to take to implement the
required restructuring, and to fix a term for taking these measures. The nature and purpose of
the instrument of an order under penalty correspond 100% to what the CBCS intended when
they gave requested emergency proceedings: the restructuring of the Insurers. By requesting
emergency proceedings instead of imposing an order under penalty, the CBCS acted contrary
to the principle of proportionality.

22

*Violation of the principle of legitimate expectation*

5.23    As said, despite the fact that parties were still negotiating a detailed implementation of a solution, the CBCS withdrew the Insurers' licenses on July 3rd, 2018 without any previous warning, and filed the CBCS Petition. This decision was taken while the ENNIA Group had shown themselves willing to cooperate in response to the CBCS' letter dated 4 August, 2016 (Exhibit 8) and were moving along with the CBCS, in order to find an acceptable solution for all parties. That the CBCS did not fully agree to all proposals made by the Insurers at that time, does not mean that the Insurers did not cooperate and had no consideration for or recognize the instructions of the CBCS. The CBCS should at the very least have waited for the results of the meeting of June 21st, 2018, as the management of the ENNIA Group trusted – with good reason – that it still had the opportunity to improve the solvency position of the Insurers, more so given that the CBCS had initially given the Insurers until August 4th, 2019. The CBCS has shown itself extremely biased with regard to the decision-making prior to the emergency proceedings.

5.24    In short, by withdrawing the Insurers' licenses and applying for the emergency regulation, the CBCS has clearly acted in violation of the principles of legitimate expectation and proportionality, as:

   a)    the negotiations with the CBCS about an acceptable solution were still ongoing, and the revocation of the licenses and the filing of the request to apply emergency proceedings took place only a week and a half after the last meeting, during which the CBCS requested the Insurers' management to come up with a proposal; and

   b)    the previously agreed period of three years to bring the Insurers' balance in conformity with the local guidelines had not yet expired at that moment.

   **D    License withdrawal not yet irrevocable**

5.25    Moreover, the emergency regulation can only be imposed on insurers whose licenses have been irrevocably withdrawn. The licenses of the Insurers were withdrawn by the CBCS' decision of July 3rd, 2018. In accordance with the National Ordinance on Administrative Procedures (**LAR**),[9] an objection or appeal may be lodged against such decisions within six weeks. Pursuant to article 56(2) of the LTV, the withdrawal of a license shall first become effective when the corresponding decision has become irrevocable. As long as there are possibilities for objection or appeal, the decision is not irrevocable.

5.26    Consequently, the withdrawal of the licenses on July 3rd, 2018 shall not be effective as long as the objection or appeal period has not expired, or, in case an objection or appeal has been lodged, as long as that procedure is ongoing. The withdrawal of the licenses is a constitutive requirement for the imposition of the emergency regulation (article 60 paragraph 1 of the LTV). As the withdrawal of the Insurers' licenses is not effective yet, the emergency regulation could not be imposed on July 4th and 6th, 2018, respectively.

5.27    This procedure regarding the regulation is shown by, among other things, the following extract about the old <u>Dutch</u> law regulating the emergency regulation:

   *"In practice, however, it turned out that the application of the emergency regulation could be postponed if the insurer lodged an appeal against the withdrawal of the license, which appeal first had to be decided on irrevocably. To end this undesirable effect, in the Insurance Company Supervision Act*

---

[9]        PB 2001, 79, last modified on 12/18/2015, PB 2015/80).

> [WTVb], *the legislator removed the requirement that all licenses must be withdrawn before the emergency regulation could be applied for and imposed, under the express statement that the meaning of the new art. 156 is equal to art. 66 of the (old) WTV.* "[10]

5.28    The quotation above confirms that the requirement that the emergency regulation can only be imposed on organizations whose licenses have been withdrawn, meaning that the objection and/or appeal period must have expired, or the objection and/or appeal procedure must have been completed, before the emergency regulation can be applied. Apparently, the legislator of Curaçao saw no reason for an amendment of the law similar to the one the Dutch legislator deemed desirable. When the LTV was amended in 2015, the requirement of irrevocability of the license withdrawal for the emergency regulation to be imposed, was not changed. The legislator did meet the supervisor half way by stipulating in article 60(7) of the LTV, that an objection or appeal lodged against the license withdrawal shall not suspend the <u>consideration</u> of the request to impose the emergency regulation. This means that the CBCS does not have to wait until the license withdrawal has become irrevocable before making their request to impose the emergency regulation; the consideration of the request can go through while the objection or appeal procedure is ongoing. However, the emergency regulation can only be <u>imposed</u> after the license withdrawal has become irrevocable.

5.29    From the point of view of legal protection, it is also a logical requirement that the license withdrawal must be irrevocable before the emergency regulation can be imposed. After all, despite the fact that this is a very drastic measure that constitutes a serious invasion of one's property rights, there are no remedies available against the imposition of the emergency regulation, except for cassation in the interest of the law (article 60(9) of the LTV). The only possible defense against this drastic measure is to dispute the license withdrawal. If the emergency regulation could be imposed immediately after the license was withdrawn – as the CBCS in fact did in this case – the insurer and its stakeholders would be deprived of any legal protection against such an extreme measure. After all, the CBCS exclusively exercises all powers of the insurer's managers, supervisors, and representatives as of the imposition of the emergency regulation (article 63(1) of the LTV), which means that the CBCS itself would have to lodge the objection against its own decision to withdraw the licenses. It is of the utmost importance to avoid such a situation in which the CBCS becomes the 'judge in its own case', as repeatedly pointed out in the Explanatory Statement to the LTV.[11] Additionally, this goes against the rules of *fair trial* provided in article 6 of the ECHR. The objection or appeal procedure against withdrawal of the license should, therefore, be concluded before the emergency regulation can be imposed.

5.30    The argument that the CBCS should be able to take immediate action to prevent that assets 'disappear', is a poor one. By withdrawing the license, the CBCS already gains sufficient power to make sure the status quo is maintained. (see article 58(1) of the LTV).

5.31    Furthermore, the CBCS has the authority to claim – in the name of the Insurers – the invalidity of legal acts that these entities carried out contrary to the limitations or the prohibition (article 58(4) of the LTV). The fifth paragraph of the same article confirms, once again, that this authority is acquired at the moment the license is withdrawn, but not yet irrevocably, given the fact that a clear statement has been made that the limitation or prohibition is lifted as soon as the withdrawal decision is reversed.

---

[10]    G.R. Boshuizen, 'Verzekeringsbedrijf en insolventie', *TvI* 2004, 3.

[11]    See, for example: Explanatory Statement p. 10 and 15.

24

5.32    The ratio of awarding certain powers to the CBCS in order to maintain the status quo as long as the withdrawal of the license is not yet irrevocable, is explained in the Explanatory Statement attached to the review of 2015 with regard to the arrangement for credit institutions, which corresponds largely with the LTV:

> *"However, to prevent that the credit institution whose license has been withdrawn, or that has lodged an objection or appeal, is stripped of its assets, or that the creditors are harmed otherwise, this concept national ordinance provides in the sixth paragraph of article 9 of the National Ordinance on the Supervision of the Banking and Credit System* [Ltbk], *that the Bank gives the credit institution notice that, as of the moment of withdrawal of the license, all or certain bodies of the credit institution may only exercise their competences after obtaining approval from one or more persons appointed by the Bank, and following the instructions of these persons."[12]*

5.33    This part of the Explanatory Statement may be aimed at credit institutions, but given the fact that the provisions for credit institutions and those for insurers are almost identical, and that the reviews of 2015 were intended to eliminate differences between the arrangements,[13] it is more than likely that this ratio also applies to the withdrawal of an insurer's license.

5.34    In summary, the emergency regulation could not be imposed yet, as the withdrawal of the licenses of the Insurers was and is not irrevocable and, therefore, not effective.

5.35    The Insurers lodged an objection against the CBCS' decision to withdraw their licenses immediately after the withdrawal of the licenses on July 3rd, 2018. However, as the CBCS took over the Insurers' management after proclaiming the emergency regulation, the CBCS withdrew this objection. As of the moment of proclaiming the emergency regulation, the CBCS exclusively assumed all authority of the Insurers' directors, commissioners and representatives (article 63 (1) LTV). Therefore, on August 13th, 2018, Parman as interested party appealed against the CBCS' decision to withdraw the Insurers' licenses. As such, the withdrawal of the Insurers' licenses is neither irrevocable nor effective.

### E    Conclusion

5.36    In view of the above, there are several grounds that justify the conclusion that the emergency regulation was not imposed lawfully. This and the fact that there were no valid grounds for proclaiming the emergency regime, underlines the fact that Parman's requests should be granted.

## 6.    REQUEST FOR COPIES/ACCESS UNDER ARTICLE 843A OF THE CCCP

6.1    As a result of activities by the CBCS, Parman has lost control of its subsidiary companies. As mentioned before, the ENNIA Group was not even given the chance to defend itself adequately against the extreme requests from the CBCS. As such, not only the ENNIA Group itself, but also its shareholder Parman were harmed severely. Moreover, Parman now has no access to the documentation it needs to substantiate its claims in these proceedings and in the appeal proceedings it has filed against the withdrawal of the Insurers' licenses. For this reason and in

---

[12]    Explanatory Statement p. 49.

[13]    See p. 3, among others: *"the relevant differences between the national ordinances are eliminated in the update and harmonization of these national supervision ordinances, as far as deemed necessary and with due regard for the nature of the supervision and the supervised parties."*

accordance with Article 843a of the CCCP, Parman requests copies of the following documentation, in which request 'access to' is deemed to be included in 'copies of':

i.  all correspondence and documentation as of 2006 relating to instructions or indications given by the CBCS to the ENNIA Group in the context of the ENNIA Group's restructuring of 2009 and the current envisaged restructuring, including, but not limited to written instructions or indications, minutes of meetings and correspondence between the CBCS, Parman and/or the ENNIA Group;

ii.  the financial statements 2006 through 2017 of the Insurers and the Unregulated Entities of the last three years;

iii.  all documentation as of 2006, including correspondence between the ENNIA Group and Parman on the one hand and the CBCS on the other, regarding the Insurers' and the Unregulated Entities' inter-company receivables, and the underlying decisions, including, but not limited to written instructions or indications, minutes of meetings and correspondence between the CBCS, Parman and/or the ENNIA Group;

iv.  bank statements for EC Investments relating to the past 5 years, from the date of the Court order on this claim;

v.  all documents relating to all money transfers from EC Investments in the period 2006 to the present day; and

vi.  the application to proclaim the emergency regulation applicable to EC Holding as filed by the CBCS on July 6th, 2018,

hereinafter jointly referred to as the **Documentation**.

6.2    Under article 843a of the CCCP, any party with a legitimate interest may request access to, copies of or extracts of certain documentation relating to legal proceedings in which it is involved. Below, Parman will illustrate how this requirement has been met and, consequently, how this request to receive copies of the Documentation is to be granted.

*Ad. 1. Parman's Legitimate Interest in the Copies/Access*

6.3    Law states that the requirement of legitimate interest is met when the Documentation may be relevant to the ruling on the dispute.14 This requirement is met, for example, when the Documentation may be relevant to the substantiation of a claim which cannot immediately be deemed baseless.15

6.4    The request to receive copies of and access to the Documentation is intended to substantiate Parman's claims in these proceedings and in Parman's appeal proceedings against the decision to withdraw the Insurers' licenses. As such, it has been proven that this Documentation is relevant to the ruling on this dispute and to the substantiation of the appeal against the withdrawal of the license in accordance with article 15 of the LAR. Moreover, Parman is

---

14    For example, refer to Court of Maastricht, March 12th, 2008, *LJN:* BC6796; Court of Rotterdam, March 19, 2008, *LJN:* BC9708; Court of Amsterdam, April 2nd, 2008, *NJF* 200B, 387; Court of Haarlem, July 16th, 2008, *LJN:* BD7632; Court of Arnhem, March 25th, 2008, *LJN:* BC9246; Court of Rotterdam, February 24th, 2010, *LJN:* BL5639.

15    For example, refer to Court of Utrecht, September 12th, 2007; *JOR* 2007. 265; Court of Utrecht, March 18th, 2009, *LJN:* BH6556; Court of Rotterdam, June 10th, 2009, *NJF* 2010, 30;Court of Utrecht, August 18th, 2010, *LJN:* BN5864; Court of Utrecht, October 12th, 2010, *LJN:* B06956, Court of Amsterdam, March 27th, 2012, *JOR* 2012, 168

26

considering filing a wrongful act claim against the CBCS to compensate for all damages Parman
has suffered and will suffer as a result of the CBCS request for emergency proceedings without
just cause, in which application CBCS committed grievous procedural errors.

6.5    Since only the Documentation can show if and to which extent the CBCS was justified in
withdrawing the Insurers' licenses and in requesting the Court to proclaim the emergency
regulation applicable to the ENNIA Group, Parman has a legitimate interest in receiving copies
of this Documentation.

*Ad. 2. Sufficient Specification of the Documentation*

6.6    The Documentation has been sufficiently specified to grant a request under article 843a of the
CCCP. The Documentation has been specified as precisely as possible and as is reasonably to
be expected under the circumstances.

6.7    The fact that Parman is not familiar with the (exact) content of each of the demanded
Documentation does not prejudice the fact that the Documentation is sufficiently specified.16
According to the Dutch Supreme Court, it is sufficient to request access to a specified file.17

*Ad. 3. Parman's Involvement in the Legal Relationship*

6.8    Parman is the ENNIA Group's shareholder and, as such, belongs to the group of beneficiaries
of the ENNIA Group. As a result of the emergency regulation, the CBCS is exclusively
performing all duties of the ENNIA Group directors, trustees and representatives. As such, the
ENNIA Group is actually being managed and represented by the CBCS. This situation gives
rise to the first legal relationship between Parman and the CBCS.

6.9    Moreover, the second legal relationship between the CBCS and Parman arises from any
wrongful act the former may have perpetrated against the latter (see paragraphs 7.4 and 7.5).

6.10   Therefore, the Documentation relates to legal relationships in which Parman is involved as a
party as referred to in article 843a of the CCCP.

## 7.    URGENT INTEREST

7.1    The nature of this case requires urgency and there is no time for main action proceedings. Every
day the risk of damages to value are accruing and the risk that CBCS will transfer ENNIA Group
assets increases. Moreover, it is essential that the situation is brought back to normal as soon as
possible and that the ongoing insecurity is ended. After all, the longer the emergency regulation
remains in place, the bigger the risk of irreparable damage.

7.2    At this moment in time, the ENNIA Group is hindered in its daily activities, thereby losing
value. The CBCS clearly acknowledges this problem, as is apparent from a press release of 15
August 2018 (**Exhibit 12**):

*"The CBCS regrets the unfounded and tendentious reporting on ENNIA by certain local
newspapers, which causes unjustified damage to the company's reputation with all the
associated consequences for ENNIA."*

---

[16] *Dutch Parliamentary Papers II* 2011/12, 33079 no. 3, p. 10.

[17] Dutch Supreme Court ruling, October 26th, 2012, *NJ* 2013/220 (X/Theodoor Gilissen), consideration 3.8.2.

7.3    Such negative reports are a result of the emergency proceedings and the CBCS' public
statements on ENNIA. This obviously goes against the interests of the joint creditors of the
Insurers, which should be protected by CBCS. Another main circumstance which needs to be
remedied is the fact that the ENNIA Group is not managed by professionals with the relevant
knowledge, but CBCS employees who lack the expertise and experience to manage an insurance
company. Also, the emergency regulation is a heavy administrative burden, confronting the
ENNIA Group unnecessarily with the related costs.

## 8.    COMPETENT COURT

In accordance with article 95(1) of the CCCP, the Court of First Instance of Curaçao is
authorized to hear this application, since the CBCS is registered in Curaçao.

## CLAIMS

Parman requests the Court to, insofar as possible with immediate effect:

PRIMARILY

a)  with regard to all entities of the ENNIA Group under the emergency regulation:

    *i.*    order the CBCS to file a request under article 61(3) of the LTV to revoke the
emergency regulation within one day as of the date of the Court's decision or to
prohibit the CBCS from executing the emergency regulation, and

    *ii.*    suspend all measures and decisions taken by the CBCS under the emergency
regulation; and

b)  order the CBCS to enter into negotiations with the aim to agree to a restructuring of the ENNIA
Group that would be acceptable to all parties within a period set by the Court; or

ALTERNATIVELY

c)  in the event that the primary requests under (a) and (b) are denied, with regard to only the
Unregulated Entities:

    *i.*    order the CBCS to file a request under article 61(3) of the LTV to revoke the
emergency regulation within one day as of the date of the Court's decision or to
prohibit the CBCS from executing the emergency regulation, and

    *ii.*    suspend all measures and decisions taken by the CBCS under the emergency
regulation; and

d)  to order the CBCS to, within seven days after the date of the summary proceedings judgment,
set out in writing which steps should be taken to carry out the restructuring of the ENNIA Group,
so that the Insurers comply with the required solvency level again; and

e)  to obligate CBCS to carry out restructuring of the ENNIA Group as soon as possible within a
period set by the Court; and

f)  to prohibit the CBCS from selling and/or transferring any ENNIA Group assets to any party
outside the ENNIA Group; and

g)  to order the CBCS to file a request to lift the emergency regulation with regard to the Insurers
and the Unregulated Entities (the latter only in the event the requests under (c) are denied)

28

pursuant to article 61(3) of the LTV, immediately after the restructuring has been implemented; and

h) to obligate the CBCS to refrain from negative reports on Parman, the ENNIA Group and any persons associated with them; and

i) to obligate the CBCS to provide Parman with copies of the Documentation within fourteen days of service of this decision, including:

    *i.* all correspondence and documentation as of 2006 relating to instructions or indications given by the CBCS to the ENNIA Group in the context of the ENNIA Group's restructuring of 2009 and the current envisaged restructuring, including, but not limited to written instructions or indications, minutes of meetings and correspondence between the CBCS, Parman and/or the ENNIA Group;

    *ii.* the financial statements 2006 through 2017 of the Insurers and the Unregulated Entities of the last three years;

    *iii.* all documentation as of 2006, including correspondence between the ENNIA Group and Parman on the one hand and the CBCS on the other, regarding the Insurers' and the Unregulated Entities' inter-company receivables, and the underlying decisions, including, but not limited to written instructions or indications, minutes of meetings and correspondence between the CBCS, Parman and/or the ENNIA Group;

    *iv.* bank statements for EC Investments relating to the past 5 years, from the date of the Court order on this claim;

    *v.* all documents relating to all money transfers from EC Investments in the period 2006 to the present day; and

    *vi.* the application to proclaim the emergency regulation applicable to EC Holding as filed by the CBCS on July 6th, 2018,

this under a penalty of ANG 500,000 (being *five hundred thousand Netherlands Antilles guilders*) or a penalty to be determined by the Court per day that the CBCS is in default of this decision.

## BOTH PRIMARILY AND ALTERNATIVELY

j) to obligate the CBCS to pay a fine of ANG 1 million (being *one million Dutch Antilles guilders*) per day that it is in default of one or more of the decisions above (with the exception of (i)) with a maximum of AND 500 million (being *five hundred million Dutch Antilles guilders*); and

k) to sentence the CBCS to payment of these legal proceedings and subsequent costs, to be supplemented with the legal interest, insofar as possible and insofar as these costs are not paid within fourteen days of service of the decision(s).

---

Case attorneys: Mrs. G. te Winkel and F.C. Leijdesdorff, Jones Day, Concertgebouwplein 20, 1071 LN Amsterdam (Postbus 51204, 2007 EE Amsterdam), phone: +31 (0)20 305 4200, fax: +31 (0)20 305 4201, and Mrs. A. Bach Kolling, Bach Kolling Mediation & Law, Mahaaiweg 7, Willemstad, Curaçao, phone: +599 9 676 3692.

**AAN HET GERECHT IN EERSTE AANLEG VAN CURAÇAO**
**24 OKTOBER 2018**

**Verzoekster verschijnt vrijwillig**

# VERZOEKSCHRIFT
# IN KORT GEDING

Van

## PARMAN INTERNATIONAL B.V.
gevestigd te Curaçao

advocaten: mrs. G. te Winkel en F.C. Leijdesdorff (Jones Day, Amsterdam)
mr. A. Bach Kolling (Bach Kolling Mediation & Law, Curaçao)

Verzoekster

Tegen

## CENTRALE BANK VAN CURAÇAO EN SINT MAARTEN
gevestigd te Curaçao

Gedaagde

advocaten: mrs. S.M. Altena, K.D. Keizer, S.N.I. Francisco

**Verzoeker**:

**PARMAN INTERNATIONAL B.V.**, gevestigd en kantoorhoudende op Curaçao aan de J.B. Gorsiraweg 4, Willemstad, Curaçao, hierna **Parman**, te dezer zake woonplaats kiezende te (1071 LN) Amsterdam aan het Concertgebouwplein 20, ten kantore van Jones Day, van welk kantoor mr. G. te Winkel tot advocaat wordt gesteld alsmede te Mahaaiweg 7, Curaçao, ten kantore van Bach Kolling Mediation & Law van welk kantoor mr. A. Bach Kolling als advocaat wordt gesteld en bevoegd is om als zodanig dit verzoekschrift te ondertekenen en in te dienen, zulks met het recht van substitutie.

Dit verzoek tot het treffen van voorlopige voorzieningen richt zich tegen:


**Gedaagde**:

de **CENTRALE BANK VAN CURAÇAO EN SINT MAARTEN**, gevestigd en kantoorhoudende op Curaçao aan het Simon Bolivarplein 1, Willemstad, Curaçao, hierna de **CBCS**.

2

# INHOUDSOPGAVE

1.    INLEIDING ........................................................................................................... 4
   A   Partijen ............................................................................................................ 4
   B   Relevante feiten ............................................................................................ 4
   C   Enkele opmerkingen vooraf ........................................................................ 8
   D   Verzochte voorlopige voorzieningen ......................................................... 10
   E   Opbouw verzoekschrift ................................................................................ 11
2.    GEEN NOODSITUATIE ..................................................................................... 12
   A   *Intercompany* verhoudingen ...................................................................... 12
   B   Aanwijzingen van CBCS en stille curatoren .............................................. 14
   C   Overdracht USD 100 miljoen ...................................................................... 16
   D   Conclusie ...................................................................................................... 17
3.    HANDELEN CBCS .............................................................................................. 17
4.    GEEN NOODREGELING BIJ ENTITEITEN ZONDER VERGUNNING ............. 18
5.    PROCEDURELE FOUTEN .................................................................................. 20
   A   Inleiding ........................................................................................................ 20
   B   Schending van beginselen van *due process* .............................................. 20
   C   Schending van algemene beginselen van behoorlijk bestuur ..................... 23
   D   Intrekking vergunning nog niet onherroepelijk .......................................... 25
   E   Conclusie ...................................................................................................... 27
6.    HET VERZOEK TOT AFSCHRIFT/INZAGE EX ARTIKEL 843A RV ............... 27
   Ad.1 Parman heeft een rechtmatig belang bij inzage/afgifte ...................... 28
   Ad. 2. Bescheiden zijn voldoende bepaald ................................................. 28
   Ad. 3. Parman is partij bij de rechtsbetrekking .......................................... 29
7.    SPOEDEISEND BELANG ................................................................................... 29
8.    BEVOEGDHEID GERECHT ............................................................................... 30

## VERZOEKSTER GEEFT EERBIEDIG TE KENNEN:

### 1.    INLEIDING

**A    Partijen**

1.1    Aanleiding voor dit kort geding is de gang van zaken rondom het uitspreken van de noodregeling op 4 respectievelijk 6 juli 2018 ten aanzien van ENNIA Caribe Holding N.V. (**ECH**), EC Investments B.V. (**EC Investments**), ENNIA Caribe Leven N.V. (**EC Leven**), ENNIA Caribe Schade N.V. (**EC Schade**), ENNIA Caribe Zorg N.V. (**EC Zorg**) respectievelijk EC Holding N.V. (**EC Holding**) en de gevolgen daarvan voor de (indirecte) aandeelhouders van deze vennootschappen.

1.2    Parman International B.V. (**Parman**) is de 100% aandeelhouder van ECH. ECH en haar (directe en indirecte) dochtermaatschappijen worden hierna tezamen aangeduid als de **ENNIA Groep**.

1.3    EC Leven, EC Schade en EC Zorg (hierna tezamen aangeduid als de **Verzekeraars**) zijn onderdeel van de ENNIA Groep. ECH is enig aandeelhouder van de Verzekeraars. De Verzekeraars, die 70 jaar geleden in Curaçao zijn gevestigd, zijn tezamen de grootste groep van verzekeraars in Caribisch Nederland. Zoals alle andere financiële instellingen staan de Verzekeraars onder toezicht van de CBCS.

1.4    ECH, EC Investments en EC Holding (hierna tezamen aangeduid als de **Niet Gereguleerde Entiteiten**) zijn ook onderdeel van de ENNIA Groep, maar staan niet onder toezicht en hebben nooit onder toezicht gestaan van de CBCS aangezien zij geen verzekeringsbedrijf uitoefenen en daarom niet onderhevig zijn aan een vergunningsplicht. Bovendien is het zo dat EC Holding geen *assets* heeft, geen operationele activiteiten verricht en geen rol speelt in de ENNIA Groep. Het is dan ook onduidelijk waarom de CBCS EC Holding in de noodregeling heeft betrokken.

1.5    Parman zal hierna in subhoofdstukken (B) en (C) – voor zover mogelijk – ingaan op enkele relevante feiten. Als gevolg van de noodregeling heeft Parman geen toegang meer tot enige documentatie, correspondentie of andere vorm van informatie met betrekking tot de ENNIA Groep. Ook de bestuurders van Parman, waarvan enkelen tot voor kort tevens bestuurder waren van bovengenoemde vennootschappen behorende tot de ENNIA Groep, hebben geen toegang meer tot de boeken en bescheiden van deze vennootschappen. Alle feiten die hieronder uiteen zijn gezet, zijn derhalve gebaseerd op herinneringen, de stukken van de CBCS en publieke bronnen.

**B    Relevante feiten**

1.6    Op 3 juli 2018 heeft de CBCS plotseling en zonder enige voorafgaande waarschuwing de vergunningen van de Verzekeraars (de **Vergunningen**) ingetrokken (**Productie 1**), hoogstwaarschijnlijk om het Gerecht te kunnen verzoeken de noodregeling uit te spreken zoals voorzien in artikel 60 Landsverordening Toezicht Verzekeringsbedrijf, zoals gewijzigd bij Landsverordening van 23 november 2015 (**LTV**). De Verzekeraars hebben direct na de intrekking van de Vergunningen op 3 juli 2018 bezwaar ingediend tegen de beschikking van de CBCS (de **Beschikking**). Na het uitspreken van de noodregeling op 4 juli 2018 is de CBCS echter ex artikel 63 lid 1 LTV als directie van de Verzekeraars gaan fungeren, en heeft zij voorts dit bezwaar ingetrokken.

4

1.7    Op 3 juli 2018 heeft de CBCS tevens een formeel verzoek ingediend bij het Gerecht voor het
uitspreken van de noodregeling ten aanzien van de Verzekeraars en de Niet Gereguleerde
Entiteiten ECH en EC Investments (het **CBCS Verzoek**) (**Productie 2**). Het Gerecht heeft
partijen vervolgens opgeroepen voor de behandeling van het CBCS Verzoek ter zitting van 4
juli 2018 om 10.00 uur.

1.8    Vroeg in de ochtend, vóór de behandeling van het CBCS Verzoek, was er een zitting waarin
de Verzekeraars het Gerecht verzochten om een voorlopige voorziening, namelijk verdaging
van de zitting waarop het CBCS Verzoek zou worden behandeld zolang er nog bezwaar en/of
beroep tegen de Beschikking liep. Op deze zitting informeerden de Verzekeraars het Gerecht
dat het in strijd zou zijn met de LTV om de noodregeling uit te spreken voordat de
Beschikking onherroepelijk was geworden. Het Gerecht wees dit verzoek diezelfde dag nog
om en nabij 13.00 uur af. Daarop vooruitlopend werd door het Gerecht om 10.30 uur een
oproep gedaan aan de Verzekeraars, ECH en EC Investments om diezelfde dag om 14.15 uur
ter zitting te verschijnen voor de behandeling van het CBCS Verzoek. Nog geen vier uur later
sprak het Gerecht de noodregeling uit ten aanzien van de Verzekeraars, ECH en EC
Investments (**Productie 3**).

1.9    Ondanks de ingrijpende gevolgen die toepassing van de noodregeling met zich brengt, hadden
de Verzekeraars dus slechts een paar uur de tijd om de meer dan 500 pagina's aan materiaal
en producties van de CBCS te beoordelen.

1.10    Op 6 juli 2018 verzocht de CBCS het Gerecht opnieuw de noodregeling uit te spreken,
ditmaal ten aanzien van EC Holding. Het is onduidelijk waarom de CBCS EC Holding in de
noodregeling wilde betrekken, aangezien EC Holding geen *assets* heeft, geen operationele
activiteiten verricht en geen rol speelt binnen de ENNIA Groep. De stelling van de CBCS dat
zij verkeerd geïnformeerd zou zijn over de structuur van de ENNIA Groep en dat EC Holding
aandelen zou houden in de Verzekeraars is onjuist, evenals het groepsorganigram dat op 6 juli
2018 aan het Gerecht is verstrekt. De aandelen in EC Holding worden gehouden door ECH,
evenals de aandelen in de Verzekeraars. EC Holding is dus een zustervennootschap van de
Verzekeraars. EC Holding houdt geen aandelen; het is een lege vennootschap. Als EC
Holding niet slechts 36 minuten vóór de zitting was geïnformeerd over het verzoek van de
CBCS om de noodregeling ook ten aanzien van EC Holding uit te spreken, had zij dit aan het
Gerecht kunnen uitleggen.

1.11    Dat is echter niet gebeurd, en het verzoek van de CBCS om de noodregeling ook ten aanzien
van EC Holding uit te spreken werd op dezelfde dag door het Gerecht behandeld en
toegewezen (**Productie 4**), wederom zonder EC Holding op gepaste wijze tijdig te informeren
of in de gelegenheid te stellen een verdediging voor te bereiden.

1.12    De noodregeling werd ten aanzien van de ENNIA Groep uitgesproken omdat (i) de
Verzekeraars niet meer zouden voldoen aan de solvabiliteitsvereisten die naar het recht van
Curaçao voor verzekeraars gelden, (ii) de Verzekeraars volgens de CBCS de instructies van
de CBCS en de stille curatoren[1] niet zouden opvolgen, en (iii) omdat er gegronde vrees zou
bestaan dat gelden zouden worden onttrokken aan een Niet Gereguleerde Entiteit (ECI).

1.13    Ten aanzien van het eerste verwijt, merkt Parman het volgende op. In september 2015 heeft
de CBCS de solvabiliteitsvereisten, zoals neergelegd in de solvabiliteitsrichtlijnen (*Valuation
guidelines ARAS 2.7*), zodanig gewijzigd dat de *intercompany* vorderingen van de
Verzekeraars niet langer mogen worden meegenomen bij de berekening van de
solvabiliteitsratio. Als gevolg van deze wijziging voldeden de Verzekeraars technisch gezien
niet langer aan de voorgeschreven minimum solvabiliteitsvereisten, aangezien hun balansen

---

[1]    De CBCS heeft met ingang van 1 oktober 2016 twee stille curatoren benoemd bij EC Leven.

5

voor een belangrijk deel bestaan uit *intercompany* vorderingen. De oorzaak van het feit dat de Verzekeraars technisch gezien niet voldoen aan de nieuwe solvabiliteitsvereisten is echter geheel gelegen in de structuur van de ENNIA Groep en is als zodanig eenvoudig op te lossen door middel van een herstructurering van de activa van de ENNIA Groep. Parman zal dit verderop in dit verzoekschrift nader toelichten.

1.14    Ten aanzien van het tweede en derde verwijt van de CBCS; Parman zal in Hoofdstuk 2.B onderbouwd uiteenzetten dat het verwijt van de CBCS dat de Verzekeraars de instructies van de CBCS en de stille curatoren niet zouden opvolgen ongegrond is. Voorts zal Parman in Hoofdstuk 2.C gemotiveerd uiteenzetten dat er geenszins sprake was van omstandigheden die een gegronde vrees zouden kunnen opleveren dat gelden zouden worden onttrokken aan een Niet Reguleerde Entiteit.

1.15    De vermeende gronden op basis waarvan de CBCS de noodregeling heeft aangevraagd zijn mager geformuleerd en onvoldoende onderbouwd. Er was geen sprake van een noodsituatie die het uitspreken van de noodregeling rechtvaardigde. De CBCS heeft bij haar aanvraag ook geen bewijs geleverd van het tegendeel.

1.16    Door de roekeloze acties van de CBCS heeft Parman alle controle over haar dochtervennootschappen verloren. Zoals gezegd, heeft de ENNIA Groep niet eens de gelegenheid gehad om op een behoorlijke wijze verweer te voeren tegen de ingrijpende verzoeken van de CBCS. Niet alleen de ENNIA Groep, maar ook Parman als aandeelhouder van de ENNIA Groep is hierdoor ernstig benadeeld. Daar komt bij dat Parman thans geen enkele toegang heeft tot de nodige stukken ter nadere onderbouwing van haar stellingen in deze procedure. Parman verkeert zodoende in bewijsnood. Het aan de ENNIA Groep ontnemen van de mogelijkheid om een deugdelijk verweer te voeren is des te eerdelijker, nu de CBCS in de noodregeling-procedure lang niet aan de op haar rustende bewijslast had voldaan. De CBCS heeft zodoende via de onredelijk korte oproepingstermijnen in feite de op haar rustende bewijslast omzeild. Onder deze omstandigheden ligt het in de rede dat in de onderhavige procedure de bewijslast bij de CBCS wordt neergelegd, althans wordt uitgegaan van een verzwaarde stelplicht aan de zijde van de CBCS.

1.17    Dat gezegd hebbende, betwist Parman dat er gegronde vrees was dat de Verzekeraars op enig moment niet meer aan (al) hun financiële verplichtingen zouden kunnen voldoen. Er is geen kapitaaltekort binnen de ENNIA Groep. Evenmin zijn of waren er liquiditeitsproblemen. Dit is ook bevestigd door de CBCS in haar persconferentie gehouden op 5 juli 2018. Een Engelse vertaling van het transcript van deze persconferentie legt Parman over als **Productie 5**.[2] De belangen van de gezamenlijke schuldeisers waren derhalve nooit in gevaar. Zoals gezegd, het onvermogen om op papier aan de solvabiliteitsvereisten te voldoen is het gevolg van de structuur van de ENNIA Groep en is als zodanig eenvoudig op te lossen door middel van een herstructurering van de activa, zodat Verzekeraars ook formeel aan de vereiste solvabiliteit kunnen voldoen.

1.18    De ENNIA Groep is sterk gekapitaliseerd. De waarde van de *assets* van ECH zijn (in miljoenen en bij benadering):

ECI (*assets*)                                                    ANG 1.330

-    ANG 560 miljoen cash (waarvan in totaal USD 155 miljoen inmiddels is gestort bij EC Leven)

-    ANG 770 miljoen in aandelen in Sun Resorts, eigenaar van Mullet Bay

---

[2]         Zie pagina 2, tweede alinea van Productie 5.

| | |
|---|---|
| Banco di Caribe (eigen vermogen) | ANG 325 |
| ENNIA Aruba Equity Operating Entities | ANG 60 |
| EC Leven (vrije reserves) | ANG 90 |
| ------------------------------------------------------------------------- | |
| Total | ANG 1.805 |

1.19    Er is zodoende een waarde van ANG 1.805 miljard in de ENNIA Groep ter dekking van de
*intercompany receivables* van EC Leven van ongeveer ANG 1.3 miljard. De gezonde
financiële positie van de groep wordt verder onderstreept door recent uitgevoerde taxaties van
een van de activa van EC Investments, te weten de aandelen in Sun Resorts N.V. (**Sun
Resorts**), waarin Mullet Bay, een stuk grond van ongeveer 720.000m² op Sint Maarten, is
ondergebracht. Vlak na orkaan Irma is een taxatie uitgevoerd, waaruit volgt dat de waarde van
de onroerende zaak ongeveer USD 431.42 miljoen is, namelijk USD 600 per vierkante meter.
De meest recente taxatie is in april 2018 uitgevoerd, en resulteerde in dezelfde waarde. De
waarde van dit stuk grond is overigens een van de punten van discussie tussen de CBCS en
het voormalig management van de ENNIA Groep. Volgens de CBCS zou de grond veel
minder waard zijn. De CBCS heeft echter jarenlang de jaarrekeningen geaccordeerd, waarin
de waarde van de aandelen in Sun Resorts conform de door de ENNIA Groep verkregen
taxaties van Mullet Bay was opgenomen. Voorts wijst Parman er op dat een deel van het
Mullet Bay grondgebied recent aan een onafhankelijke partij is verkocht voor USD 2.4
miljoen per *acre* (= ongeveer USD 593 per vierkante meter) via Sotheby's International
Realty. Het stuk land dat is verkocht, is het minst gewilde deel van Mullet Bay, aangezien het
zicht heeft op twee parkeerplaatsen en niet *beachfront* is gelegen. Desondanks is het stuk land
verkocht voor om en nabij de taxatiewaarde.

1.20    Tot slot wordt de gezonde financiële situatie van de ENNIA Groep nog verder bevestigd door
de koers van de aandelen in Kirby Corporation (een aan de beurs in New York genoteerd
bedrijf) die EC Investments houdt. Zoals zal worden uiteengezet in paragraaf 2.7, heeft EC
Investments haar aandelen in Stewart & Stevenson (**S&S**) verkocht voor een totaal bedrag
van USD 283 miljoen. De koopprijs bestond voor een deel uit cash en een deel uit aandelen
Kirby Corporation.

1.21    De Kirby-aandelen hebben aanzienlijke waarde gegenereerd voor de ENNIA Groep. De koers
van de Kirby-aandelen is aanmerkelijk gestegen in de periode gelegen tussen 13 september
2017 (de *closing* datum van de S&S-transactie) en de data van het intrekken van de
Vergunningen en het uitspreken van de noodregeling, namelijk van USD 64,35 tot USD 83,75
op 3 juli 2018; een winst van ongeveer USD 20 miljoen voor de Verzekeraars. Echter, als
gevolg van de noodregeling heeft Merril Lynch de bankrekeningen van onder meer EC
Investments geblokkeerd, waardoor er geen transacties meer kunnen plaatsvinden op de
*securities accounts* van ECI. Sinds de noodregeling is uitgesproken en Merril Lynch de
bankrekeningen heeft geblokkeerd, is de koers gedaald tot ongeveer USD 75. Hierdoor is een
deel van de winst in deze investering weer verdampt, hetgeen het directe gevolg is van de
noodregeling.

1.22    Als gezegd was die noodregeling helemaal niet nodig, gezien de gezonde financiële situatie
van de ENNIA Groep. Dit wordt onder meer ook geïllustreerd door het feit dat de
Verzekeraars het afgelopen jaar als eersten in staat waren om direct alle claims uit te betalen
die waren ontstaan naar aanleiding van de orkaan Irma op Sint Maarten. Het vermogen van de
Verzekeraars om deze verplichtingen na te komen is onder meer verzekerd doordat onder de
leningsovereenkomst met EC Investments die was aangegaan voor de investering in S&S een

gegarandeerd en vast rentepercentage van 5% is overeengekomen (zie paragraaf 2.7 en 2.8 voor een nadere toelichting hierop).

1.23    Het enige probleem van de ENNIA Groep is dat – louter als gevolg van een wijziging van de solvabiliteitsrichtlijnen – de balans van de Verzekeraars opeens niet meer voldeed aan de voorgeschreven minimum solvabiliteitsvereisten. De feitelijke financiële situatie van de ENNIA Groep was echter onveranderd. Er zijn voldoende liquide middelen en kapitaal beschikbaar.

1.24    Door de Vergunningen in te trekken en voorts de oplegging van de noodregeling te verzoeken, heeft de CBCS zelf een nadelige situatie voor de Verzekeraars gecreëerd die er voorheen niet was. Sinds de noodregeling is uitgesproken ten aanzien van de ENNIA Groep heerst er onrust (zie in dit verband paragraaf 7.2 en 7.3). Het is dan ook een kwalijke zaak dat de ENNIA Groep tegen het verzoek van de CBCS tot oplegging van de noodregeling geen (deugdelijk) verweer heeft kunnen voeren. De oproepingstermijn die is gehanteerd zowel met betrekking tot de zitting van 4 juli 2018 (om 14.15 uur) als het verweer tegen het verzoek van 6 juli 2018 (uiterlijk om 16.15 uur) was dermate kort (te weten 3 uur en 45 minuten respectievelijk 36 minuten) dat het voeren van verweer praktisch onmogelijk was gemaakt. Had de ENNIA Groep die gelegenheid wel gehad, dan had zij duidelijk kunnen maken dat er geen noodzaak was om de noodregeling uit te spreken met alle schadelijke gevolgen van dien. Immers, nu de noodregeling is uitgesproken wordt de ENNIA Groep niet meer bestuurd door *professionals* die verstand van zaken hebben, maar door medewerkers van de CBCS die niet de kennis en ervaring hebben om een verzekeraar te besturen.

1.25    Door de hiervoor beschreven gang van zaken heeft een ernstige schending van het recht op hoor en wederhoor plaatsgevonden. Dat is een zeer kwalijke zaak, zeker nu het gaat om een verzoek tot het uitspreken van een zover strekkende maatregel als de noodregeling, hetgeen de facto onteigening van een Amerikaanse aandeelhouder tot gevolg heeft, en er geen hoger beroep openstaat tegen de beslissing waarbij de noodregeling wordt uitgesproken.

1.26    Parman als (indirect) aandeelhouder van de Verzekeraars heeft op 13 augustus 2018 beroep ingesteld tegen de Beschikking (**Productie 6**). Op 9 oktober 2018 heeft Parman haar beroepsgronden ingediend (**Productie 7**).

1.27    Op 25 september 2018 heeft de CBCS een *Chapter 15*-procedure aanhangig gemaakt in New York waarbij zij de rechtbank verzoekt om de noodregeling ten aanzien van de Verzekeraars en de Niet Gereguleerde Entiteiten te erkennen in de Verenigde Staten. Op 24 oktober 2018 heeft Parman een *Objection* tegen het verzoek van de CBCS ingediend bij de *United States Bankruptcy Court Southern Dsitrict of New York*. Mede naar aanleiding van deze actie van de CBCS heeft Parman besloten het onderhavige kort geding aanhangig te maken.

**C       Enkele opmerkingen vooraf**

1.28    Sinds de noodregeling is uitgesproken, heeft Parman de gelegenheid gehad om het CBCS Verzoek en de bijbehorende producties te bestuderen. Voordat Parman ingaat op de door de CBCS aangevoerde gronden in het CBCS Verzoek, wil zij een aantal belangrijke opmerkingen maken:

a) De solvabiliteitsproblematiek van EC Leven zou relatief eenvoudig hersteld kunnen worden, bijvoorbeeld door het navolgende te doen:

   • Het ongedaan maken van alle *book-entries* met betrekking tot de overdracht van *assets* van EC Leven naar EC Investments, die overigens door de CBCS waren goedgekeurd. Als gevolg van deze correctie zullen alle vorderingen van EC

8

Leven op EC Investments worden voldaan door middel van betaling van geldmiddelen en/of kasequivalenten en andere *assets*.

- De vorderingen in de boeken van EC Leven jegens ECH kunnen volledig worden voldaan door – met toestemming van de aandeelhouders – de ingehouden winsten van Banco di Caribe uit te keren aan ECH. ECH zou vervolgens deze fondsen kunnen aanwenden ter voldoening van haar schulden aan EC Leven.

Deze oplossingen voor de technische solvabiliteitsproblematiek zijn in overeenstemming met de herstructureringsplannen die zijn opgesteld door de ENNIA Groep en die herhaaldelijk uitgebreid met de CBCS in verschillende bijeenkomsten zijn besproken, waaronder de bijeenkomst van 21 juni 2018, zijnde de laatste bijeenkomst voorafgaand aan de toewijzing van het CBCS Verzoek.

b) Het voorkomen van verlies van bekwaam personeel als gevolg van de noodregeling is van cruciaal belang. Het is namelijk het zeer bekwame personeel van de ENNIA Groep dat mogelijk heeft gemaakt dat ENNIA Leven heeft kunnen uitgroeien tot de grootste en meest succesvolle verzekeraar van het Nederlands Caribisch gebied. Gelukkig heeft het vertrek van gekwalificeerd talent nog geen kritiek peil bereikt. Om het personeel te behouden is het echter van groot belang dat de noodregeling zeer spoedig wordt opgeheven.

c) In de verzekeringssector is *critical mass* van cruciaal belang. De economie van Curaçao is daartoe ontoereikend en de historische jaarlijkse BBP-groei is niet meer dan circa 1% per jaar. Het is dan ook een dagelijkse uitdaging om het marktaandeel van de Verzekeraars te laten groeien of zelfs te behouden. Ook om deze reden is het verzoek van Parman tot opheffing van de noodregeling gerechtvaardigd.

d) Sinds Parman de ENNIA Groep heeft overgenomen hanteert de ENNIA Groep een beleid waarbij zij er naar streeft om haar rendement te vergroten door kansen aan te grijpen op de Amerikaanse investeringsmarkt in plaats van de concurrentie aan te gaan op de lokale markt. Dit beleid heeft geresulteerd in mooie rendementen die het gemiddelde rendement op een lokale investering ruimschoots overschrijden. Het is simpelweg niet mogelijk om dergelijke rendementen te realiseren op de lokale markt.

e) In het verleden is de noodregeling alleen uitgesproken ten aanzien van entiteiten die niet meer aan hun financiële verplichtingen konden voldoen, dan wel *cash flow* problemen hadden waardoor er betalingsproblemen ontstonden jegens klanten, banken, werknemers, leveranciers, belastingdienst etc. In het geval van de ENNIA Groep is juist het omgekeerde het geval. De ENNIA Groep is nooit eerder zo liquide, winstgevend, succesvol en stabiel geweest als op het moment dat de noodregeling abrupt en zonder dat een redelijke oproepingstermijn voor de behandeling van het verzoek daartoe in acht was genomen, werd uitgesproken.

f) De CBCS heeft één van Curaçao's meest bekwame en toegewijde management teams ontslagen zonder daarbij een behoorlijke termijn in acht te nemen en hen in de gelegenheid te stellen een verweer te voeren. Voorts werd het management niet alleen de toegang tot het kantoor ontzegd. De CBCS ging zelfs zo ver dat zij het management beval om op korte termijn de door het bedrijf geboden woonvoorzieningen te verlaten.

g) De CBCS heeft daarnaast ook geprobeerd om de publieke opinie negatief te beïnvloeden door onder meer te suggereren dat de ENNIA Groep zich schuldig heeft gemaakt aan verduistering doordat EC Investments, een niet-gereguleerde

9

vennootschap, een geldbedrag had overgemaakt naar een andere niet-gereguleerde vennootschap om een investering te doen, terwijl dit soort transacties binnen de normale bedrijfsuitoefening van EC Investments vallen en geen goedkeuring van de CBCS vereisen.

**D    Verzochte voorlopige voorzieningen**

1.29    Nu er geen gegronde redenen waren voor het uitspreken van de noodregeling, verzoekt Parman het Gerecht primair om (i) de CBCS te bevelen een verzoek ex artikel 61 lid 3 LTV in te dienen tot intrekking van de noodregeling ten aanzien van de Verzekeraars en de Niet Gereguleerde Entiteiten, en (ii) alle maatregelen en besluiten die zijn genomen door de CBCS in het kader en ten tijde van de noodregeling te schorsen. Daarnaast verzoekt Parman het Gerecht om te bevelen dat de CBCS met Parman om de tafel gaat zitten met als doel op korte termijn een voor alle partijen acceptabele herstructurering van de ENNIA Groep overeen te komen.

1.30    Subsidiair, te weten uitsluitend in het geval de primaire vorderingen van Parman zouden worden afgewezen, verzoekt Parman het Gerecht om dezelfde voorlopige maatregelen te treffen maar dan enkel met betrekking tot de Niet Gereguleerde Entiteiten.

1.31    Om te voorkomen dat schade wordt toegebracht aan de ENNIA Groep verzoekt Parman het Gerecht daarnaast om de CBCS te bevelen om binnen zeven dagen na de datum van het kort gedingvonnis schriftelijk uiteen te zetten welke stappen dienen te worden genomen in het kader van de herstructurering van de ENNIA Groep, zodat de Verzekeraars weer voldoen aan het vereiste solvabiliteitsniveau, en te bevelen dat de herstructurering binnen een door het Gerecht te bepalen termijn zal worden geïmplementeerd en nadat de herstructurering is voltooid, de zeggenschap en controle over de ENNIA Groep wordt teruggegeven aan de aandeelhouder. Voorts verzoekt Parman het Gerecht om de CBCS te verbieden enige activa van de ENNIA Groep te verkopen aan een partij of partijen die niet behoren tot de ENNIA Groep of daar anderszins over te beschikken.

1.32    Daarnaast verzoekt Parman het Gerecht om aan de CBCS een verbod op te leggen tot het doen van negatieve uitlatingen over Parman, de ENNIA Groep en aan hen gelieerde personen. Tot slot verzoekt Parman het Gerecht om de CBCS te bevelen om inzage te geven in dan wel afschrift te verstrekken van bepaalde stukken die Parman nodig heeft om haar standpunten die betrekking hebben op de financiële toestand van de ENNIA Groep, nader te kunnen onderbouwen. Als gevolg van de noodregeling is Parman immers volledig buitenspel gezet en heeft zij geen toegang meer tot deze informatie.

1.33    Parman wijst erop dat, mocht de noodregeling in stand blijven, herstructureren ook het enige is dat de CBCS juridisch gezien mag doen ten aanzien van de Verzekeraars. Op grond van artikel 60 lid 1 LTV kan het Gerecht de noodregeling slechts uitspreken op verzoek van de CBCS. De CBCS heeft in het CBCS Verzoek uitsluitend verzocht om de noodregeling uit te spreken met de opdracht om tot herstructurering over te gaan ex artikel 60 lid 2 sub (c) LTV. Uit de tekst en systematiek van artikel 60 lid 1 en 2 LTV vloeit voort dat de opdracht tot herstructurering genoemd in artikel 60 lid 2 sub (c) LTV, een alternatieve opdracht is en niet tevens omvat de opdracht tot vereffening (ex artikel 60 lid 2 sub (a) LTV) en overdracht van rechten en verplichtingen (ex artikel 60 lid 2 sub (b) LTV). Dit volgt uit de tekst van artikel 60 lid 2 LTV, waar bij de opsomming van de drie mogelijke opdrachten gebruik wordt gemaakt van het woord 'of'. Het uitspreken van de noodregeling op 4 juli 2018 heeft de CBCS dus niet de bevoegdheid gegeven om de portefeuille van de Verzekeraars te vereffenen of te verkopen.

1.34   Bovenstaande interpretatie wordt gesteund door de memorie van toelichting bij de gewijzigde
       LTV, waar wordt benadrukt dat sinds 2015 (toen de LTV voor het laatst werd gewijzigd),
       herstructurering ook een mogelijke opdracht kan zijn bij het uitspreken van de noodregeling,
       in aanvulling op de twee andere opdrachten die voor de LTV-wijziging van 2015 al
       bestonden, namelijk vereffening en overdracht. Parman verwijst in dit verband naar de
       volgende passage uit de memorie van toelichting:

> *"De wijziging van het tweede lid van dit artikel is het directe gevolg van het*
> *herziene eerste lid van artikel 60 van de LTV. In het herziene tweede lid van artikel*
> *60 van de LTV wordt opgenomen dat de Bank ook gemachtigd kan worden tot de*
> *herstructurering van het bedrijf van de verzekeraar. Uit de praktijk blijkt dat niet*
> *slechts de in het tweede lid van artikel 60 van de LTV, zoals dit luidde voor de*
> *inwerkingtreding van de onderhavige ontwerplandsverordening, genoemde*
> *opdrachten mogelijk moeten zijn bij het uitspreken van de noodregeling, maar dat*
> *ook dat herstructurering van het bedrijf van de verzekeraar een mogelijke opdracht*
> *moet kunnen zijn."*

1.35   Uit deze passage blijkt dat de drie in artikel 60 lid 2 LTV genoemde opdrachten, alternatieve
       opdrachten zijn. De noodregeling die ten aanzien van de Verzekeraars is uitgesproken
       machtigt de CBCS zodoende enkel tot herstructurering van de ENNIA Groep.

1.36   Om te voorkomen dat schade wordt toegebracht aan de ENNIA Groep dient – indien de
       noodregeling in stand blijft – de herstructurering op korte termijn te worden doorgevoerd.
       Nadat de uitvoering is voltooid, dient de zeggenschap en controle weer volledig bij de
       aandeelhouder van de ENNIA Groep te komen liggen door opheffing van de noodregeling.
       Tevens zal moeten zijn gewaarborgd dat de CBCS niet zal overgaan tot verkoop en
       overdracht van enige activa van de ENNIA Groep aan een partij of partijen die niet behoren
       tot de ENNIA Groep.

1.37   Eveneens om te voorkomen dat schade wordt toegebracht aan de ENNIA Groep (voor zover
       dat nog niet is gebeurd), dient de CBCS zich te onthouden van negatieve berichtgevingen
       over de ENNIA Groep en aan haar gelieerde personen.

1.38   Parman benadrukt dat de CBCS dient te handelen in het belang der gezamenlijke schuldeisers
       (artikel 63 lid 2 LTV), en dat de huidige situatie – waarbij de Verzekeraars worden bestuurd
       door medewerkers van de CBCS die niet de kennis en ervaring hebben om een verzekeraar te
       besturen – juist schadelijk is voor de bedrijfsvoering van de ENNIA Groep en dus voor de
       gezamenlijke schuldeisers. Voor ogen gehouden moet worden dat de noodregeling slechts kan
       worden uitgesproken wanneer het belang der gezamenlijke schuldeisers die bijzondere
       voorziening vordert. Gezien de financiële situatie van de ENNIA Groep, was daarvan geen
       sprake. Er is voldoende kapitaal in de groep. Nu de verschillende entiteiten van de ENNIA
       Groep worden bestuurd door medewerkers van de CBCS, komt het belang van de
       gezamenlijke schuldeisers daarentegen wel in het geding als dit te lang voortduurt vanwege
       het ontbreken van de kennis en ervaring om een verzekeringsbedrijf te runnen. In dit verband
       wijst Parman op de hiervoor genoemde koersdaling van de aandelen in Kirby.

**E      Opbouw verzoekschrift**

1.39   In Hoofdstuk 2 zal Parman de gronden die de CBCS ten grondslag heeft gelegd aan haar
       verzoek tot het uitspreken van de noodregeling uiteenzetten en de onjuistheid daarvan
       aantonen. Het gaat daarbij – kort gezegd – om (i) de solvabiliteitspositie van de Verzekeraars,
       (ii) het vermeende feit dat de Verzekeraars de instructies van de CBCS en de stille curatoren
       niet zouden hebben opgevolgd en (iii) de overboeking door EC Investments van een bedrag
       van USD 100 miljoen. Parman zal eerst uiteenzetten welke *intercompany* verhoudingen er
       zijn en hoe deze zijn ontstaan, om aan te tonen dat zij geen bedreiging vormen voor de

11

financiële stabiliteit van de ENNIA Groep. Daarna zal Parman nogmaals toelichten waarom er geen sprake was van een noodsituatie die het inroepen van de noodregeling rechtvaardigde en dat de ENNIA Groep en de CBCS nog middenin onderhandelingen waren over een herstructurering van de ENNIA Groep. Vervolgens zal Parman aantonen dat de stelling dat de Verzekeraars de instructies van de CBCS en de stille curatoren niet opvolgden onjuist is. Tot slot zal Parman in Hoofdstuk 2 ingaan op wat kennelijk de directe aanleiding voor het aanvragen van de noodregeling is geweest, te weten de overboeking van een bedrag van USD 100 miljoen door EC Investments.

1.40    In Hoofdstuk 3 zal Parman kort toelichten dat juist het handelen van de CBCS kan leiden tot financiële instabiliteit van de ENNIA Groep en zodoende van Curaçao. In Hoofdstuk 4 zal Parman uiteenzetten dat de noodregeling ten aanzien van de Niet Gereguleerde Entiteiten niet had mogen worden uitgesproken. In Hoofdstuk 5 zal Parman uiteenzetten dat er ook procedureel niet is voldaan aan de criteria voor het uitroepen van de noodregeling. In Hoofdstuk 6 zal Parman haar vordering op grond van artikel 843a Rv uiteenzetten. In Hoofdstuk 7 zal Parman toelichten dat zij een spoedeisend belang heeft bij de gevraagde voorzieningen. In Hoofdstuk 8 zal Parman ingaan op de bevoegdheid van het Gerecht om van haar verzoek kennis te nemen.

## 2.    GEEN NOODSITUATIE

### A    *Intercompany* verhoudingen

2.1    Zoals reeds toegelicht in paragraaf 1.13, ontstond het vermeende solvabiliteitsprobleem als gevolg van de wijziging in de solvabiliteitsvereisten, zoals neergelegd in de solvabiliteitsrichtlijnen (*Valuation Guidelines ARAS 2.7*). Als gevolg van deze wijziging, konden *intercompany* vorderingen niet langer worden meegenomen bij de berekening van de solvabiliteit van een verzekeraar. Het merendeel van de *intercompany* vorderingen die momenteel op de balans van EC Leven staan, is echter ontstaan als gevolg van instructies van de CBCS zelf.

2.2    Eén van de grootste *intercompany* vorderingen in de boeken van EC Leven betreft een lening van ANG 300 miljoen ter financiering van de overname van de aandelen in Sun Resorts door EC Investments van Banco di Caribe. Zoals gezegd is Sun Resorts de eigenaar van het onroerend goed Mullet Bay op Sint Maarten. Belangrijk hierbij is dat Parman (destijds de directe aandeelhouder van Banco di Caribe) in januari 2006 – met goedkeuring van de CBCS – de aandelen in Sun Resorts als kapitaal had ingebracht in Banco di Caribe, om zodoende de aankoop van de aandelen in ECH te kunnen financieren. De transactiewaarde van de aankoop van ECH was circa USD 75 miljoen. De aandelen waren op dat moment gewaardeerd op USD 175 miljoen. Er was dus een surplus aan geïnjecteerd kapitaal van USD 100 miljoen. Dit surplus was niet vereist, aangezien Banco di Caribe ook zonder deze USD 100 miljoen reeds aan haar solvabiliteitseisen voldeed. Ook was het niet zo dat de CBCS de instructie had gegeven om het surplus van USD 100 miljoen te injecteren.

2.3    Een aantal maanden later kwam de CBCS terug op haar beslissing en deelde zij het management van Banco di Caribe mee dat zij eenzijdig had besloten haar eerder gegeven goedkeuring in te trekken. Voorts nam de CBCS de opmerkelijke stap om het management van Banco di Caribe te instrueren de betreffende aandelen in Sun Resorts uit het gereguleerde Banco di Caribe te halen, en over te dragen aan EC Investments. Daarnaast instrueerde de CBCS het management van Banco di Caribe om deze overdracht te administreren als een directe verkoop van Banco di Caribe aan EC Investments in plaats van een teruggave van kapitaal aan ECH en een nieuwe kapitaalinjectie in EC Investments. Het is evident dat de CBCS niet het management van Banco di Caribe had moeten benaderen, maar de

12

Amerikaanse aandeelhouders die – met goedkeuring van de CBCS – hadden besloten om de aandelen in Sun Resorts als kapitaal in te brengen ter financiering van de aankoop van ECH.

2.4    Onder druk van de CBCS volgde het management van Banco di Caribe de instructies van de CBCS op. Voor zover Parman heeft begrepen kocht EC Investments een deel van de aandelen in Sun Resorts van Banco di Caribe voor ANG 300 miljoen. Als gevolg daarvan werd EC Investments gedwongen om een aanzienlijke koopprijs te betalen waarvoor zij financiering moest aantrekken van EC Leven, en waarbij zij zich committeerde aan het betalen van een jaarlijkse rente van 5% aan EC Leven. De financiering bestond uit *performing assets* zoals hypotheken en verzekeringsportefeuilles met een totale waarde van ANG 300 miljoen. Deze activa werden verplaatst van EC Leven naar Banco di Caribe. Dit creëerde de vordering tussen EC Investments en EC Leven.

2.5    Er was geen gegronde reden voor deze transactie. Zoals gezegd, had Banco di Caribe het surplus van USD 100 miljoen niet nodig om aan de solvabiliteitsvereisten te voldoen. De CBCS had daarom Parman de keuze moeten bieden om de door haar ingebrachte *asset* uit Banco di Caribe te halen en andere financiering te regelen voor de aankoop van ECH. In plaats daarvan verplichtte de CBCS Banco di Caribe om Sun Resorts/Mullet Bay aan EC Investments te verkopen, hetgeen heeft geleid tot een *intercompany* vordering in de boeken van EC Leven ten bedrage van ANG 300 miljoen plus een jaarlijkse renteverplichting van 5%.

2.6    Een andere *intercompany* vordering die is gecreëerd op aanbeveling en met goedkeuring van de CBCS zijn de leningen van in totaal ANG 186 miljoen van de werkmaatschappijen aan ECH (voornamelijk van EC Leven en Banco di Caribe). In de periode 2006 tot en met 2016 boekten de werkmaatschappijen winst. De CBCS stond de gereguleerde entiteiten echter niet toe om deze winst uit te keren aan de aandeelhouder, ECH. Om het voor ECH toch mogelijk te maken om dividend uit te keren aan Parman, kwam de CBCS met de suggestie om de betreffende dividenduitkeringen te financieren met leningen van de werkmaatschappijen aan ECH. Zo behielden de werkmaatschappijen vorderingen ter waarde van de uitgekeerde bedragen. Deze vorderingen telden tot september 2015 nog mee als kapitaalsdekking van de schulden van de werkmaatschappijen.

2.7    De derde en laatste grote *intercompany* vordering op de balans van EC Leven ziet op leningen van in totaal USD 203 miljoen met een jaarlijkse renteverplichting van 5% aan EC Investments ter financiering van aankopen in de periode 2006 tot en met 2011 van preferente aandelen in olie- en gasapparatuur toeleverancier S&S. Dit was een van de Amerikaanse investeringen van EC Investments. In september 2017 heeft EC Investments de aandelen in S&S verkocht aan Kirby Corporation voor een totaalbedrag van USD 283 miljoen. De koopprijs werd als volgt betaald:

- 50% in cash: Kirby Corporation betaalde een bedrag van USD 141,5 miljoen aan EC Investments. Een bedrag van USD 55 miljoen werd door EC Investments aangewend om leningen van EC Leven af te lossen.

- 50% in aandelen: EC Investments verwierf aandelen in Kirby Corporation voor een bedrag van USD 141,5 miljoen. EC Investments houdt op dit moment nog steeds deze aandelen.

2.8    EC Investment zou niet in staat zijn geweest om de 5% renteverplichting op de leningen van EC Leven te garanderen, indien zij alleen zou investeren op de lokale markt. De CBCS was daarom ook een voorstander van de investeringen in de Verenigde Staten. EC Investment heeft bijvoorbeeld met de S&S investering een rendement van ongeveer USD 225 miljoen behaald. Dit komt neer op een rendement van 10 tot 11% per jaar, en overschrijdt dus

13

ruimschoots de renteverplichtingen aan EC Leven. Zoals reeds opgemerkt in paragraaf 1.28 onder (d), hanteert de ENNIA Groep een beleid waarbij zij er naar streeft haar rendement te vergroten door kansen aan te grijpen op de Amerikaanse investeringsmarkt. Dit beleid heeft geresulteerd in mooie rendementen die het gemiddelde rendement op een lokale investering ruimschoots overschrijden.

2.9    Gezien het voorgaande is het onjuist en onredelijk dat de CBCS de *intercompany* verhoudingen aanwendt ter onderbouwing van haar verzoek tot het uitspreken van de noodregeling. Parman realiseert zich dat op grond van de nieuw solvabiliteitsrichtlijnen de *intercompany* vorderingen van de Verzekeraars niet langer mogen worden meegenomen bij de berekening van de solvabiliteitsratio, en dat de Verzekeraars als gevolg daarvan technisch gezien niet voldoen aan de solvabiliteitsvereisten. Om deze reden was het management van de Verzekeraars in onderhandeling met de CBCS over een voor alle partijen acceptabele herstructurering van de *intercompany* leningen. Deze onderhandelingen liepen overigens nog op het moment dat de CBCS het CBCS Verzoek indiende. Hierbij is van belang dat de CBCS de ENNIA Groep aanvankelijk drie jaar de tijd had gegeven om de balans van de Verzekeraars in overeenstemming te brengen met de Richtlijnen. Dit volgt uit de brief van 4 augustus 2016 van de CBCS aan de ENNIA Groep (**Productie 8**). In deze brief had de CBCS de ENNIA Groep verschillende instructies gegeven om de solvabiliteitspositie van EC Leven te verbeteren. Er werd een termijn gegeven om hier uitvoering aan te geven, die liep tot 4 augustus 2019. Die termijn loopt zodoende nog steeds.

2.10    Eind 2017 is er bij de CBCS echter een nieuw bestuur benoemd. Het nieuwe bestuur wilde – anders dan met het voormalige bestuur van de CBCS was overeengekomen – dat de Verzekeraars vaart zouden zetten achter een herstructurering. Dit, terwijl de Verzekeraars nog ruim anderhalf jaar de tijd hadden om de herstructurering uit te voeren.

2.11    In de weken voorafgaand aan de toepassing van de noodregeling, spraken het bestuur van de Verzekeraars en het bestuur van de CBCS over verschillende mogelijkheden die de solvabiliteitsproblematiek van de Verzekeraars zouden kunnen oplossen. Een vertegenwoordiger van Parman was ook betrokken bij deze gesprekken. Het laatste gesprek vond plaats op 21 juni 2018, anderhalve week vóór dat de CBCS haar verzoek tot uitspreken van de noodregeling had ingediend. Dit gesprek eindigde met het verzoek van de CBCS aan het bestuur van de Verzekeraars om met een voorstel te komen.

2.12    Nu blijkt dat – terwijl het bestuur van de Verzekeraars geheel te goeder trouw aan de slag ging met het verzoek van de CBCS – de CBCS toen reeds bezig moet zijn geweest met het opstellen van het CBCS Verzoek. Ondanks dat partijen nog steeds in gesprek waren over een verdere uitwerking van een oplossing, trok de CBCS zonder enige waarschuwing op 3 juli 2018 de Vergunningen in en diende het CBCS Verzoek in bij het Gerecht. Parman benadrukt nogmaals dat de financiële situatie van de ENNIA Groep onveranderd en geenszins precair was. Er was dus geen gegronde reden om opeens de noodregeling aan te vragen.

**B    Aanwijzingen van CBCS en stille curatoren**

2.13    De CBCS stelt in het CBCS Verzoek dat de beleidsbepalers en medebeleidsbepalers van de Verzekeraars de aanwijzingen van de CBCS en van de stille curatoren niet zouden hebben opgevolgd.[3] De CBCS onderbouwt deze stelling door in het CBCS Verzoek te verwijzen naar een eenzijdige set van brieven die door de CBCS aan de Verzekeraars zijn gestuurd in de periode 2013 tot en met 2017 (**Productie 9**). De CBCS heeft echter nagelaten enige nadere toelichting hierop te geven, alsook de antwoorden van de Verzekeraars op die brieven in te brengen.

---

[3]    CBCS Verzoek, §§ 8 en 18 (Productie 2).

14

2.14    Parman merkt op dat de Verzekeraars elke brief die door de CBCS is overgelegd in de
noodregeling-procedure hebben beantwoord door middel van brieven, e-mails, besprekingen,
telefoongesprekken en anderszins. Parman hoopt op begrip van het Gerecht voor het feit dat
zij, als gevolg van het uitspreken van de noodregeling, momenteel geen enkele toegang heeft
tot enige documentatie betreffende de ENNIA Groep. Parman is daarom niet in staat om haar
standpunt met documentatie te onderbouwen. Om desondanks aan te tonen dat op grond van
de door de CBCS overgelegde brieven niet kan worden geconcludeerd dat de ENNIA Groep
materiële aanwijzingen van de CBCS niet zou hebben opgevolgd, heeft Parman per relevante
paragraaf uit de betreffende brieven een reactie opgesteld (**Productie 10**). De brieven van 10
december 2013, 10 maart 2014 en 29 september 2016 komen niet aan de orde in het overzicht
van Productie 10, omdat deze brieven geen (nieuwe) verwijten dan wel aanwijzingen
bevatten.

2.15    Eén van de instructies van de CBCS is dat de onroerende zaak Mullet Bay, dan wel de
aandelen Sun Resorts binnen drie jaar gerekend vanaf 4 augustus 2016 verkocht moeten
worden. Ten aanzien van deze instructie merkt Parman het volgende op:

- het is, gezien de gang van zaken met betrekking tot Mullet Bay zoals beschreven in
de paragrafen 2.2 tot en met 2.5, op zijn zachtst gezegd wrang dat de CBCS nu
kritisch is over het feit dat Mullet Bay (nog) niet is verkocht;

- daar komt bij dat de gegeven termijn van drie jaar nog niet is verstreken;

- de Verzekeraars hebben de CBCS ook meerdere keren uitgelegd dat de verkoop zou
resulteren in een substantieel verlies van circa ANG 60 miljoen. Het zou ook leiden
tot overbodige en onnodige liquiditeit binnen de ENNIA Groep;

- Parman is voorts van mening dat de aanwijzingen van de CBCS de bevoegdheid van
de CBCS te buiten gaan door te eisen dat alle activa omgezet zouden moeten worden
in geld. Overeenkomstig artikel 31(1) LTV kan de CBCS een verzekeraar een
bindende aanwijzing geven als de CBCS dit noodzakelijk acht in het belang van
degenen die als polishouders, verzekerde partijen of partijen die recht hebben op
uitbetalingen,    betrokken    zijn    of    betrokken    zullen    worden    bij    de
verzekeringsovereenkomsten die door een verzekeraar zijn aangegaan of aangegaan
zullen worden. Dit toont aan dat een aanwijzing die door de CBCS wordt gegeven
niet simpelweg maar alles kan worden wat de CBCS juist acht. Een aanwijzing
dient, kortgezegd, in het belang van de polishouders te zijn (om volledig te zijn:
degenen die als polishouders, verzekerde partijen of partijen die recht hebben op
uitbetalingen    betrokken    zijn    of    betrokken    zullen    worden    bij    de
verzekeringsovereenkomsten die door een verzekeraar zijn aangegaan of aangegaan
zullen worden). De verkoop van Sun Resorts/Mullet Bay zou nadelig geweest zijn
voor de polishouders van de Verzekeraars en voor de Verzekeraars zelf; en

- ook is Parman van mening dat als de Verzekeraars de instructie hadden opgevolgd
om alle activa om te zetten in cash, de bestuurders van de Verzekeraars in strijd
hadden gehandeld met de op hen rustende fiduciaire plicht om te handelen in het
belang van de Verzekeraars.

2.16    De bewering dat de ENNIA Groep instructies van de stille curatoren niet zou hebben
opgevolgd is niet gespecificeerd, laat staan onderbouwd. De CBCS geeft geen enkel voorbeeld
van een situatie waarin dergelijke instructies niet zouden zijn opgevolgd. De brieven van de
CBCS hebben geen betrekking op de stille curatele, omdat deze brieven (behalve de brief van
21 december 2017) dateren van vóór de datum van de stille curatele. De brieven van 22 en 29
september 2016 gaan met name over de aanstelling van de stille curatoren als zodanig, maar

15

refereren niet aan enige instructie van de stille curatoren (die beweerdelijk niet zou zijn
opgevolgd). Tot slot maakt ook de brief van 21 december 2017 geen melding van enige
instructie van de stille curatoren die niet zou zijn opgevolgd door de ENNIA Groep. Er is dan
ook geen enkele aanwijzing dat de ENNIA Groep instructies van de stille curatoren niet zou
hebben opgevolgd, noch is er enig concreet voorbeeld genoemd van een situatie waarin het
management zou hebben gehandeld zonder goedkeuring van de stille curatoren terwijl dat wel
nodig zou zijn geweest.

**C    Overdracht USD 100 miljoen**

2.17    De directe aanleiding om op 3 juli 2018 de noodregeling aan te vragen lijkt te zijn geweest, zo
blijkt uit het CBCS Verzoek, de overboeking van USD 100 miljoen door EC Investments –
een niet-gereguleerde entiteit – vanuit de door haar bij Merrill Lynch New York aangehouden
bankrekening. Dat deze betaling is aangegrepen als reden om per direct de noodregeling aan
te vragen is geheel onterecht, aangezien de betaling van USD 100 miljoen geenszins een
bijzondere en voor de ENNIA Groep nadelige transactie was. EC Investments had het bedrag
van USD 100 miljoen begin juli 2018 overgemaakt met het oog op een bepaalde investering,
die juist bedoeld was om voldoende rendement te verschaffen om aan de verplichtingen van
de Verzekeraars te kunnen voldoen. Daar komt bij dat de betaling is gedaan door een
entiteit die niet onder toezicht staat van de CBCS aan een entiteit die ook niet onder toezicht
staat van de CBCS. Niet valt in te zien waarom een overboeking van gelden door een niet
gereguleerde vennootschap waarvan 100% van de aandelen worden gehouden door een
private partij, hetgeen een gebruikelijke transactie is waarvoor nooit goedkeuring van de
CBCS nodig is geweest, nu opeens de basis zou kunnen vormen voor toepassing van de
noodregeling. Overigens is het bedrag op eigen initiatief teruggestort, zij het niet aan EC
Investments maar direct aan EC Leven. Daarmee is dus tegelijkertijd een bedrag van
USD 100 miljoen van de *intercompany* lening van EC Leven aan EC Investment afgelost.

2.18    Op het moment dat EC Investments de investering ten bedrage van USD 100 miljoen wilde
doen, had zij een bedrag van USD 280 miljoen aan beschikbare cash op haar rekening staan.
Van dat bedrag moest zij in ieder geval USD 148 miljoen reserveren ter dekking van haar
schuld aan EC Leven, te weten de *intercompany* vordering van EC Leven op EC Investments
met betrekking tot de S&S investering. De onroerende zaak Mullet Bay diende ter dekking
van de *intercompany* vordering met betrekking tot de aankoop van de aandelen in Sun
Resorts. EC Investments had dus beschikbare ruimte om de investering ad USD 100 miljoen
te doen.

2.19    Zoals gezegd is de openstaande schuld van EC Investments aan EC Leven verminderd met
USD 100 miljoen, nu het bedrag van USD 100 miljoen is teruggestort op de rekening van EC
Leven. Daar komt bij dat EC Investments met haar investeringen in de Verenigde Staten een
bedrag van USD 111 miljoen aan winst heeft gegenereerd. Van dit bedrag is USD 86 miljoen
bestemd om de rente af te lossen en het resterende bedrag van USD 25 miljoen is bestemd om
een gedeelte van de hoofdsom af te lossen. Dit betekent dat de schuld van EC Investments aan
EC Leven reeds is verminderd met USD 211 miljoen.

2.20    Het was van levensbelang voor de ENNIA Groep dat zij dit soort buitenlandse investeringen
deed en kon blijven doen, om aan het vereiste rendement van 5 % te komen. Gezien de kleine
markt van Curaçao, kon de ENNIA Groep niet leven van binnenlandse beleggingen en
uiteraard al helemaal niet van de rente die zij van de bank ontving. De overmaking van de
USD 100 miljoen was dus, anders dan de CBCS het doet voorkomen, helemaal niet een
bijzondere en voor de ENNIA Groep nadelige transactie. Sterker nog, EC Investments is het
investeringsvehicle van de ENNIA Groep en voerde dergelijke transacties veelvuldig uit met
medeweten van de CBCS. Als de CBCS nu zo'n punt maakt van de overboeking, waarom
heeft zij dit dan nooit bij eerdere vergelijkbare overboekingen gedaan?

16

2.21 Het is bovendien altijd de intentie geweest van de Amerikaanse *ultimate benefical owners* dat de opbrengsten en rendementen uit de investeringen op Curaçao zouden blijven, ook indien en voorzover deze rendementen de renteverplichting van 5% van EC Investments jegens de Verzekeraars zou overstijgen. De transactie van USD 100 miljoen viel zodoende binnen de normale bedrijfsuitoefening van EC Investments. Van een onttrekking van gelden aan de ENNIA Groep was ook in het geheel geen sprake. De betaling van USD 100 miljoen had geen nadelige gevolgen voor EC Leven en schiep dus evenmin een noodsituatie zoals bedoeld in de LTV, waarvoor de noodregeling moest worden uitgeroepen.

**D     Conclusie**

2.22 Uit het voorgaande volgt dat er geen sprake was van een noodsituatie die de oplegging van de noodregeling rechtvaardigde. Immers:

a) de ENNIA Groep beschikt over voldoende kapitaal. Door dat kapitaal te herstructureren, kan de solvabiliteitspositie van de Verzekeraars weer op het juiste niveau worden gebracht;

b) de CBCS had de ENNIA Groep drie jaar de tijd gegeven om de balans van de Verzekeraars in overeenstemming te brengen met de Richtlijnen;

c) partijen waren nog steeds aan het onderhandelen over een voor alle partijen acceptabele herstructurering van de *intercompany* leningen;

d) het argument dat de ENNIA Groep de instructies van de CBCS en de stille curatoren niet zouden opvolgen, is onjuist en op geen enkele wijze gemotiveerd en/of onderbouwd door de CBCS; en

e) de overmaking van de USD 100 miljoen was geen bijzondere en voor de ENNIA Groep nadelige transactie. De betaling schiep dus geenszins een noodsituatie zoals bedoeld in de LTV, waarvoor de noodregeling moest worden uitgeroepen.

2.23 De oplegging van de noodregeling was dus evident prematuur en had niet mogen worden uitgesproken.

**3.     HANDELEN CBCS**

3.1 Het handelen van de CBCS dreigt daarentegen wel tot instabiliteit van de ENNIA Groep te leiden. De CBCS heeft onder de noodregeling de plicht om te handelen in het belang van de gezamenlijke schuldeisers. De verspreiding van negatieve informatie over de ENNIA Groep en valse beschuldigingen aan het adres van de uiteindelijke aandeelhouders en bestuurders van de ENNIA Groep is echter evident schadelijk voor de onderneming van de ENNIA Groep en mitsdien voor de gezamenlijke schuldeisers. Ter illustratie verwijst Parman naar de volgende passage uit het persbericht van de CBCS van 6 juli 2018 (**Productie 11**):

> *"De herstructurering van Ennia verloopt voorspoedig. Onder andere is inmiddels het bedrag van $ 100 miljoen dat kort geleden buiten de Ennia groep was verplaatst, weer teruggehaald."*

3.2 De CBCS suggereert met dit bericht dat het bedrag van USD 100 miljoen op onrechtmatige wijze was onttrokken aan de ENNIA Groep (hetgeen onjuist is, zoals uitgelegd in Hoofdstuk2.C) en dat zíj er voor gezorgd heeft dat het bedrag is teruggestort. Dat laatste is eveneens onjuist. Het bedrag is op eigen initiatief teruggestort op verzoek van de ENNIA Groep. Dit soort suggestieve negatieve berichtgeving is schadelijk voor de continuering van

de Verzekeraars en zodoende schadelijk voor de gezamenlijke schuldeisers van de Verzekeraars. Het is dus van groot belang dat de CBCS zich onthoudt van het doen van enige negatieve uitlatingen over de ENNIA Groep en aan hen gelieerde personen.

3.3    Als gevolg van de noodregeling, wordt de ENNIA Groep thans niet meer bestuurd door *professionals* die verstand van zaken hebben, maar door medewerkers van de CBCS die niet de kennis en ervaring hebben om een verzekeraar te besturen (artikel 63 lid 1 LTV). Ook dit draagt bij aan instabiliteit van de ENNIA Groep. Het feit dat de CBCS de bestuurders van de ENNIA Groep volledig heeft *kaltgestellt*, draagt ook geenszins bij aan een behoorlijke continuering van de bedrijfsvoering.

3.4    Bovengenoemde feiten baren Parman grote zorgen. Temeer nu in eerdere zaken waarin de noodregeling is uitgesproken niet voortvarend is opgetreden door de CBCS. Parman heeft zodoende groot belang bij een snelle herstructurering, mocht de noodregeling in stand blijven. Immers, hoe langer de noodregeling van toepassing blijft, hoe groter de kans op onomkeerbare schade. Om een snelle herstructurering te waarborgen, verzoekt Parman het Gerecht dan ook, in het geval de primaire vorderingen van Parman zouden worden afgewezen, om de CBCS te bevelen om binnen zeven dagen na de datum van het kort gedingvonnis aan te geven welke stappen te worden genomen in het kader van de herstructurering, zodat de Verzekeraars weer voldoen aan het vereiste solvabiliteitsniveau, en te bevelen dat de herstructurering binnen een door het Gerecht te bepalen termijn zal worden geïmplementeerd en nadat de herstructurering is voltooid, de zeggenschap en controle over de ENNIA Groep wordt teruggegeven aan de aandeelhouder.

## 4.    GEEN NOODREGELING BIJ ENTITEITEN ZONDER VERGUNNING

4.1    De noodregeling had voorts hoe dan ook niet mogen worden uitgesproken ten aanzien van de Niet Gereguleerde Entiteiten, hetgeen Parman in dit hoofdstuk nader zal toelichten.

4.2    Om de noodregeling uit te kunnen spreken is ingevolge artikel 60 lid 1 LTV vereist dat het gaat om (i) een verzekeraar, (ii) die een vergunning had, en (iii) wiens vergunning is ingetrokken. De Niet Gereguleerde Entiteiten voldoen aan geen van die – constitutieve – vereisten, zoals hieronder zal worden toegelicht. De noodregeling had dan ook nooit uitgesproken mogen worden ten aanzien van deze entiteiten.

4.3    Een verzekeraar is ingevolge artikel 1 lid 1 sub (g) LTV eenieder die het verzekeringsbedrijf uitoefent. Onder het verzekeringsbedrijf wordt verstaan het levensverzekeringsbedrijf of het schadeverzekeringsbedrijf (artikel 1 lid 1 sub (f) LTV). Voor de kwalificatie als levens- of schadeverzekeringsbedrijf is vereist dat er sprake is van het als bedrijf sluiten van overeenkomsten van levens- dan wel schadeverzekering voor eigen rekening, met inbegrip van het afwikkelen van de in dat bedrijf gesloten overeenkomsten van levens- dan wel schadeverzekering, ook al wordt daarmee niet beoogd het maken van winst (artikel 1 lid 1 sub (d) en (e) LTV).

4.4    De Niet Gereguleerde Entiteiten voldoen geenszins aan deze definitie, nu zij geen verzekeringsovereenkomsten afsluiten of afwikkelen. De activiteiten van deze entiteiten bestaan uit het doen van investeringen (EC Investments) of het vervullen van de rol van holdingvennootschap (ECH en EC Holding). Het zijn dus geen operationele vennootschappen. De Niet Gereguleerde Entiteiten kwalificeren dan ook niet als verzekeraars ten aanzien waarvan de noodregeling kon worden uitgesproken. Daar komt nog bij dat onomstotelijk vast staat dat de Niet Gereguleerde Entiteiten nooit een vergunning hebben gehad, die logischerwijze dan ook niet ingetrokken kon worden.

18

4.5    Er bestaat jurisprudentie op basis waarvan niet-vergunninghoudende entiteiten onder een
noodregeling kunnen worden gebracht. In dergelijke gevallen moet uit de activiteiten van de
entiteiten blijken dat zij tezamen één onderneming drijven die dient te worden aangemerkt als
één onder toezicht staande instelling. De 'onderlinge verwevenheid' tussen die entiteiten
speelt hierbij een grote rol. In de noot bij het meest recente arrest van de Hoge Raad over deze
materie wordt echter terecht opgemerkt dat deze leer met grote terughoudendheid moet
worden toegepast en slechts in gevallen waar het gaat om een kunstmatige situatie die alleen
in het leven is geroepen om de relevante toezichtbepalingen te ontwijken:

> *"Het gaat hier overduidelijk om een kunstmatige situatie die enkel en alleen in het
> leven lijkt te zijn geroepen om de bepalingen uit de Wtk 1992 geheel of ten dele te
> omzeilen. De "onderlinge verwevenheid" leer zal echter zeer terughoudend moeten
> worden toegepast. Buiten een kunstmatige situatie zoals die blijkt uit de feiten (met
> name dat Belba en A/b Financiën door één en dezelfde persoon worden
> aangestuurd, de geldstromen van A/b Financiën en Belba over gelijke rekeningen
> en door elkaar lopen en voor de feitelijke leidinggevende van Belba en A/b
> Financiën het niet uitmaakt op welke rekening het geld binnenkomt en dat hij het
> allemaal als één grote pot beschouwt) is geen plaats voor de redenering dat
> meerdere rechtspersonen tezamen één kredietinstelling zijn."[4]*

4.6    In het geval van de ENNIA Groep is dit geenszins aan de orde. Allereerst zijn de geldstromen
van de Verzekeraars en de Niet-Verzekeraars strikt gescheiden, wat onder andere blijkt uit het
feit dat op de balans van bijvoorbeeld EC Leven diverse vorderingen op EC Investments zijn
opgenomen. Verder is er geen sprake van een kunstmatige situatie die alleen in het leven is
geroepen om de relevante toezichtbepalingen te ontwijken. De huidige structuur is immers
reeds negen jaar geleden zo ingericht op instructie van de CBCS zelf. Daarnaast is er een
volstrekt legitieme reden om de fondsen onder te brengen bij andere entiteiten dan de
Verzekeraars. Door de investeringen op die wijze te structureren kan namelijk gebruik
worden gemaakt van fiscale voordelen. EC Leven heeft de betreffende structuur dan ook
opgezet op advies van haar accountant. Investeringen in de Verenigde Staten en gebruik van
bestaande belastingverdragen zijn de enige mogelijkheden om het aan EC Leven
gegarandeerde rendement van 5% te kunnen genereren. De hele ENNIA Groep en met name
de Verzekeraars profiteren van deze constructie. De CBCS is hiervan altijd op de hoogte
geweest en heeft hier altijd achter gestaan. Van het ontwijken van toezicht is geen sprake.

4.7    Dat er geen sprake is van een zodanige onderlinge verwevenheid dat de ENNIA Groep geacht
moet worden gezamenlijk één verzekeringsbedrijf uit te oefenen blijkt verder uit het feit dat
de CBCS heeft geëist dat (een deel van) het actief van EC Investments op de balans van
verzekeraar EC Leven moest worden gebracht. Dat zou niet nodig zijn als EC Investments en
EC Leven inderdaad tezamen een verzekeringsbedrijf uitoefenden.

4.8    Ten slotte zou de CBCS, als zij daadwerkelijk van mening zou zijn dat ook de Niet
Gereguleerde Entiteiten een verzekeringsbedrijf uitoefenen en daarmee onder toezicht staan,
dat al veel eerder aangekaart moeten hebben (zie artikel 4 lid 4 en 5 LTV). De ENNIA Groep
is sinds 2009 – op instructie van de CBCS – op deze wijze gestructureerd. De CBCS heeft
ondanks de vele gesprekken met de ENNIA Groep nooit te kennen gegeven dat zij van
mening was dat ook de Niet Gereguleerde Entiteiten onder toezicht moesten staan of
vergunningplichtig waren. Zelfs als dat wel zo was geweest, dan was de CBCS redelijkerwijs
en conform de algemene beginselen van behoorlijk bestuur verplicht geweest om een van de
veel minder verstrekkende toezichtmaatregelen die de CBCS tot haar beschikking heeft op te
leggen aan de Niet Gereguleerde Entiteiten.

---

[4]    HR 24 juni 2005, ECLI:NL:HR:2005:AT6005, *JOR* 2005/212, m.nt. Botter.

4.9   De noodregeling had dan ook nooit uitgesproken mogen worden ten aanzien van de Niet
Gereguleerde Entiteiten. Niet alleen ontbreekt elke wettelijke basis om deze vennootschappen
onder de noodregeling te brengen, maar ook de beperkte *carve out* die hiervoor in de
jurisprudentie is gemaakt, is niet van toepassing. Zoals hierboven toegelicht, is er immers
geen sprake van een zodanige onderlinge verwevenheid van de Verzekeraars en de Niet
Gereguleerde Entiteiten dat zij tezamen één verzekeringsbedrijf voeren, of van een
kunstmatige situatie die puur zou zijn opgezet om de relevante toezichtbepalingen te
ontwijken.

## 5.   PROCEDURELE FOUTEN

### A   Inleiding

5.1   Naast het feit dat er geen gegronde redenen waren voor het uitroepen van de noodregeling,
wenst Parman ook kanttekeningen te plaatsen bij de procedurele gang van zaken die tot het
uitspreken van de noodregeling heeft geleid.

5.2   De procedure voor het aanvragen van de noodregeling is niet deugdelijk doorlopen. Ten
eerste zijn de beginselen van *due process* geschonden doordat de ENNIA Groep niet een
behoorlijke kans heeft gekregen om zich te verweren tegen de aanvraag van de CBCS om de
noodregeling uit te spreken ten aanzien van de ENNIA Groep. Ten tweede heeft de CBCS
door haar handelwijze algemene beginselen van behoorlijk bestuur geschonden. Ten derde
kon de noodregeling niet worden uitgesproken, zolang de intrekking van de Vergunningen
niet onherroepelijk is geworden. Tot slot, zoals reeds uitvoerig uiteengezet in Hoofdstuk 4,
heeft de CBCS ten onrechte het Gerecht verzocht om de noodregeling ten aanzien van de Niet
Gereguleerde Entiteiten uit te spreken.

### B   Schending van beginselen van *due process*

5.3   De CBCS heeft op 3 en 6 juli 2018 een verzoekschrift ingediend bij het Gerecht met het
verzoek om de noodregeling uit te spreken ten aanzien van de ENNIA Groep. Hier was geen
enkele waarschuwing of aanzegging aan vooraf gegaan, inhoudende dat de CBCS van plan
was de noodregeling aan te vragen indien de situatie bij de Verzekeraars niet binnen een
bepaalde termijn zou zijn hersteld, zoals wel gebruikelijk is. De ENNIA Groep heeft dus geen
enkele kans gehad om de toepassing van de noodregeling te voorkomen, laat staan een
redelijke kans.

5.4   Op grond van art. 60 lid 4 LTV behandelt het Gerecht het verzoek tot uitspreken van de
noodregeling met de meeste spoed en "op de voet van de rechtspleging in burgerlijke zaken,
voor zover daarvan bij deze landsverordening niet is afgeweken." Van een dergelijke
wettelijke afwijking is geen sprake. Dit betekent dat de behandeling van het verzoek –
waaronder de oproeping – plaats moet vinden conform de regels die gelden voor de
rechtspleging in vergelijkbare burgerlijke zaken. In de memorie van toelichting bij de
gelijkluidende bepaling in de Nederlandse Wet Financieel Toezicht (art. 3:162a Wft) wordt de
vergelijking getrokken met de behandeling van een verzoek tot het uitspreken van een
faillissement.[5] Ook in een van de commentaren bij dit artikel wordt opgemerkt dat de
behandeling van een verzoek tot het uitspreken van de noodregeling en een verzoek tot het
uitspreken van faillissement nauw verwant zijn.[6] Volgens de geldende
faillissementswetgeving wordt het verzoek tot faillietverklaring met de meeste spoed
behandeld (art. 4 lid 1 Curaçaosch Faillissementsbesluit 1931). Voor de oproeping voor de
behandeling van het verzoek wordt desondanks een termijn gehanteerd van ten minste een

---

5     *Kamerstukken II* 1999/2000, 26 855, nr. 3, p. 58.

6     R.A. Stegeman, Wft T&T – Wet 2018, commentaar op art. 3:162a Wft.

week.[7] Ook voor de behandeling van een verzoek tot het uitspreken van de noodregeling zou daarom een oproepingstermijn van tenminste een week gehanteerd moeten worden. Dat is in deze zaak niet gedaan.

5.5   Naar aanleiding van het CBCS Verzoek zijn EC Leven, EC Schade, EC Zorg, EC Investments en ECH op aanvankelijk op 3 juli 2018 opgeroepen om op 4 juli om 10.00 uur te verschijnen ter terechtzitting. Om 08.00 uur die ochtend diende echter het kort geding waarbij deze entiteiten schorsing van de behandeling verzochten totdat op het bezwaar en/of beroep tegen de intrekking van de vergunningen zou zijn beslist. Daarop volgde om 10.30 uur een oproep om te verschijnen voor de behandeling van het CBCS Verzoek welke behandeling vervolgens om 14.15 uur plaatsvond. Zodoende hadden de betreffende vennootschappen toen nog slechts 3 uur en 45 minuten de tijd om een verweer voor te bereiden en te verschijnen, hetgeen praktisch onmogelijk was. Om circa 13.00 uur deed de rechter uitspraak in het kort geding tot schorsing, waarbij het schorsingsverzoek werd afgewezen. Met veel moeite heeft het bestuur van de ENNIA Groep nog wel een advocaat kunnen vinden, die de zitting van 14.15 uur heeft bijgewoond tezamen met een aantal bestuurders van de betreffende vennootschappen. Zij hadden echter geen tijd gehad om zich voor te bereiden, laat staan deugdelijk voor te bereiden op de zitting en deugdelijk verweer te voeren tegen het verzoek van de CBCS.

5.6   Bij de aanvraag tot toepassing van de noodregeling bij EC Holding was de oproeping nog schrijnender. EC Holding werd om 15.39 uur in de gelegenheid gesteld om uiterlijk 16.15 uur per email op het verzoek van de CBCS te reageren. EC Holding had dus slechts 36 minuten de tijd om een verweer te vormen tegen het verzoek. Het behoeft geen uitleg dat EC Holding zich onmogelijk (op een deugdelijke wijze) heeft kunnen verweren tegen het verzoek van de CBCS.

5.7   Door bovengenoemde gang van zaken heeft een ernstige schending van het recht op hoor en wederhoor plaatsgevonden en is sprake van een ernstige inbreuk op de beginselen van *due process*. Dat is een zeer kwalijke zaak, zeker nu het ging om een verzoek tot het uitspreken van de noodregeling, hetgeen de facto onteigening tot gevolg heeft en waartegen geen hoger beroep mogelijk is. De CBCS heeft hiermee onmiskenbaar in strijd gehandeld met artikel 60 lid 6 LTV, artikel 1 van het Eerste Protocol bij het EVRM en artikel 6 EVRM.

Artikel 60 lid 6 LTV

> *"Het Gerecht geeft geen beschikking dan nadat de verzekeraar en de Bank zijn gehoord althans behoorlijk zijn opgeroepen."*

> *(Onderstreping advocaat)*

---

[7]   Procesreglement voor civiele zaken in eerste aanleg en hoger beroep 2018 Gemeenschappelijk Hof van Justitie, p. 19 en Faillissementsrichtlijnen 2012 Gemeenschappelijk Hof van Justitie (versie 2018), p. 6 – 7.

Artikel 1 Eerste Protocol EVRM

*"Iedere natuurlijke of rechtspersoon heeft recht op het ongestoord genot van zijn
eigendom. Aan niemand zal zijn eigendom worden ontnomen behalve in het
algemeen belang en onder de voorwaarden voorzien in de wet en in de algemene
beginselen van internationaal recht. (...)"*

*(Onderstreping advocaat)*

Artikel 6 lid 1 EVRM

*"In the determination of his civil rights and obligations or of any criminal charge
against him, everyone is entitled to a fair and public hearing within a reasonable
time by an independent and impartial tribunal established by law.. (...)"*

5.8    Parman verwijst in dit kader naar de toelichting op artikel 6 lid 1 EVRM zoals opgenomen in
de *Guide on Article 6 of the European Convention on Human Rights*:

*"The right of access to a court must be "practical and effective" (Bellet v. France,
§ 38). For the right of access to be effective, an individual must "have a clear,
practical opportunity to challenge an act that is an interference with his rights"
(ibid., § 36; Nunes Dias v. Portugal (dec.) regarding the rules governing notice to
appear)."*[8]

*(Onderstreping advocaat)*

5.9    Het is evident dat de ENNIA Groep niet behoorlijk is opgeroepen en dat zij ook niet op
behoorlijke wijze is gehoord. Dit, terwijl er ook niet, zoals gebruikelijk, een waarschuwing of
aanzegging is gedaan dat het uitspreken van de noodregeling zou worden aangevraagd. De
ENNIA Groep is zodoende niet in staat geweest om op een behoorlijke wijze verweer te
voeren tegen het zeer ingrijpende verzoek van de CBCS, laat staan dat zij enige gelegenheid
had tot herstel, voor zover dat nodig zou zijn geweest.

5.10   Voor de goede orde zij hierbij opgemerkt dat er geen enkel belang was om op deze manier te
handelen en de normale regels van *due process* niet in acht te nemen. De discussie over de
solvabiliteitspositie van de Verzekeraars vond al sinds enige maanden, zo niet jaren, plaats. Er
was geen reden om nu plotseling de noodregeling aan te vragen en binnen een paar uur op die
aanvraag te beslissen. De financiële situatie van de ENNIA Groep was niet wezenlijk
verslechterd vergeleken met voorgaande jaren. Sterker nog, de financiële situatie was eerder
verbeterd. Zoals hiervoor uiteengezet noopte de overmaking van USD 100 miljoen door EC
Investment hier ook niet toe. Daar komt bij dat, anders dan bij een bank het geval kan zijn,
zich bij een verzekeraar veel minder of zelfs nauwelijks het risico van een *"run"* door het
publiek voor doet, mocht de waarschuwing of de kennisgeving van het CBCS Verzoek
publiekelijk bekend zijn geworden. Verzekerden kunnen niet hun betaalde premies terug
halen. Evenmin zullen zij *overnight* hun (pensioen)verzekeringen opzeggen, gezien de
implicaties die dit voor het pensioen en de pensioenopbouw kan hebben. De aanzegging of
waarschuwing dat de noodregeling zou worden aangevraagd, waarbij nog een laatste kans op
herstel werd gegeven, had dus zonder risico van een *"run"* kunnen worden gedaan.

5.11   De CBCS had het Gerecht niettemin expliciet verzocht om een korte oproepingstermijn te
hanteren. De reden die de CBCS hiervoor gaf was dat er zogenaamd gegronde vrees zou
bestaan dat de Verzekeraars gelden buiten de groep zouden brengen vóórdat het Gerecht op
het verzoek zou hebben beslist. Deze vrees zou bestaan omdat de CBCS op diezelfde dag (te

---

[8]    Guide on Article 6 of the European Convention on Human Rights, Right to a fair trial (civil limb), Updated to 31
December 2017, § 75.

22

weten 3 juli 2018) had vernomen uit "betrouwbare bronnen" dat de Verzekeraars en Parman activa ter waarde van USD 100 miljoen buiten de ENNIA Groep zouden hebben gebracht. Dit is, als gezegd, onjuist. Het ging hier dus om een niet geverifieerde grond.

5.12 Zoals in Hoofdstuk 2.C reeds uiteengezet, is het juist dat EC Investments voornemens was om een bedrag van USD 100 miljoen te investeren in het buitenland. Met de overboeking van USD 100 miljoen had EC Investments echter geenszins op onrechtmatige wijze gelden onttrokken aan de ENNIA Groep, hetgeen de CBCS ten onrechte heeft gesuggereerd. De transactie van USD 100 miljoen viel binnen de normale bedrijfsuitoefening van EC Investments en had geen nadelige gevolgen voor de ENNIA Groep. Sterker nog, de buitenlandse investering waarop deze betaling was gericht, was juist bedoeld om voldoende rendement te verschaffen om aan de verplichtingen van de Verzekeraars te kunnen voldoen. Waren de normale regels van *due process* in acht genomen, dan had de ENNIA Groep dit uiteen kunnen zetten en het verwijt op behoorlijke wijze kunnen weerleggen.

5.13 Kort en goed, de CBCS had dus geen gegronde reden om een dermate korte oproepingstermijn te verzoeken. Door deze gang van zaken zijn fundamentele rechtsbeginselen, zoals onder meer neergelegd in de LTV en het EVRM, geschonden. Ook dit rechtvaardigt toewijzing van de door Parman verzochte voorlopige voorzieningen.

**C    Schending van algemene beginselen van behoorlijk bestuur**

5.14 Door haar handelwijze heeft de CBCS eveneens algemene beginselen van behoorlijk bestuur geschonden, meer specifiek het evenredigheidsbeginsel en het vertrouwensbeginsel.

*Schending evenredigheidsbeginsel*

5.15 Zoals toegelicht in paragraaf 1.17 en verder, was de situatie van de ENNIA Groep geenszins zodanig nijpend dat die het drastische ingrijpen van de CBCS rechtvaardigde. De CBCS was bovendien bekend met het feit dat er voldoende kapitaal aanwezig is in de ENNIA Groep om het solvabiliteitsprobleem op te lossen. Het verzoek van de CBCS tot uitspreken van de noodregeling was dan ook evident onevenredig.

5.16 Een andere reden waarom het besluit tot intrekking van de Vergunningen en het verzoek tot uitspreken van de noodregeling in strijd is met het evenredigheidsbeginsel, is dat de CBCS ook minder extreme maatregelen had kunnen nemen om de solvabiliteitsproblematiek en/of de vermeende nalatigheid om instructies op te volgen aan te pakken. Zo had de CBCS bijvoorbeeld:

- de vrije beschikking van de Verzekeraars over haar waarden kunnen beperken of de Verzekeraars kunnen verbieden om zich van deze waarden te ontdoen, anders dan met schriftelijke toestemming van de CBCS (zie paragraaf 5.17 voor een nadere toelichting hierop); of

- een last onder dwangsom kunnen opleggen voor het geval de Verzekeraars de door de CBCS gegeven aanwijzingen niet zouden opvolgen (zie paragraaf 5.18 tot en met 5.22).

5.17 Op grond van artikel 53 lid 1 jo 52 lid 2 LTV is de CBCS immers bevoegd om, in het geval de solvabiliteitsmarge is gedaald of naar het oordeel van de CBCS zal dalen beneden het krachtens artikel 36 lid 3 LTV vereiste minimum bedrag, de vrije beschikking door de verzekeraar over zijn waarden, waar deze zich ook bevinden, te beperken of de verzekeraar te verbieden om anders dan met schriftelijke machtiging van de CBCS te beschikken over deze

waarden. Indien de CBCS het risico had willen uitsluiten dat er gelden uit de ENNIA Groep
zouden vloeien, dan had zij ook deze minder vergaande maatregel kunnen toepassen.

5.18    Daarnaast voorziet de LTV sinds 2015 in het instrument van de last onder dwangsom. Op
grond van artikel 79b LTV wordt onder last onder dwangsom verstaan: de herstelsanctie,
inhoudende:

   a)   een last tot geheel of gedeeltelijk herstel van de overtreding; en

   b)   de verplichting tot betaling van een geldsom indien de last niet of niet tijdig wordt
        uitgevoerd.

5.19    Op grond van artikel 79c lid 3 LTV moet de last onder dwangsom de te nemen
herstelmaatregelen omschrijven. Bij de last onder dwangsom wordt een termijn gesteld
gedurende welke de overtreder de last kan uitvoeren zonder dat een dwangsom wordt
verbeurd. In feite is de last onder dwangsom dus te beschouwen als een "aanwijzing plus", te
weten als de overtreder de door de CBCS gegeven aanwijzing niet binnen de gegeven termijn
opvolgt, verbeurt hij een boete.

5.20    Nu de CBCS van mening is dat de Verzekeraars tot herstructurering over moeten gaan, en nu
het doel en de bevoegdheden van de CBCS ten aanzien van de Verzekeraars zich uitsluitend
beperken tot herstructurering en niet raken aan beëindiging van afwikkeling van hun
bedrijfsvoering, is het voor Parman geheel onbegrijpelijk waarom CBCS geen last onder
dwangsom heeft opgelegd (dit overigens, zonder enige overtreding te erkennen) maar ervoor
heeft gekozen de Vergunningen in te trekken en om toepassing van de noodregeling te
verzoeken.

5.21    Dit was logisch geweest, mede omdat de CBCS de Verzekeraars al verschillende
aanwijzingen had gegeven. Deze aanwijzingen waren erop gericht om bepaalde gedragingen
af te dwingen, net als een last onder dwangsom zou zijn geweest. Indien de gegeven
aanwijzingen in de optiek van de CBCS niet effectief genoeg zijn geweest, zou een logische,
effectieve en proportionele vervolgstap het opleggen van een last onder dwangsom zijn
geweest.

5.22    De CBCS had een last onder dwangsom kunnen opleggen. Daarbij had de CBCS dan kunnen
uiteenzetten welke herstelmaatregelen de Verzekeraars precies diende te nemen om de
gewenste herstructurering door te voeren, voorzien van een begunstigingstermijn. De aard en
de doelstelling van het instrument van de last onder dwangsom sluiten 100% aan bij hetgeen
de CBCS voor ogen stond toen zij om de toepassing van de noodregeling verzocht: het
herstructureren van de Verzekeraars. Echter, door het Gerecht te verzoeken de noodregeling
uit te spreken in plaats van een last onder dwangsom op te leggen, heeft de CBCS in strijd
gehandeld met het evenredigheidsbeginsel.

*Schending vertrouwensbeginsel*

5.23    Ondanks dat partijen nog steeds onderhandelden over een gedetailleerde uitwerking van een
mogelijke oplossing, zoals reeds uiteengezet in paragraaf 2.9 en verder, trok de CBCS op 3
juli 2018 plotseling en zonder enige waarschuwing vooraf de Vergunningen in en diende zij
het CBCS Verzoek in bij het Gerecht. De CBCS had hiertoe besloten, ondanks dat de ENNIA
Groep als reactie op de brief van de CBCS van 4 augustus 2016 (Productie 8) zich bereid had
getoond om mee te werken aan een voor alle partijen acceptabele oplossing. Dat de CBCS
niet volledig akkoord was met de voorstellen van de Verzekeraars die op dat moment
voorlagen, betekent niet dat de Verzekeraars niet meewerkten of dat zij de instructies van de
CBCS niet in acht namen. De CBCS had op zijn minst de uitkomst van de bespreking van 21

24

juni 2018 moeten afwachten. Het bestuur van de ENNIA Groep vertrouwde er immers op – en mocht er ook op vertrouwen – dat zij nog de gelegenheid had om de solvabiliteitspositie van de Verzekeraars te verbeteren. Temeer nu de CBCS de Verzekeraars hiervoor aanvankelijk tot 4 augustus 2019 de tijd had gegeven.

5.24    Kortom, door de Vergunningen in te trekken en de noodregeling aan te vragen, heeft de CBCS in strijd gehandeld met het evenredigheids- én vertrouwensbeginsel. Immers:

a) ondanks dat de onderhandelingen met de CBCS over een voor alle partijen acceptabele oplossing nog steeds gaande waren, besloot de CBCS slechts anderhalve week ná de laatste bespreking tussen de ENNIA Groep en de CBCS tot intrekking van de Vergunningen en indiening van het CBCS Verzoek. Dit terwijl de CBCS in deze bespreking het management van de ENNIA Groep had verzocht om met een voorstel te komen; en

b) de termijn van drie jaar die de CBCS de ENNIA Groep aanvankelijk had gegeven om de balans van de Verzekeraars in overeenstemming te brengen met de Richtlijnen, was nog niet verlopen.

**D    Intrekking vergunning nog niet onherroepelijk**

5.25    Bovendien kan de noodregeling slechts worden uitgesproken ten aanzien van verzekeraars, waarvan de vergunning onherroepelijk is ingetrokken. Bij beschikking van 3 juli 2018 van de CBCS zijn de Vergunningen ingetrokken. Tegen dergelijke beschikkingen kan conform de Landsverordening administratieve rechtspraak[9] (de **LAR**) binnen zes weken bezwaar dan wel beroep worden aangetekend. Op grond van artikel 56 lid 2 LTV wordt de intrekking van de vergunning eerst van kracht wanneer het daartoe strekkende besluit onherroepelijk is geworden. Zolang er nog bezwaar- of beroepsmogelijkheden zijn is het besluit niet onherroepelijk.

5.26    Het gevolg is dat de intrekking van de Vergunningen op 3 juli 2018 nog niet van kracht is zolang de bezwaar- of beroepstermijn nog niet is verstreken of er bezwaar of beroep is ingesteld en die procedure nog loopt. De intrekking van de Vergunningen is een constitutief vereiste voor het uitspreken van de noodregeling (artikel 60 lid 1 LTV). Nu de intrekking van de Vergunningen nog niet van kracht is, kon de noodregeling op 4 respectievelijk 6 juli 2018 niet worden uitgesproken.

5.27    Dat dit de systematiek van deze regeling is, blijkt onder meer uit de volgende passage over de oude Nederlandse wet betreffende de noodregeling:

> *"In de praktijk bleek echter het nadeel dat het toepassen van de noodregeling kon worden gerekt doordat de verzekeraar in beroep ging tegen de intrekking van de vergunning op welk beroep eerst onherroepelijk moest zijn beslist. Om aan dit ongewenste effect een eind te maken heeft de wetgever in de WTVb, onder de uitdrukkelijke mededeling dat het nieuwe art. 156 naar zijn strekking gelijk is aan art. 66 van de (oude) WTV, de eis laten vervallen dat alle vergunningen moeten zijn ingetrokken, alvorens de noodregeling kon worden aangevraagd en uitgesproken."[10]*

5.28    Het voorgaande citaat bevestigt dat het vereiste dat de noodregeling alleen kan worden uitgesproken ten aanzien van instellingen wiens vergunningen zijn ingetrokken, betekent dat eerst de bezwaar- en/of beroepstermijn moet zijn verstreken dan wel de bezwaar- en/of

---

9       PB 2001, 79, zoals laatstelijk gewijzigd op 18/12/2015, PB 2015/80.

10      G.R. Boshuizen, 'Verzekeringsbedrijf en insolventie', TvI 2004, 3.

beroepsprocedure moet zijn doorlopen, alvorens de noodregeling kan worden toegepast. Een vergelijkbare wetswijziging als door de Nederlandse wetgever wenselijk werd geacht, heeft de wetgever op Curaçao kennelijk niet nodig gevonden. Bij de herziening van de LTV in 2015 is het vereiste van de onherroepelijk ingetrokken vergunningen voor het kunnen uitspreken van de noodregeling niet gewijzigd. Wel is de wetgever de toezichthouder tegemoetgekomen door in artikel 60 lid 7 LTV te bepalen dat een tegen de intrekking van de vergunning ingesteld bezwaar of beroep de <u>behandeling</u> van het verzoek tot uitspreken van de noodregeling niet schorst. Dat betekent dat de CBCS niet hoeft te wachten met het indienen van een verzoek tot het uitspreken van de noodregeling totdat de intrekking van de vergunning onherroepelijk is geworden; de behandeling van het verzoek kan wel al plaatsvinden als er nog een bezwaar- of beroepsprocedure loopt. De noodregeling kan echter pas worden <u>uitgesproken</u> als de intrekking van de vergunning onherroepelijk is geworden.

5.29    Ook vanuit het oogpunt van rechtsbescherming is het een logisch vereiste dat de intrekking van de vergunning onherroepelijk moet zijn geworden voordat de noodregeling kan worden uitgesproken. Tegen het uitspreken van de noodregeling staan immers – ondanks dat dit een zeer ingrijpende maatregel is die een zware inbreuk maakt op het eigendomsrecht – geen voorzieningen open behoudens cassatie in het belang der wet (artikel 60 lid 9 LTV). De enige manier om bezwaar te kunnen maken tegen deze ingrijpende maatregel is dan ook het aanvechten van de intrekking van de vergunning. Als de noodregeling direct zou kunnen worden uitgesproken nadat de vergunning is ingetrokken – zoals in dit geval de facto door de CBCS is gedaan – zou de verzekeraar en haar *stakeholders* elke rechtsbescherming tegen het opleggen van een dergelijke zware maatregel worden ontnomen. De CBCS oefent immers vanaf het uitspreken van de noodregeling bij uitsluiting alle bevoegdheden van de bestuurders, de commissarissen of de vertegenwoordiger van de verzekeraar uit (artikel 63 lid 1 LTV), wat zou betekenen dat de CBCS namens de verzekeraar zelf bezwaar zou moeten maken tegen haar eigen besluit tot intrekking van de Vergunningen. Het is noodzakelijk dat een dergelijke situatie – waarbij de CBCS 'rechter wordt in eigen zaak' – wordt voorkomen, zoals ook herhaaldelijk in de Memorie van Toelichting bij de LTV wordt opgemerkt.[11] Dit is daarnaast in strijd met de regels van *fair trial* zoals neergelegd in artikel 6 EVRM. De bezwaar- of beroepsprocedure tegen intrekking van de vergunning zou daarom eerst afgerond moeten zijn voordat de noodregeling kan worden uitgesproken.

5.30    Het argument dat de CBCS per direct moet kunnen ingrijpen om te voorkomen dat er activa 'verdwijnen' gaat niet op. Door de vergunning in te trekken verkrijgt de CBCS namelijk al bepaalde bevoegdheden die afdoende zijn om te kunnen waarborgen dat de status quo gehandhaafd wordt (zie artikel 58 lid 1 LTV).

5.31    Daarnaast heeft CBCS de bevoegdheid om namens de Verzekeraars de ongeldigheid in te roepen van rechtshandelingen die door deze entiteiten in strijd met het verbod of de beperking zijn verricht (artikel 58 lid 4 LTV). Het vijfde lid van datzelfde artikel bevestigt wederom dat het hier gaat om een bevoegdheid die ontstaat op het moment dat de vergunning wordt ingetrokken maar nog niet onherroepelijk is, nu duidelijk is opgenomen dat de beperking of het verbod wordt opgeheven zodra het besluit tot intrekking is vernietigd.

5.32    De ratio van het toekennen van dergelijke bevoegdheden aan de CBCS om de status quo te bewaren zolang de intrekking van de vergunning nog niet onherroepelijk is, wordt toegelicht in de Memorie van Toelichting bij de herzieningen van 2015 met betrekking tot de regeling voor kredietinstellingen, die grotendeels overeenkomt met de LTV:

> *"Echter om te voorkomen dat de kredietinstelling wiens vergunning is ingetrokken, dan wel die bezwaar of beroep heeft aangetekend wordt leeggehaald of dat de*

---

[11]    Zie bijvoorbeeld: MvT p. 10 en 15.

*crediteuren op een andere manier worden benadeeld, wordt in de onderhavige
ontwerplandsverordening in het zesde lid van artikel 9 van de Ltbk bepaald dat de
Bank de kredietinstelling bij aangetekende brief aanzegt dat vanaf het tijdstip van
intrekking van de vergunning alle of bepaalde organen van de kredietinstelling hun
bevoegdheden slechts mogen uitoefenen na goedkeuring door één of meer door de
Bank aangewezen personen en met inachtneming van de opdrachten van deze
personen.* "[12]

5.33    Dit deel van de Memorie van Toelichting is weliswaar gericht op kredietinstellingen, maar
gezien het feit dat de regelingen voor kredietinstellingen en verzekeraars vrijwel gelijkluidend
zijn en met de herzieningen in 2015 juist is beoogd om de onderlinge verschillen tussen de
regelingen op te heffen,[13] is meer dan aannemelijk dat deze ratio ook geldt voor het intrekken
van de vergunning van een verzekeraar.

5.34    Kortom, de noodregeling kon nog niet worden uitgesproken omdat de intrekking van de
Vergunningen nog niet onherroepelijk en daarmee nog niet van kracht was en is.

5.35    Overigens hadden de Verzekeraars direct na de intrekking van hun Vergunningen bezwaar
ingediend tegen de betreffende beslissing van de CBCS. Echter, omdat als gevolg van de
toepassing van de noodregeling de zeggenschap binnen de Verzekeraars per 3 juli 2018 ex
artikel 63 lid 1 LTV bij de CBCS kwam te liggen, is dit bezwaar ingetrokken door de CBCS.
Om die reden heeft Parman op 13 augustus 2018 op haar beurt als belanghebbende beroep
ingesteld tegen de beslissing van de CBCS tot intrekking van de Vergunningen. Het staat dus
vast dat de intrekking van de Vergunningen nog niet onherroepelijk en daarmee nog niet van
kracht is.

E    Conclusie

5.36    Gelet op het voorgaande zijn er meerdere gronden waarop geconcludeerd kan worden dat de
noodregeling niet rechtsgeldig is uitgesproken. Om deze reden en het feit dat er geen
gegronde redenen waren om de noodregeling uit te spreken, dient het verzoek van Parman tot
opheffing van de noodregeling, te worden toegewezen.

6.    HET VERZOEK TOT AFSCHRIFT/INZAGE EX ARTIKEL 843A RV

6.1    Door de acties van de CBCS heeft Parman de controle over haar dochtervennootschappen
verloren. Zoals gezegd, heeft de ENNIA Groep niet eens op een behoorlijke wijze verweer
kunnen voeren tegen de ingrijpende verzoeken van de CBCS. Niet alleen de ENNIA Groep,
maar ook Parman als aandeelhouder van de ENNIA Groep is hierdoor ernstig benadeeld. Daar
komt bij dat Parman thans geen enkele toegang heeft tot stukken die zij nodig heeft ter nadere
onderbouwing van haar stellingen in de onderhavige procedure alsook in de beroepsprocedure
die zij heeft ingesteld tegen de intrekking van de Vergunningen. Om die reden vordert
Parman dan ook op grond van artikel 843a Rv afschrift van de volgende bescheiden (waarbij
Parman onder 'afschrift van' eveneens 'inzage in' schaart):

(i)    alle correspondentie en documentatie vanaf 2006 tot heden die verband houden met
de aanwijzingen of instructies die de CBCS aan de ENNIA Groep hebben gegeven in
het kader van de herstructurering van de ENNIA Groep van 2009, alsmede van de
thans beoogde herstructurering, inclusief maar niet beperkt tot schriftelijke

---

[12]    MvT p. 49.

[13]    Zie onder andere p. 3: "*Bij de actualisering en harmonisatie van deze toezichtlandsverordeningen worden de
relevante verschillen tussen de landsverordeningen, voor zover noodzakelijk geacht en met inachtneming van de aard
van het toezicht en de ondertoezichtgestelden, opgeheven.*"

27

aanwijzingen of instructies, notulen van vergaderingen en correspondentie tussen de CBCS, Parman en/of de ENNIA Groep;

*(ii)*    de jaarrekeningen van de Verzekeraars en de Niet Gereguleerde Entiteiten van 2006 tot en met 2017;

*(iii)*    alle documentatie vanaf 2006 tot heden, waaronder correspondentie tussen de ENNIA Groep en Parman enerzijds en de CBCS anderzijds, betreffende de *intercompany receivables* van de Verzekeraars en de Niet Gereguleerde Entiteiten, dan wel en de daaraan ten grondslag liggende besluiten, inclusief maar niet beperkt tot schirftelijke aanwijzingen of instructies, notulen van vergaderingen en correspondentie tussen de CBCS, Parman en/of de ENNIA Groep;

*(iv)*    bankafschriften van EC Investments die zien op de afgelopen vijf jaar gerekend van de datum van het kort gedingvonnis;

*(v)*    alle documentatie die verband houdt met alle betalingen die zijn verricht door EC Investments in de periode 2006 tot heden; en

*(vi)*    het verzoekschrift tot het uitspreken van de noodregeling ten aanzien van EC Holding ingediend door de CBCS op 6 juli 2018.

tezamen: de **Bescheiden**.

6.2    Op grond van artikel 843a Rv kan een ieder die daarbij een rechtmatig belang heeft, inzage, afschrift of uittreksel vorderen van bepaalde bescheiden aangaande een rechtsbetrekking waarbij hij partij is. Parman zal hieronder toelichten dat aan deze vereisten is voldaan, als gevolg waarvan de vordering tot afschrift van de Bescheiden voor toewijzing gereed staat.

**Ad.1 Parman heeft een rechtmatig belang bij inzage/afgifte**

6.3    Uit de rechtspraak blijkt dat aan het vereiste van rechtmatig belang is voldaan indien de bescheiden relevant kunnen zijn voor de beoordeling van het geschil.[14] Aan dit vereiste is onder meer voldaan indien de bescheiden van belang zijn voor het onderbouwen van een niet op voorhand als kansloos aan te merken vordering.[15]

6.4    Het verzoek om afschrift van en inzage in de Bescheiden dient ertoe de vorderingen van Parman in de onderhavige procedure en het beroep van Parman tegen het besluit tot intrekking van de Vergunningen te onderbouwen. Daarmee staat vast dat deze Bescheiden relevant zijn voor de beoordeling van dit geschil en van belang zijn voor de onderbouwing van het beroepschrift tegen de intrekking van de vergunning op grond van artikel 15 LAR.

6.5    Aangezien alleen uit de Bescheiden kan blijken of en in hoeverre de CBCS terecht de Vergunningen heeft ingetrokken en voorts terecht het Gerecht heeft verzocht de noodregeling ten aanzien van de ENNIA Groep uit te spreken, heeft Parman een rechtmatig belang bij afgifte.

**Ad. 2. Bescheiden zijn voldoende bepaald**

---

[14]    Vgl. (o.a.) Rb. Maastricht *12* maart 2008, *LJN:* BC6796; Rb. Rotterdam 19 maart 2008, *LJN:* BC9708; Rb. Amsterdam 2 april 2008, *NJF* 200B, 387; Rb. Haarlem 16 juli 2008, *LJN:* BD7632; Hof Arnhem 25 maart 2008, *LJN:* BC9246; Rb. Rotterdam 24 februari 2010, *LJN:* BL5639.

[15]    Vgl. o.a. Rb. Utrecht 12 september 2007; *JOR* 2007, 265; Rb. Utrecht 18 maart 2009, *LJN:* BH6556; Rb. Rotterdam 10 juni 2009, *NJF* 2010, 30; Rb. *Utrecht* 18 augustus 2010, *LJN:* BN5864; Rb. Utrecht 12 oktober 2010, *LJN:* B06956, Rb. Amsterdam 27 maart 2012, *JOR* 2012, 168.

28

6.6    De Bescheiden zijn voldoende bepaald voor toewijzing van een vordering ex art. 843a Rv. De Bescheiden zijn zo precies mogelijk omschreven als in de gegeven omstandigheden redelijkerwijs mogelijk is.

6.7    Dat Parman niet bekend is met de (exacte) inhoud van data van elk van de gevorderde Bescheiden doet niet af aan het feit dat deze voldoende bepaald zijn.[16] Het is voldoende dat sprake is van een vordering tot inzage in een concreet dossier, aldus de Hoge Raad.[17]

**Ad. 3. Parman is partij bij de rechtsbetrekking**

6.8    Parman is de aandeelhouder van de ENNIA Groep. Zij behoort aldus tot de groep van rechthebbenden c.q. begunstigden van de ENNIA Groep. De CBCS oefent, als gevolg van het uitspreken van de noodregeling, bij uitsluiting alle bevoegdheden van de bestuurders, de commissarissen of de vertegenwoordiger van de ENNIA Groep uit. De ENNIA Groep wordt feitelijk bestuurd en vertegenwoordigd door de CBCS. Aldus bestaat tussen Parman en de CBCS in de eerste plaats uit dien hoofde een rechtsbetrekking.

6.9    De Bescheiden betreffen aldus rechtsbetrekkingen waarbij Parman partij is als bedoeld in artikel 843a Rv.

## 7.    SPOEDEISEND BELANG

7.1    Bij deze zaak is naar zijn aard spoedeisendheid geboden. Een bodemzaak kan niet worden afgewacht. Iedere dag dat wordt gewacht, neemt in het bijzonder het risico toe dat schade wordt toegebracht aan de waarde van de activa van de ENNIA Groep en dat de CBCS activa van de ENNIA Groep gaat vervreemden. Ook is het van groot belang dat de situatie met de grootste spoed wordt genormaliseerd en daarmee een einde wordt gemaakt aan de voortdurende onzekerheid. Immers, hoe langer de noodregeling van toepassing blijft, hoe groter de kans op onomkeerbare schade.

7.2    De ENNIA Groep wordt op dit moment gehinderd in het voortzetten van haar dagelijkse activiteiten, waardoor waarde verloren gaat. Zoals blijkt uit het persbericht van de CBCS van 15 augustus 2018 (**Productie 12**), wordt dit probleem ook erkend door de CBCS:

> "De CBCS betreurt de onjuiste en tendentieuze berichtgeving in enkele media ten aanzien van ENNIA, welke onterecht reputatieschade veroorzaakt met alle gevolgen van dien voor de onderneming."

7.3    Dergelijke negatieve berichtgevingen zijn het gevolg van de noodregeling en de publiekelijke mededelingen van de CBCS over de ENNIA Groep. Dat is evident in strijd met het belang van de gezamenlijke schuldeisers van de Verzekeraars, dat de CBCS dient te behartigen. Het is in het bijzonder van groot belang dat de onderneming zo spoedig mogelijk weer wordt bestuurd door *professionals* die verstand van zaken hebben en niet door medewerkers van de CBCS die niet de kennis en ervaring hebben om een verzekeraar te besturen. Daarbij is de noodregeling een zware administratieve last en wordt de ENNIA Groep onnodig geconfronteerd met de kosten die met de noodregeling gemoeid zijn.

---

[16]    *Kamerstukken II* 2011/12, 33079 nr. 3, p. 10.

[17]    HR 26 oktober 2012, *NJ* 2013/220 (X/Theodoor Gilissen), r.o. 3.8.2.

**8.    BEVOEGDHEID GERECHT**

8.1    Het Gerecht in Eerste Aanleg van Curaçao is op grond van artikel 95 lid 1 Wetboek van
Burgerlijke Rechtsvordering bevoegd om van dit verzoekschrift kennis te nemen, nu de
CBCS gevestigd is op Curaçao.

**REDENEN WAAROM**

Parman zich wendt tot Uw Gerecht met het verzoek bij vonnis, voor zover mogelijk uitvoerbaar bij
voorraad:

**PRIMAIR**

a)  Met betrekking tot de Verzekeraars en de Niet Gereguleerde Entiteiten:

    i.   de CBCS te bevelen een verzoek ex artikel 61 lid 3 LTV in te dienen tot intrekking
         van de noodregeling binnen één dag gerekend van de datum van het kort
         gedingvonnis of de CBCS te verbieden uitvoering te geven aan de noodregeling; en

    ii.  de reeds in het kader van de noodregeling genomen maatregelen en besluiten te
         schorsen; en

b)  de CBCS te bevelen met Parman in overleg te treden met als doel om binnen een door het
    Gerecht te bepalen termijn een voor alle partijen acceptabele herstructurering van de ENNIA
    Groep overeen te komen,

**SUBSIDIAIR**

In geval de primaire vorderingen onder (a) en (b) worden afgewezen,

c)  uitsluitend met betrekking tot de Niet Gereguleerde Entiteiten:

    iii.  de CBCS te bevelen een verzoek ex artikel 61 lid 3 LTV in te dienen tot intrekking
          van de noodregeling binnen één dag gerekend van de datum van het kort
          gedingvonnis of de CBCS te verbieden uitvoering te geven aan de noodregeling; en

    iv.   de reeds in het kader van de noodregeling genomen maatregelen en besluiten te
          schorsen; en

d)  de CBCS te bevelen om binnen zeven dagen na de datum van het kort gedingvonnis
    schriftelijk uiteen te zetten welke stappen dienen te worden genomen in het kader van de
    herstructurering van de ENNIA Groep, zodat de Verzekeraars weer voldoen aan het vereiste
    solvabiliteitsniveau; en

e)  de CBCS te bevelen dat de herstructurering binnen een door het Gerecht te bepalen termijn
    zal worden geïmplementeerd; en

f)  te verbieden dat de CBCS enige activa van de ENNIA Groep verkoopt en/of overdraagt aan
    een partij of partijen die niet behoren tot de ENNIA Groep; en

g)  de CBCS te bevelen om direct nadat de herstructurering is uitgevoerd, een verzoek ex artikel
    61 lid 3 LTV in te dienen tot intrekking van de noodregeling ten aanzien van de Verzekeraars
    en de Niet Gereguleerde Entiteiten (laatstgenoemde entiteiten uitsluitend in geval de
    vorderingen onder (c) worden afgewezen); en

30

h) te bevelen dat de CBCS zich onthoudt van negatieve berichtgevingen over Parman, de ENNIA Groep en aan hen gelieerde personen; en

i) de CBCS te veroordelen om uiterlijk binnen veertien dagen na betekening van het vonnis afschrift van de Bescheiden te verstrekken aan Parman, waartoe behoren:

  *i.* alle correspondentie en documentatie vanaf 2006 tot heden die verband houden met de aanwijzingen of instructies die de CBCS aan de ENNIA Groep hebben gegeven in het kader van de herstructurering van de ENNIA Groep, van 2009, alsmede van de thans beoogde herstructurering, inclusief maar niet beperkt tot schriftelijke aanwijzingen of instructies, notulen van vergaderingen en correspondentie tussen de CBCS, Parman en/of de ENNIA Groep;

  *ii.* de jaarrekeningen van de Verzekeraars en de Niet Gereguleerde Entiteiten van 2006 tot en met 2017;

  *iii.* alle documentatie vanaf 2006 tot heden, waaronder correspondentie tussen de ENNIA Groep en Parman enerzijds en de CBCS anderzijds, betreffende de *intercompany receivables* van de Verzekeraars en de Niet Gereguleerde Entiteiten, dan wel en de daaraan ten grondslag liggende besluiten, inclusief maar niet beperkt tot schriftelijke aanwijzingen of instructies, notulen van vergaderingen en correspondentie tussen de CBCS, Parman en/of de ENNIA Groep;

  *iv.* bankafschriften van EC Investments die zien op de afgelopen vijf jaar gerekend van de datum van het kort gedingvonnis;

  *v.* alle correspondentie en documentatie die verband houden met alle betalingen die zijn verricht door EC Investments in de periode 2006 tot heden; en

  *vi.* het verzoekschrift tot uitspreken van de noodregeling ten aanzien van EC Holding ingediend door de CBCS op 6 juli 2018,

een en ander op straffe van een dwangsom van ANG 500.000 (zegge: *vijfhonderdduizend Antilliaanse guldens*) per dag dat de CBCS in gebreke blijft aan dit gebod te voldoen, althans een door het Gerecht in goede justitie te bepalen bedrag.

ZOWEL PRIMAIR ALS SUBSIDIAIR

j) een en ander (behoudens het gevorderde onder (i)) op straffe van een dwangsom van ANG 1 miljoen (zegge: *een miljoen Antilliaanse guldens*) per dag dat de CBCS in gebreke blijft aan een of meer van deze veroordelingen te voldoen, met een maximum van ANG 500 miljoen (zegge: *vijfhonderd miljoen Antilliaanse guldens*); en

k) de CBCS te veroordelen tot betaling van de kosten van dit geding, alsmede de nakosten, alles te vermeerderen met de wettelijke rente, voor zover mogelijk, indien deze kosten niet zijn voldaan binnen veertien dagen na betekening van het vonnis.

---

Deze zaak wordt behandeld door mrs. G. te Winkel en F.C. Leijdesdorff, Jones Day, Concertgebouwplein 20, 1071 LN Amsterdam (Postbus 51204, 2007 EE Amsterdam), telefoon: 020 305 4200, fax: 020 305 4201, en mr. A. Bach Kolling, Bach Kolling Mediation & Law, Mahaaiweg 7, Willemstad, Curaçao, telefoon: +599 9 676 3692.

31