Martin J. Bienenstock
Timothy Q. Karcher
David A. Picon
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Counsel to Parman International B.V.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | Chapter 15 |
| **ENNIA Caribe Holding N.V.,**[1] | Case No. 18-12908 (MG) |
| **Debtors in a Foreign Proceeding.** | (Jointly Administered) |

**LIMITED OBJECTION OF PARMAN INTERNATIONAL B.V. TO MOTION OF FOREIGN REPRESENTATIVE FOR ENTRY OF AN ORDER GRANTING CERTAIN DISCRETIONARY RELIEF AND REQUEST FOR ADEQUATE AND SUFFICIENT PROTECTION PURSUANT TO 11 U.S.C. §§ 361 AND 1522**

---

[1] The debtors in these chapter 15 cases, along with each debtor's trade register number, are: ENNIA Caribe Holding N.V. (trade register number 63986) ("ECH"), EC Holding N.V. (trade register number 138313) ("EC Holding"), ENNIA Caribe Leven N.V. (trade register number 36875) ("ECL"), ENNIA Caribe Zorg N.V. (trade register number 51811) ("ECZ"), ENNIA Caribe Schade N.V. (trade register number 63987) ("ECS") and EC Investments B.V. (trade register number 99988) ("ECI") (together with ECH, EC Holding, ECL, ECZ and ECS, "ENNIA Group" or "Debtors"). The mailing address of the lead debtor in these chapter 15 cases, ECH, is John B. Gorsiraweg 6, Willemstad, Curaçao.

i

# TABLE OF CONTENTS

PAGE

**Preliminary Statement**..................................................................................................1

**Jurisdiction and Venue**................................................................................................ 4

**Standing** .......................................................................................................................... 4

**Background** .....................................................................................................................4

    ENNIA Structure and Ownership ............................................................................. 4

    ENNIA's First Restructuring Under Parman ................................................... 5

    ENNIA's Second Restructuring Under Parman.......................................... 6

    Parman's Interest in ENNIA Is At Risk ............................................................... 8

    Commencement of the Chapter 15 Proceedings ......................................... 10

**Objection**.......................................................................................................................11

    The Requested Relief Is Overly Broad ..................................................... 12

    The Requested Relief Does Not Adequately Protect Parman's Interests...................... 14

    The Following Conditions Would Sufficiently and Adequately Protect Parman's Interests ..................................................................... 15

**Conclusion** ...................................................................................................................17

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

*In re Amatex Corp.*,
   755 F.2d 1034 (3d Cir. 1985) ................................................................... 11

*In re Cozumel Caribe, S.A. de C.V.*,
   482 B.R. 96 (Bankr. S.D.N.Y. 2012)...........................................1, 2, 12, 13

*In re Ephedra Prods. Liab. Litig.*,
   349 B.R. 333 (S.D.N.Y. 2006) ..................................................................13

*In re Int'l Banking Corp., B.S.C.*,
   439 B.R. 614 (Bankr. S.D.N.Y. 2010)...........................................12, 13, 14

*In re Irish Bank Resolution Corp. Ltd. (in Special Liquidation)*,
   559 B.R. 627 (Bankr. D. Del. 2016)..............................................................4

*Jaffe v. Samsung Elec. Co., Ltd.*,
   737 F.3d 14 (4th Cir. 2013) .......................................................................13

*In re Johns–Manville Corp.*,
   36 B.R. 743 (Bankr. S.D.N.Y. 1984)...........................................................11

*In re Metcalfe & Mansfield Alt. Inv.*,
   421 B.R. 685 (Bankr. S.D.N.Y. 2010).........................................................13

*In re Ocean Rig UDW Inc.*,
   570 B.R. 687 (Bankr. S.D.N.Y. 2017)...........................................................4

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000) .......................................................................11

*In re Qimonda AG Bankr. Litig.*,
   433 B.R. 547 (E.D. Va. 2010) ....................................................................13

*In re Stone Barn Manhattan LLC*,
   405 B.R. 68 (Bankr. S.D.N.Y. 2009)...........................................................11

*In re Zhejiang Topoint Photovoltaic Co., Ltd.*,
   No. 14-24549 (GMB), 2015 WL 2260647 (Bankr. D.N.J. May 12, 2015).............4, 12

## S<small>TATUTES</small> & R<small>ULES</small>

11 U.S.C. § 105(a) ...................................................................................10

11 U.S.C. § 361 .................................................................................1, 14, 15, 16

11 U.S.C. § 363 .................................................................................1, 14, 15

11 U.S.C. § 363(a) ...................................................................................15

11 U.S.C. § 363(b) ...................................................................................10

11 U.S.C. § 363(e) ...................................................................................14, 15

11 U.S.C. § 1109 ...................................................................................4

11 U.S.C. § 1109(b) ...................................................................................11

11 U.S.C. § 1501 ...................................................................................4

11 U.S.C. § 1520 ...................................................................................10

11 U.S.C. § 1520(a)(1) ...................................................................................14

11 U.S.C. § 1520(a)(2) ...................................................................................14

11 U.S.C. § 1521 ...................................................................................4, 10

11 U.S.C. § 1521(a) ...................................................................................1, 12

11 U.S.C. § 1521(a)(5) ...................................................................................12

11 U.S.C. § 1521(b) ...................................................................................12

11 U.S.C. § 1522 ...................................................................................1, 4, 12, 13

11 U.S.C. § 1522(a) ...................................................................................1, 12, 13, 14, 15

28 U.S.C. § 157 ...................................................................................4

28 U.S.C. § 157(b)(2)(P) ...................................................................................4

28 U.S.C. § 1334 ...................................................................................4

28 U.S.C. § 1410 ...................................................................................4

Fed. R. Bankr. P. 9019 ...................................................................................10

To the Honorable Martin Glenn, United States Bankruptcy Judge:

Parman International B.V. ("Parman"), a party in interest in these chapter 15 cases, respectfully submits this (i) limited objection to the *Motion of Foreign Representative For Entry of An Order Granting Certain Discretionary Relief Pursuant to 11 U.S.C §§ 1521(a) and 1522* [ECF No. 78] (the "Discretionary Motion") and (ii) request for adequate protection of Parman's interests, pursuant to 11 U.S.C. §§ 361, 363, and sufficient protection, pursuant to 11 U.S.C. § 1522(a). In support of the objection and request, Parman respectfully states as follows:

<u>**Preliminary Statement**</u>

1. On July 5, 2018, the Central Bank of Curaçao and St Martin (CBCS) instituted Emergency Regulations with respect to ECL and certain of its affiliates, and thereafter, the funds in the ECL Merrill Lynch account at ECL were frozen by Merrill Lynch.

2. The propriety of the Emergency Regulations is the subject of proceedings currently pending in Curaçao, but this court has *in rem* jurisdiction over the Merrill Lynch accounts.

3. At a hearing on December 12, 2018, this Court asked about the source of the funds in the Merrill Lynch accounts. (12.12.18 Hr'g Tr. at 48:25-49:10; 133:20-134:13.) Citing its own decision in *In re Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96 (Bankr. S.D.N.Y. 2012), this Court questioned whether the situation here was similar. In *Cozumel Caribe*, funds in the United States, belonging to non-debtor entities, were swept up into a Mexican restructuring. The Court concluded that it had *in rem* jurisdiction over the funds and that the non-debtor parties were "sufficiently protected as a temporary matter *as long as the funds remain in the United States*" and directed the foreign representative in that case to seek resolution as to ownership in the foreign jurisdiction. *Id.* at 111.

4.     Parman is not objecting to the release of funds in the ECL account at Merrill Lynch necessary to satisfy medium-term liquidity needs.  The amount on deposit at ECL should be more than sufficient to meet the medium-term liquidity needs of ECL, which are forecasted by the Foreign Representative to be "some 40 million USD by March 31, 2019."  *See Declaration of Leslie-Ann Brodie* (ECF No. 79) ("Brodie Declaration") at ¶ 35.[2]

5.     However, at the December 12 hearing, this Court also questioned its ability to address funds in the Merrill Lynch accounts of un-regulated, unlicensed entities (ECI and ECH) because it was not clear to the Court who owned that money.  The short answer is that ECI owns the money that is not property of ECL.  As demonstrated below, the money and investments in ECI - that is not owing to ECL - belongs to ECI, and is held for the benefit of ECI and ultimately, its shareholder, Parman.  With respect to these funds money, Parman asks that the Court follow its ruling in *Cozumel Caribe* and refrain from granting the requested relief for the time being, until there is greater clarity in Curaçao.

6.     As this Court has rightly pointed out, much of the central activity in this case is occurring in Curaçao, and proceedings in Curaçao are ongoing.  Five days ago, on January 10, 2019, the Court of First Instance of Curaçao heard proceedings regarding whether it was appropriate for the Central Bank of Curaçao to seize the regulated and non-regulated entities (including ECI and ECH).  The Court of First Instance has taken the issue under advisement and a decision is expected by the end of this month.  Pending resolution of those proceedings, Parman respectfully submits it is not appropriate to grant any relief to the Foreign Representative with respect to ECI and ECH – especially in light of the voluntary release funds at ECL sufficient to satisfy medium-term liquidity obligations for the regulated insurance companies.

---

[2] Parman reserves the right to challenge this assertion, but for the purpose of establishing immediate funding needs Parman will use the stated amount asserted by the Foreign Representative.

7.      In light of the pending proceedings in Curaçao, the requested relief with respect to ECI and ECH does not adequately protect the interests of Parman and other non-debtors, and should not be granted at this time.

**Jurisdiction and Venue**

8.      This Court has jurisdiction over this objection and request pursuant to 28 U.S.C. §§ 157 and 1334 and sections 1501, 1521, and 1522 of the Bankruptcy Code, as well as the Amended Standing Order of Reference from the United States District Court for the Southern District of New York dated as of January 31, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).  Venue for this proceeding is proper before this Court pursuant to 28 U.S.C. § 1410.

**Standing**

9.      As a majority shareholder and principal investor in ENNIA, Parman is a "party in interest" under 11 U.S.C. § 1109 and, thus, has standing to file this objection and request for adequate and sufficient protection.  *See In re Ocean Rig UDW Inc.*, 570 B.R. 687, 692 (Bankr. S.D.N.Y. 2017) (relying on the "party in interest" doctrine in analyzing standing in the Chapter 15 context); *In re Irish Bank Resolution Corp. Ltd. (in Special Liquidation)*, 559 B.R. 627, 640-41 (Bankr. D. Del. 2016) (same); *In re Zhejiang Topoint Photovoltaic Co., Ltd.*, No. 14-24549 (GMB), 2015 WL 2260647 at *3 (Bankr. D.N.J. May 12, 2015) (same).

**Background**

ENNIA Structure and Ownership

10.      ENNIA has been operating in Curaçao for 70 years and, through certain of its affiliates, is the largest insurer in the Dutch Caribbean.  (*See Declaration of Abdallah Andraous* (the "Andraous Declaration") [ECF 24-4] at ¶ 2).  Its insurance activities in Curaçao are carried out by three entities, debtors, ECL, ECS and ECZ, each of which is regulated by the CBCS.  *Id.* The regulated insurance entity debtors, along with two non-regulated ENNIA debtor entities, ECI and EC Holding, are each wholly-owned by non-regulated debtor ECH, which in turn is wholly-owned by Parman, a Curaçao company.  *Id.* at ¶ 3, 4.

11.     In or around 2006, Parman, through its wholly owned subsidiary Banco di Caribe ("BdC"), bought ENNIA from Delta Lloyd for a purchase price of USD 67 million. Under Parman's ownership, and implementation of its investment strategy, ENNIA grew its return on capital by investing in U.S.-based opportunities, thereby achieving returns not possible in Curaçao. Initially, these investments were made directly by the regulated insurance companies.

ENNIA's First Restructuring Under Parman

12.     Shortly after the acquisition, the CBCS required ENNIA to restructure. The effect of the restructuring was to remove the investments from the *regulated* insurance companies, and transfer the investments to *un-regulated* investment vehicles. As a result, ENNIA was consensually, and voluntarily, restructured such that the *regulated* insurance entities and BdC are now sister entities, each directly owned by *non-regulated* ECH. ECI, another non-regulated entity, was formed as an investment vehicle for ENNIA. It, too, is directly owned by non-regulated ECH, and is another sister entity to the insurance entities and BdC. This restructuring gave rise to an intercompany receivable, which benefited the regulated insurance entities (i.e., ECL) by shifting risk to non-regulated entities (ECI) and providing a fixed 5% minimum return to the regulated insurance entities as demonstrated below.

13.     In addition to the structural changes discussed above, the non-regulated entities, as borrowers, entered into certain other intercompany loan transactions with ECL, as lender, to provide a fixed return to ECL. Under the loans and related financial arrangements, the regulated insurance entity (ECL) receives a fixed return of *at least* 5% from ECI, an outsized return that far exceeds the rate of return otherwise available in Curaçao. *See Brodie Declaration* at Exhibits I, J, K (loan agreements). Significantly, and as set forth in the Brodie Declaration, there was an Umbrella Agreement in 2011 (*Brodie Declaration* at Exhibit H) pursuant to which any earnings

from the particular investment in excess of the interest owed to the insurance entity (ECL) inure

to the benefit of the non-regulated entity (ECI) and, ultimately, Parman.

14.     The language of the 2011 Umbrella Agreement speaks for itself,

> "In return for the assumption of such responsibility, ECI shall be
> allowed to retain any return on such resources from ECL which may
> exceed 5% per annum."

*Brodie Declaration* at Exhibit H, ¶1.

15.     Further, under the clear and unambiguous language of the Umbrella Agreement,

the 5-year term of the Umbrella Agreement *extends automatically* for an additional five years

unless there has been an express notice, in writing, that the agreement is terminated 90 days prior

to the expiry of the term.  To Parman's knowledge, no such termination notice has been provided.

Accordingly, the Umbrella Agreement (dated June 27, 2011) is in its second 5-year term, and is

valid through June 27, 2021.

16.     The bank accounts through which the funds for these loan transactions, as well as

excess deposits under the Umbrella Agreement, are held at a Merrill Lynch branch office in the

United States.

ENNIA's Second Restructuring Under Parman

17.     The intercompany transactions in which ENNIA has engaged are consistent with

the Investment Strategy agreed to by the CBCS, and were made with the CBCS's knowledge and

approval.   Toward the end of 2015, however, the CBCS amended the solvency guidelines

applicable to the insurance entities such that the insurance entities' intercompany receivables may

no longer be considered in determining their solvency. (*Andraous Declaration* at ¶6)  Of course,

this change in solvency requirements does not mean that the healthy financial condition of the

insurers or their ability to meet their insurance obligations has changed, only that the companies

no longer technically meet the solvency requirements imposed by the CBCS.  This change had the

effect of removing ECL's money-good investments with ECI from the "asset" category for purpose of the changed solvency requirements.

18.     ENNIA immediately started a voluntary restructuring of its assets to meet the new technical solvency requirements imposed by the CBCS. *Andraous Declaration* at ¶7.  It should be noted, however, that the solvency requirements (which is a function of accounting) are unrelated to the asserted liquidity needs at ECL.  Parman has maintained that the technical solvency issues can be addressed through a restructuring of ENNIA, and was working with the CBCS to address these concerns.

19.     After the new solvency requirements were imposed, and through June 21, 2018, ENNIA engaged in multiple discussions with the CBCS concerning the proposed restructuring. *Andraous Declaration* at ¶8, 9. On July 3, 2018, while discussions were ongoing, the CBCS revoked the insurance companies' licenses, enacted the Emergency Regulations, and seized control of the management of not only the regulated insurance companies, but non-regulated entities ECH, ECI, and EC Holding.  This action led Merrill Lynch to freeze all of ENNIA's bank accounts.

20.     The CBCS commenced the Emergency Regulations because of the alleged "dire financial" situation of ECL.  At the time ECL, had a thriving business with ample liquidity.  There were, to Parman's knowledge, no unmet operating expenses and policy holders were being paid in the normal course -- and without the need to access investment accounts at Merrill Lynch.  In short, the proffered solvency concern was only a book accounting test and was not causing any liquidity problem.

21.     The parties are currently engaged in proceedings in Curaçao, pursuant to which Parman is challenging the revocation of the insurers' licenses and seeking revocation or suspension of the Emergency Regulations with respect to all of the entities, and at a minimum, with respect to the non-regulated entities.

22.     Parman's interest in ENNIA is at risk as a result of the Emergency Regulation, and what Parman believes to be mismanagement of the regulated insurance entities and non-regulated entities under CBCS's control.  For example, Parman is informed that since the declaration of the emergency regulation only a few months ago, the value of the assets in the ECI Merrill Lynch account have been diminished by more than USD 55 million.

23.     As noted above, as a result of the Emergency Regulation, the ECI Merrill Lynch account has been frozen so no trading can take place.  The CBCS likely knew in July 2018 (or shortly thereafter), when Merrill Lynch froze the bank accounts that Merrill Lynch, a United States bank, would not act without an appropriate order of a court in the United States.  Nevertheless, the CBCS sat on its hands until September (when it commenced this chapter 15) before seeking such an order and, when the CBCS finally came to the United States, it sought overreaching authority with respect to all the Merrill Lynch accounts; namely, for authority to move all of the accounts offshore and away from the territorial jurisdiction of the United States or to liquidate the accounts when the investment guidance (including the guidance of Merrill Lynch) is to "hold" (or even "buy") the underlying securities in the accounts. (*See Brodie Declaration* at Exhibit AB, indicating Merrill Lynch guidance with respect to the securities.)

24.     Worse, despite invitations from Parman to reengage, the CBCS has refused to meet with Parman and its principals to discuss a plan which would include protecting the assets in these United States accounts, among other things.  All the while, the value in the Merrill Lynch accounts has declined.

25.     As further evidence of the CBCS's mismanagement, never before (at least not since Parman acquired the ENNIA entities) have the insurance entities had to draw upon the Merrill Lynch accounts to meet their obligations.  Indeed, the account statements from Merrill Lynch and

the Year End Financials for ECL indicate that (i) the Merrill Lynch Accounts at ECL never held more than $20 million USD at the year-end in 2013, 2014, 2015, and 2016 and every reported quarter in 2017 (*See Brodie Declaration* at Exhibit L) and (ii), according to the audited financials of ECL (provided in the *Brodie Declaration* at Exhibit AU), ECL showed *positive net income* in 2015 and 2016. The Foreign Representative's insistence that it is now necessary for ECL to avail itself of funds from ECL (or from ECI or ECH) is a strong indication that the insurance company is not being managed well under the CBCS, and has suffered even more damage as a result of the Emergency Regulation.

26. Parman has, on multiple occasions, made clear to the Foreign Representative that it has had no objection to the CBCS having access to the ECL Merrill Lynch accounts, if needed to pay claims and insurance related expenses. The relief the Foreign Representative has sought in this Court (authority to move the money offshore and to take control of and liquidate the ECI and ECH accounts), however, goes far beyond what is necessary to maintain the status quo and ensure ECL's continued solvency, even under the new requirements imposed by the CBCS. This is why Parman's interests are not sufficiently protected.

27. While policyholders may have not made any claim in this Court or in the Court in Curacao, the relief sought by the Foreign Representative in this Court is also contrary to the agreed investment strategy, which provides policyholders at ECL with the benefit of a fixed return of 5% (or more) as set forth in the 2011 Umbrella Agreement.

28. The requested relief would give the CBCS the ability to move all of the assets in the Merrill Lynch accounts out of the United States, including those to which non-regulated entity ECI is entitled, and in which Parman has a vested interest. If the assets were transferred to a bank outside of the United States, the damages to Parman would likely be irreversible. Adequate protection of Parman's interests is therefore necessary, particularly in light of the pending

proceedings in Curaçao challenging the CBCS's control over the management of the ENNIA entities – and the expectation that a decision in Curaçao will be issued at the end of this month.

Commencement of the Chapter 15 Proceedings

29.     On September 25, 2018, the Foreign Representative, in his capacity as the duly appointed foreign representative in the above-captioned chapter 15 cases with respect to the Debtors, commenced the above-captioned chapter 15 cases by filing petitions for recognition of the Foreign Proceeding [ECF No. 1], and contemporaneously a motion for recognition (the "Recognition Motion") [ECF No. 4] with this Court.

30.     At the request of the parties, the Court held a status conference on October 31, 2018.  [*See* ECF No. 19].

31.     On December 2, 2018, the Foreign Representative filed a motion (the "Settlement Motion"), pursuant to sections 105(a), 363(b), 1520, and 1521 of title 11 of the United States Code (as amended from time to time, the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for approval of a settlement and release with respect to certain potential causes of action of the Debtors against Merrill Lynch. [ECF No. 45].

32.     On December 12, 2018, the Court held a hearing to consider the Recognition Motion and the Settlement Motion.

33.     On December 20, 2018, the Court entered its Memorandum Opinion and Order Granting Recognition of a Foreign Main Proceeding. [ECF No. 73]

## **Objection**

34.    As noted above, section 1109(b) of the Bankruptcy Code gives a party in interest standing to "appear and be heard on any issue in a case in this chapter." The term "party in interest" is not defined by the Bankruptcy Code or Rules, but courts construe its meaning broadly "to insure fair representation of all constituencies impacted in any significant way." *In re Johns–Manville Corp.*, 36 B.R. 743, 754 (Bankr. S.D.N.Y. 1984); *In re Stone Barn Manhattan LLC*, 405 B.R. 68, 74 (Bankr. S.D.N.Y. 2009) ("The basic test under section 1109(b) is whether the prospective party in interest has a sufficient stake in the outcome of the proceeding so as to require representation." (internal citations and quotations omitted)). Indeed, the purpose of § 1109(b) was to "confer[] broad standing at the trial level," *In re PWS Holding Corp.*, 228 F.3d 224, 249 (3d Cir. 2000), and to "continue[] in [the] tradition" of "encourag[ing] and promot[ing] greater participation in reorganization cases," *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985). "It is generally understood that a pecuniary interest directly affected by the bankruptcy proceeding provides standing under §1109(b)." *In re Stone Barn*, 405 B.R. at 74 (internal citations and quotations omitted).

35.    Parman has a "pecuniary interest" and a "direct stake" in these proceedings because, as explained above: (1) Parman owns (directly or indirectly) 100% of the shares of ECI, which assets are held in the account to which the Foreign Representative seeks access; (2) Parman has an interest in assuring that the value of the assets held by its direct and indirect subsidiaries is not diminished; (3) the value of shares in the various funds in which ECI was invested have fallen sharply; (4) ENNIA has been unable to liquidate its position in those funds, and; (5) the Foreign Representative has acknowledged its intention to move the Merrill Lynch accounts, including ECI's account offshore – *away from the territorial jurisdiction of the United States.*

36.     The Foreign Representative may also seek to move other assets in which Parman has an interest (assets held by non-regulated entities) away from the United States jurisdiction. Thus, Parman has standing to be heard on the issue of relief, lest its interests would otherwise lack representation.

37.     For the same reasons, Parman is also an "interested entity" under 11 U.S.C. § 1522(a). *See In re Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 108 (Bankr. S.D.N.Y. 2012) (Glenn, J.) (noting that the purpose of § 1522(a) is "to ensure a balance between the relief that may be granted to the foreign representative and the *interests of the persons potentially affected by such relief* (emphasis added; internal quotations marks and citations omitted)); *In re Int'l Banking Corp., B.S.C.*, 439 B.R. 614, 626 (Bankr. S.D.N.Y. 2010) (noting that bankruptcy courts must balance the interests of the "persons that may be affected" by the relief pursuant to section 1522); *see also In re Zhejiang Topoint Photovoltaic Co., Ltd.*, No. 14-24549 (GMB), 2015 WL 2260647 at *3 (Bankr. D.N.J. May 12, 2015) (commenting that "courts' intentional usage of the word, 'persons,' rather than the word, 'creditors,' implies that § 1522(a) is to be construed broadly").

The Requested Relief Is Overly Broad

38.     Following the Court's entry of an order granting recognition, the Court may, under appropriate circumstances, grant the Foreign Representative relief regarding the Debtors' U.S.-based assets. 11 U.S.C. § 1521(a). Such relief could include "entrusting the administration" or "entrust[ing] the distribution" "of all ***or part*** of the debtor's assets . . . to the foreign representative." *Id.* § 1521(a)(5), (b) (emphasis supplied). The use of the term "or part" in the statute is indicative of this Court's ability to appropriately tailor relief to protect the interests of the non-debtors. For example, to the extent the requested relief would needlessly permit distribution or transfer of the funds outside of the United States, or to accounts at banks outside of the United States – and outside of the jurisdictional reach of this, or any other, United States Court,

the Court may construct a remedy that does not leave Parman without protection of its interests in the accounts, assets, and investments of the non-regulated entities: ECI, EC Holding, and ECH.[3]

39.     Post-recognition "relief is largely discretionary and turns on subjective factors that embody principles of comity." *In re Metcalfe & Mansfield Alt. Inv.*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010) (citation omitted); *see also In re Ephedra Prods. Liab. Litig.*, 349 B.R. 333, 334-35 (S.D.N.Y. 2006) (observing that "[u]pon the recognition of a foreign proceeding," the court had discretion to grant "any appropriate relief" "necessary to effectuate the purpose of this chapter").

40.     Pursuant to 11 U.S.C. §1522(a), a court may grant relief "only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." *See In re Cozumel Caribe*, 482 B.R. at 108 ("[T]o ensure a balance between the relief that may be granted to the foreign representative and the interests of the persons potentially affected by such relief . . . Section 1522 gives the bankruptcy court broad latitude to mold relief to meet specific circumstances."); *In re Int'l Banking Corp.*, 439 B.R. at 626 ("[T]he idea underlying [§ 1522] is that there should be a balance between relief that may be granted to the foreign representative and the interests of the persons that may be affected by such relief." (citation omitted)); *see also Jaffe v. Samsung Elec. Co., Ltd.*, 737 F.3d 14, 27-28 (4th Cir. 2013) (section 1522(a) analysis requires "balancing of the respective interests based on the relative harms and benefits"); *In re Qimonda AG Bankr. Litig.*, 433 B.R. 547, 557-58 (E.D. Va. 2010) (explaining how a court considering discretionary relief should "tailor relief and conditions so as to balance the relief granted to the foreign representative and the interests of those affected by such relief, without unduly favoring one group of creditors over another") (emphasis omitted).

---

[3] The Court should bear in mind that Parman has indicated it has no objection to the Foreign Representative's access to the Merrill Lynch Leven account at ECL necessary to meet the stated medium-term liquidity concerns.

41.     Here, there is no protection, much less "sufficient protection" or "adequate protection," afforded to Parman if the requested relief is granted.  Granting the relief requested by the Foreign Representative would irreparably harm Parman's interests because assets (in the form of Merrill Lynch bank accounts) held by ECI, a subsidiary of which Parman owns (directly or indirectly) 100% of the shares, which assets are in the United States, would be subject to being permanently and irrevocably transferred away from ECI by a Foreign Representative whose tenure and authority in Curaçao are in still question.  Indeed, on January 10, 2019, the Court in Curaçao held a hearing to determine whether, among other things, the Emergency Regulations could apply to non-regulated entities – such as ECI and ECH.  A decision with respect to this proceeding is expected by the end of the month.

42.     Parman has an interest in assuring that the value of the assets held by its direct and indirect subsidiaries is not diminished or dissipated.  A balancing of the interests of Parman and the Foreign Representative weighs decisively against granting the Foreign Representative permission to transfer the ECI funds and assets outside of the United States because such transfer would severely prejudice the interests of Parman.

The Requested Relief Does Not Adequately Protect Parman's Interests

43.     For the same reasons, any relief that permits the transfer of the ECI funds and assets outside of the United States also fails to provide *adequate* protection to Parman's interests as required by 11 U.S.C. §§ 361 and 363, made applicable to Chapter 15 post-recognition proceedings by Section 1520(a)(1)-(2) of the Bankruptcy Code.  *See In re Int'l Banking Corp.*, 439 B.R. at 627 (equating "sufficient protection" under § 1522(a) with "adequate protection" under §§ 361 and 363).

44.     Section 363(e) of the Bankruptcy Code provides:

Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. . . .

11 U.S.C. § 363(e).

45.    Section 363(a) of the Bankruptcy Code provides:

In this section, "cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

46.    As explained above, Parman has an interest in ECI's funds because Parman has an interest in assuring that the assets held by its wholly-owned direct and indirect subsidiaries are not diminished, irreversibly squandered, or moved permanently outside the territorial jurisdiction of the United States, in contravention of the 2006 agreement between Parman and the Central Bank and the 2011 Umbrella Agreement.  To this end, and because Parman and the Debtors share an interest in the property held by ECI (including the Merrill Lynch accounts), Parman is entitled to adequate protection of that interest.

The Following Conditions Would Sufficiently and Adequately Protect Parman's Interests

47.    Pursuant to 11 U.S.C. §§ 361, 363, and 1522(a), this Court may grant Parman adequate and sufficient protection, thereby ensuring that Parman's interests in ECI are preserved. Notably, Section 361 of the Bankruptcy Code states that:

When adequate protection is required under section . . . 363 . . . of an interest of an entity in property, such adequate protection may be provided by . . .

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title . . . as will result in the realization . . . of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

48.     Of course, Parman has an interest in ECL remaining healthy and paying its obligations.  In order to provide adequate and sufficient protection of Parman's interests, this Court should:

(i)     Grant the requested relief with respect to ECL, to the extent necessary to meet Foreign Representative's alleged $40 million medium-term liquidity needs;

(ii)     Order an accounting of each of the Debtors;

(iii)     Order and direct the Foreign Representative, CBCS, and Parman to confer regarding a protocol for the parties' joint administration of the assets in the ECI Merrill Lynch account ("ECI Account Joint Administration Protocol") and other matters outstanding between the parties;

(iv)     In the event the Foreign Representative, CBCS, and Parman cannot agree on an ECI Account Joint Administration Protocol, refer the parties to mediation to determine appropriate access to and administration of the assets in the ECI Merrill Lynch account; and

(v)     We further respectfully request that this Court not issue any order until after January 31, 2019 to permit the Court in Curacao to issue its decision which may moot issues before this Court.

## Conclusion

For the reasons set forth herein, Parman respectfully requests that this Court enter an order conditioning the Foreign Representative's access to and use of the Merrill Lynch assets and funds upon the Foreign Representative providing adequate and sufficient protection of Parman's interests in the form requested above, and such other and further relief as the Court deems just and proper.

Dated:  January 15, 2019
        New York, NY

**PROSKAUER ROSE LLP**

By: _/s/ Timothy Q. Karcher_

Martin J. Bienenstock
Timothy Q. Karcher
David A. Picon
Eleven Times Square
New York, New York 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

_Counsel to Parman International B.V._